# IN THE COURT OF COMMON PLEAS
# FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| MILTON RUDI,<br>Derivatively and on Behalf of Nominal<br>Defendant L BRANDS, INC.,<br>532 Susan Road<br>Saint Louis, MO 63129, | ) ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| LESLIE H. WEXNER<br>c/o L Brands, Inc.<br>Three Limited Parkway<br>Columbus, OH 43230, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| EDWARD RAZEK<br>245 N. Drexel Avenue<br>Columbus, OH 43209, | ) ) ) ) | |
| DAVID T. KOLLAT<br>4410 Smothers Road,<br>Westerville, OH 43081, | ) ) ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| L BRANDS, INC.<br>Three Limited Parkway<br>Columbus, OH 43230, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Milton Rudi ("Plaintiff"), by and through his undersigned counsel, hereby submits

this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of Nominal

Defendant L Brands, Inc. ("L Brands" or the "Company") against certain current and former

members of the L Brands Board of Directors (the "Board") and certain other current and former

executive officers (collectively, "Defendants") for breaching their fiduciary duties.

**EXHIBIT**

**A**

exhibitsticker.com

Plaintiff makes these allegations upon personal knowledge, as to the facts of his ownership of L Brands stock, and upon the investigation of counsel, which included review and analysis of: (a) public filings made by L Brands, other related parties, and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by the Company, Defendants, and other related non-parties; (c) news articles, stockholder communications, and postings on L Brands's website concerning the Company's public statements; (d) the proceedings in related civil litigation; and (e) other publicly available information concerning L Brands and Defendants.

## INTRODUCTION AND SUMMARY OF CLAIMS

1.      This shareholder derivative action arises out of Defendants' major breaches of their fiduciary duties in failing to diligently, consistently, and disinterestedly serve the interests of L Brands.  Defendants allowed and enabled L Brands to develop a hostile abusive environment rife with sexual harassment, ultimately erupting into a series of scandals that irreparably harmed the long-time cornerstone of the Company, Victoria's Secret, destroying the Company's goodwill, and making it impossible to either fix the Victoria's Secret business, or sell it off for anywhere near its true value.

2.      The two main subsidiaries of L Brands are Victoria's Secret and Bath & Body Works, LLC ("Bath & Body Works").  Bath & Body Works, which focuses on soaps and other bathroom accessories, has found tremendous success in recent years.  By contrast, Victoria's Secret has struggled to keep up with evolving consumer preferences.

3.      Under activist stockholder pressure, L Brands has looked to spin off Victoria's Secret, so that it could focus on growing Bath & Body Works.  But effecting this spinoff has been difficult because Victoria's Secret is no longer a desirable corporate target, due, in large part, to the toxic culture perpetrated and condoned by Defendants.

4.     L Brands's long-time Chief Marketing Officer ("CMO"), Defendant Edward Razek ("Razek"), who retired in August 2019, presided over a culture of harassment and allegedly personally harassed and even assaulted women associated with the Company.[1] Razek ruled with impunity as Defendant Leslie H. Wexner's ("Wexner") right-hand man.  Employees or models who raised complaints about Razek to human resources ("HR") or to Wexner found that their complaints fell on deaf ears.

5.     In August 2019, one of L Brands's highest-ranking female executives, Monica Mitro ("Mitro"), Executive Vice President ("EVP") of Public Relations for Victoria's Secret, raised complaints to then-Board director Defendant David T. Kollat ("Kollat").[2]  Instead of receiving a constructive response, the very next day Mitro was placed on administrative leave by the head of HR and locked out of the building.  Shortly thereafter, Mitro left the Company under the terms of a confidential settlement.

6.     The culture of harassment and predation at Victoria's Secret was reinforced after public reports emerged about the relationship between Wexner and convicted sex predator Jeffrey Epstein ("Epstein").  These reports show that Wexner took a laissez-faire approach to oversight in contravention of his fiduciary duties as an officer of the Company.  The reports not only revealed that Epstein would use his connections to prey on models, who thought he had hiring power at Victoria's Secret, but he also possibly misappropriated Company assets, such as having the Company sell him a plane for $10 million.

---

[1]     Jessica Silver-Greenberg, et al., *'Angels' in Hell: The Culture of Misogyny Inside Victoria's Secret*, N.Y. TIMES (Feb. 1, 2020; updated Feb. 3, 2020), https://www.nytimes.com/2020/02/01/business/victorias-secret-razek-harassment.html ("*'Angels' in Hell*").

[2]     James B. Stewart, *A Top L Brands Executive Complained of Harassment. Then She Was Locked Out.*, N.Y. TIMES (Feb. 3, 2020; updated Feb. 20, 2020), https://www.nytimes.com/2020/02/03/business/victorias-secret-l-brands-leslie-wexner.html ("*A Top Executive Complained*").

7.     Defendants, as direct participants in the wrongdoing, and as the top echelon of the Company, set the tone for the broken culture at Victoria's Secret and the Company at large. Their misconduct contributed to a cratering in the value of the Victoria's Secret business, creating a paradox: because of Defendants' actions, Victoria's Secret was a huge drag on the Company as a whole, making divestment of the business a necessity, but the fundamental problems at Victoria's Secret made divestment at anything short of a fire sale impossible.

8.     On February 6, 2020, Plaintiff sent a pre-suit litigation demand to the Board (the "Demand"), setting forth the facts concerning Defendants' actions leading to the destruction of the value of Victoria's Secret and the broader impact on L Brands. In the Demand, Plaintiff requested that the Board form a Special Committee to investigate Defendants' wrongdoing, pursue litigation against them, if appropriate, and enact several corporate governance reforms that would prevent similar wrongdoing from occurring in the future.

9.     On February 12, 2020, the Corporate Secretary for L Brands sent an e-mail to Plaintiff's counsel, indicating receipt of the Demand and stating that the Board would consider it in due course. On March 12, 2020, counsel for L Brands sent a letter to Plaintiff's counsel which, among other things, repeated that the Board would consider the Demand in due course.

10.    On April 3, 2020, Plaintiff sent a supplemental litigation demand to the Board (the "Supplemental Demand"). The Supplemental Demand noted the public announcement of the proposed spinoff of Victoria's Secret that transpired after the initial Demand was sent. The Supplemental Demand expressed concern that the proposed deal did not properly value Victoria's Secret, or conversely, locked Company shareholders into a 45% share of a failing asset. The Supplemental Demand requested that the Board investigate the good faith of the Company's two Transaction Committee members in recommending the proposed spinoff to the Board as in the

best interest of L Brands. The Supplemental Demand also requested that the Board conduct a fact-gathering investigation to assess the potential value of the litigation asset.

11. Plaintiff has not received any communication from L Brands or its counsel since the Supplemental Demand was sent.

12. Given L Brands's refusal to form a Special Committee to investigate Defendants' wrongdoing, the Demand has been constructively refused. Plaintiff therefore brings this action derivatively on behalf of L Brands against Defendants for breaching their fiduciary duties to L Brands and its stockholders. Through this action, Plaintiff seeks damages on behalf of L Brands.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to the Ohio Constitution, Art. IV, §4.04 and O.R.C. §2305.01 because the matter in dispute exceeds the exclusive original jurisdiction of county courts.

14. This Court has personal jurisdiction over each Defendant named herein because each Defendant conducted business in, resided in, and/or was a citizen of Ohio at the time of the events described herein.

15. Venue is proper in this forum pursuant to OH Civ.R. 3(C)(2) because Nominal Defendant L Brands has a principal place of business within Franklin County, Ohio.

## PARTIES

### A. Plaintiff

16. Plaintiff Milton Rudi is a current stockholder of L Brands, has continuously held L Brands stock at all relevant times, and will continue to hold L Brands stock throughout the pendency of this action. Plaintiff will adequately and fairly represent the interests of L Brands and its stockholders in enforcing its rights.

### B.    Nominal Defendant

17.    Nominal Defendant L Brands is a Delaware corporation with its principal place of business located at Three Limited Parkway, Columbus, OH 43230.  L Brands's common stock is traded on the NYSE exchange under the ticker symbol "LB."

### C.    Individual Defendants

18.    Defendant Wexner founded the Company and has served as its Chief Executive Officer ("CEO") and a director since 1963 and as Chairman of the Board since 1967.

19.    Defendant Razek joined the Company in 1983 and served as CMO of the Company until his retirement in August 2019.

20.    Defendant Kollat served as a director on the Board from 1976 until May 2019. From 2015 until 2017, Defendant Kollat served as the Chair and a member of the Compensation Committee and as a member of the Audit, Nominating and Governance, and Finance Committees. Defendant Kollat served as an advisor to the Compensation Committee upon his retirement from the Board.

## DUTIES OF THE DEFENDANTS

### A.    The Fiduciary Duties of the Defendants

21.    By virtue of their positions as past or present directors and/or officers, and by virtue of their ability to control the business and corporate affairs of L Brands, each Defendant owed and owes L Brands and its stockholders fiduciary obligations of trust, loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  Defendants were, and are, required to act in furtherance of the best interests of L Brands and its stockholders, so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

22.     Each Defendant owes to L Brands and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, use and preservation of its property and assets, and highest obligations of fair dealing.

23.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and the Company and was at all times acting within the course and scope of such agency.

24.     By virtue of their fiduciary duties of loyalty, good faith, trust, and candor, each Defendant was required to, among other things:

(a)     exercise good faith to ensure that L Brands's affairs were conducted in an efficient business-like manner;

(b)     exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and contractual obligations, including acting only within the scope of its legal authority;

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

(d)     remain informed as to how the Company conducted its operations and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

**B.      L Brands's Corporate Governance Guidelines and Code of Conduct Impose Additional Responsibilities**

25.     The Corporate Governance page on L Brands's investor relations website contains links to several corporate governance documents and sets out what should be L Brands's

governance philosophy and standards that apply to each and every director, officer, and employee

of L Brands, including Defendants.

26.     L Brands's "Governance Overview" provides as follows:

L Brands has long been recognized as a values-based organization. ***We are committed to building a culture that fosters mutual respect, open communication and sharing***. As an enterprise, we have chosen to live our professional lives by this philosophy… we consistently try to do what's right. ***This behavior manifests itself in how we treat each other***, how we treat customers and how we support the communities in which we live and work.[3]

[Emphasis added.]

27.     L Brands's "Our Values" page provides as follows:

At L Brands, we are guided in our work and our interactions with others by four core principles – our values. These are the same beliefs that have made us successful since our start in 1963. They are:

                              *   *   *

- **It matters how we play the game.**
  *Doing what is right means following our beliefs – and the rules – when no one is watching. Winning means nothing unless how we get there is fair, collaborative, rooted in our values and contributes to the greater good.*

Our values are at the heart of every thing we do. They're a connection to our history and a guide for our future. And they're the measure of success for how we do things today.[4]

28.     Moreover, every director and officer of L Brands was, and is, required to comply

with the Company's Code of Conduct (the "Code").  The Code begins with a letter from Defendant

Wexner that makes clear that each director, officer, and employee is held to a high standard of

ethical behavior from the outset: "Our values are the measure of success for **HOW** we do things,

---

[3]     *Governance Overview*, L BRANDS, INC., https://lb.gcs-web.com/governance/governance-overview (last visited May 1, 2020).

[4]     *Our Values*, L BRANDS, INC., https://lb.gcs-web.com/governance/values (last visited May 1, 2020).

and we hold each other accountable for living them each day."[5]  One of the core values listed

emphasizes the importance of personal ethical behavior:

> **It matters how we play the game.** Doing what is right means following our beliefs — and the rules — even when no one is watching. Winning means very little unless how we get there is fair, collaborative, rooted in our values and contributes to the greater good.  (*Id.*)

29.  The Code's "Commitment and Accountability" section has additional basic tenets,

as well as more specific duties, for L Brands employees and senior personnel:

> **We follow the basic guidance of our Code of Conduct: Do what's right.**
>
> **Leading with Values**
>
> We are committed to living by our values, doing what's right and acting with integrity everywhere we do business regardless of the circumstances. Each of us has the responsibility to understand and follow the Code and other company policies. We follow the law in all countries where we do business. Violations will result in disciplinary action up to and including termination of employment.
>
> Managers and senior leaders have additional duties:
>
> - lead by example;
> - ensure your teams understand and follow the Code and complete all training;
> - create an open environment so associates can ask questions and raise concerns;
> - actively support and follow the no retaliation policy;
> - take quick corrective action where appropriate; and
> - get help from Human Resources or the Office of the Chief Compliance Officer when needed.
>
> \* \* \*
>
> **Our Open Communications Advantage**
>
> \* \* \*
>
> As part of our commitment to you, associates are assured:
>
> - equal opportunity and treatment;
> - career-advancement opportunities;

---

[5] *Code of Conduct: Letter from the Chairman*, L BRANDS, INC. https://www.lb.com/associates/our-code-of-conduct (last visited May 1, 2020).

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 May 19 10:58 AM-20CV003916

- equitable and competitive wages;
- excellent benefits;
- open and honest communication; and
- a rewarding and safe work environment.

Our open door policy has always meant associates could address issues honestly with anyone – at any level.

**Getting Help and Sharing Concerns**

The Code cannot anticipate every situation. But, most problems can be avoided by checking the Code, using good judgment and asking for help.

**No Retaliation**

In no event will any associate be subject to reprisals, retribution or any career disadvantage for raising a concern. We strictly prohibit retaliation for reporting under the Code. Anyone who retaliates (or tries to retaliate) will be subject to disciplinary action up to and including termination of employment.[6]

30.     The Code's "You and the Workplace" section lays out the employees' right to a

workplace free of harassment and discrimination.  Specifically, the Code states:

**We provide a harassment-free workplace with equal employment opportunities.**

**Equal Opportunity and No Discrimination or Harassment**

We treat everyone with respect and dignity. We are an equal opportunity employer. We do not base employment-related decisions on an individual's race, color, religion, gender, gender identity, national origin, citizenship, age, disability, sexual orientation, marital status or any other legally protected status under applicable laws.

We also do not tolerate discrimination or harassment. It doesn't matter if the conduct is in person, shared electronically or occurs off company property or off-the-clock. Harassment may include slurs and any other offensive remarks, jokes and other verbal, non-verbal, sexually oriented, graphic, written or electronic comments or physical conduct.[7]

---

[6]     *Code of Conduct: Commitment and Accountability*, L BRANDS, INC., https://www.lb.com/associates/our-code-of-conduct/our-commitment-and-accountability (last visited May 1, 2020).

[7]     *Code of Conduct: You and the Workplace*, L BRANDS, INC., https://www.lb.com/associates/our-code-of-conduct/you-and-the-workplace (last visited May 1, 2020).

31. The Company also provides assurances for personnel who report violations of the Code:

> If you see something that you think is wrong, don't worry about the repercussions of sharing it. In no event will you or any Associate be subject to reprisals, retribution or any career disadvantage for complying with the reporting or other requirements of this Code. Company policy strictly prohibits any retaliation for reporting under this Code.[8]

32. The Company also lays out consequences for violating the Code – and states that no waivers of the Code are available for directors and executive officers without action of the Board or the Audit Committee, with requisite disclosure:

**Consequences for Violations of Our Code**

> All violations of our Code- no matter how trivial they may seem at the time - are harmful to the interests of the Company and will be treated accordingly. Associates who violate the Code are subject to disciplinary action up to and including termination of employment. The following are examples of conduct that may result in discipline under this Code:
>
> - Actions that violate a Company policy.
> - Requesting or permitting others to violate a Company policy.
> - Failure to promptly report a known or suspected violation of a Company policy.
> - Failure to cooperate with Company investigators or auditors.
> - Retaliation against another Associate or third party for reporting a policy violation or cooperating with a Company investigation.
> - For managers and supervisors, failing to use reasonable care to prevent or detect a violation or otherwise failing to demonstrate the leadership and diligence necessary to ensure compliance with Company policies.
>
> The Company will waive application of the policies set forth in this Code only where circumstances warrant granting a waiver. Waivers of the Code for directors and executive officers may be made only by the Board of Directors as a whole or the Audit Committee of the Board and will be disclosed as required by law or regulation. (*Id.*)

---

[8] *Code Violations & Reporting*, L BRANDS, INC., https://lb.gcs-web.com/governance/code-violations-reporting (last visited May 1, 2020).

33.     The Company also has a dedicated Civility and Anti-Harassment Policy, which

emphasizes and expands upon certain provisions in the Code:

**Unwelcome Conduct: Harassment, Discrimination and Bullying**
While each situation must be evaluated on its own specific circumstances, for
purposes of this policy examples of harassment or discrimination include any of the
following:

- Giving unwanted sexual attention to others – colleagues, customers, vendors, contractors, and other business partners or third parties.
- Offering a workplace benefit in exchange for sexual conduct or giving work-related rewards for sexual conduct.
- Sexually explicit or suggestive comments or behavior.
- Sexual joking, storytelling, and the like.
- Repeated requests for dates.
- Comments, cartoons, jokes, emails, texts, social media posts or other communications that include degrading, insulting, or insensitive content or assumptions concerning any individual's race, color, religion, gender, gender identity, national origin, citizenship, age, disability, sexual orientation, marital status or any other protected status under applicable laws.
- Verbal, non-verbal, visual, or physical behavior that makes another person feel intimidated, offended or uncomfortable.
- Slurs and other offensive remarks.
- Joining in when others are harassing or discriminating against another person.

In addition to discrimination or harassment, bullying is another form of incivility
and disrespectful behavior that can range from minor incidents to serious ones and
will not be tolerated. Bullying typically involves repeated actions intended to
intimidate, harass, degrade, or offend. Bullying can be verbal, nonverbal,
psychological, or physical. For the most part, we usually know a bully when we see
one in action. But for illustration, here are some examples of bullying that
undermine our commitment to treat everyone with respect and dignity and violate
company policy:

- Demeaning a colleague, particularly in front of others.
- Personal attacks (angry outbursts, name-calling, and the like).
- Physical intimidation.
- Encouraging others to turn against
- or "gang up on" a targeted co-worker or groups of co-workers.
- Pressuring someone to do or say something they don't want to.
- Sabotaging another's work product or deliberately undermining their work performance.
- Behavior that is malicious, hostile, or offensive.

Behavior that would be unacceptable at work is also unacceptable off-the-clock.
Harassing, bullying, discriminating against or otherwise disrespecting a colleague,

customer, vendor, contractor, or business partner electronically, off company property or off-the-clock, is also prohibited. While the company respects your privacy, if you violate our Code or this policy you may be subject to disciplinary action up to and including termination regardless of when or where that conduct occurs.[9]

34.      The Civility and Anti-Harassment Policy also re-emphasizes the protections given

to people who report violations of the policy:

**Speak Up: Doing What's Right**
The company strongly recommends the prompt reporting of all perceived incidents of harassment, discrimination or bullying by anyone experiencing or observing them. The company offers many ways to ask a question relating to harassment, discrimination or bullying, or to report a possible violation of this policy. Under our Open Door policy, if you see something that you think is wrong, you are encouraged to raise it to your manager, next level manager, Human Resources partner, the Ethics Hotline (www.lb.ethicspoint.com) or the Ethics Office (ethics@lb.com). Managers are required to report any complaints that they receive to their HR partners.

Any customers, vendors, contractors, or other business partners who believe they have been subjected to harassment, discrimination, or bullying should raise the incident to any member of the Human Resources Department, the Ethics Hotline (www.lb.ethicspoint.com), or the Ethics Office (ethics@lb.com).

The company will promptly investigate each report and the investigation will be conducted by an impartial individual. All such reports will be kept confidential to the extent reasonably possible and permissible.

Under our Code, we strictly prohibit retaliation for reporting concerns. Anyone who retaliates or tries to retaliate against an individual who raises a concern in relation to this policy or who participates in the investigation, will be subject to disciplinary action up to and including termination of employment.  (*Id.*)

---

[9]      *Civility and Anti-Harassment Policy*, L BRANDS, INC., https://lb.gcs-web.com/civility-and-anti-harassment-policy (last visited May 1, 2020).

## SUBSTANTIVE ALLEGATIONS

### A.  Victoria's Secret – L Brands's Billion-Dollar Albatross

35.     L Brands was founded in 1963 in Columbus, Ohio, by Defendant Wexner, moving over time from an apparel-based specialty retailer to focus on women's intimate and other apparel, personal care, beauty, and home fragrance products.[10]

36.     L Brands, as led by Defendant Wexner, spearheaded the growth of several leading American retailers, including The Limited, Abercrombie & Fitch, Victoria's Secret, and Bath & Body Works.  At various points, L Brands contained a portfolio of a large number of different retail brands, but over the last decade has spun off most of them.  Its two main remaining subsidiaries are Victoria's Secret and Bath & Body Works.  Bath & Body Works, which focuses on soaps and other bathroom accessories, has found tremendous success in recent years.  By contrast, Victoria's Secret – while still a well-known brand with billions of dollars in annual sales – has struggled to keep up.

37.     Under activist stockholder pressure, L Brands has looked to spin off Victoria's Secret, so that it could focus on growing Bath & Body Works.  But effecting this spinoff has been difficult because Victoria's Secret is no longer a desirable corporate target – a result, in part, of failing to keep up with changing consumer tastes, but in large part due to a toxic culture of bullying, harassment, and retaliation perpetrated and condoned by top executives at the Company, including Defendants.

38.     The toxic culture centered at Victoria's Secret has led to tremendous business harm to L Brands as the systemic problems lead to reluctance by potential buyers to engage.  This harm

---

[10]     *See* L Brands, Inc., Annual Report at 1 (Form 10-K) (Mar. 30, 2020).

drags down both the Company and its stockholders by making it impossible for the Company to sell one of its marquee assets at anything approaching market value – if at all.

**B.     The Leadership at L Brands Created and Allowed a Toxic Culture to Fester at the Company for Years**

39.     L Brands's long-time CMO, Defendant Razek, who retired in August 2019, presided over a toxic culture and allegedly personally harassed and even assaulted women associated with the Company.[11]  Razek was understood to be Wexner's right-hand man and, therefore, was feared.  Yet, despite this fear, various employees or models raised complaints about Razek to HR or to Wexner, but those complaints fell on deaf ears.  Indeed, Wexner himself was heard to make demeaning remarks about women.

40.     Others who complained suffered from retaliation, as Victoria's Secret stopped hiring them for future engagements.  The *New York Times* (the "*Times*") quoted a former public relations employee, Casey Crowe Taylor ("Crowe Taylor"), who stated on the record: "'What was most alarming to me, as someone who was always raised as an independent woman, was just how ingrained this behavior was[.] . . . This abuse was just laughed off and accepted as normal. It was almost like brainwashing. And anyone who tried to do anything about it wasn't just ignored. They were punished.'"  *Id.*

41.     In another quote on the record, Alyssa Miller, a Victoria's Secret model, described Razek "as someone who exuded 'toxic masculinity'" and summed up his attitude toward models as "'I am the holder of the power. I can make you or break you.'"  *Id.*  And another Victoria's Secret model, Andi Muise, described in detail how Razek tried to kiss her without her consent, pestered her with intimate e-mails, including suggesting that they move in together, and asked her to come to his home for a private dinner.  *Id.*  But after she politely declined his advances, she

---

[11]     *'Angels' in Hell*, *supra* n.1.

suddenly stopped being invited to participate in the Victoria's Secret fashion show for the first time in four years – a clear sign of retaliation. *Id.*

42.     Moreover, the *Times* reported that there were over a dozen HR complaints against Razek, from allegations ranging from verbal abuse, to lewd comments, to unwanted touching and groping of models.  Yet, apparently nothing was ever done with these complaints.

43.     Even after Razek retired in August 2019, one of L Brands's highest-ranking female executives, Mitro, EVP of Public Relations for Victoria's Secret, raised complaints to then-Board director, Defendant Kollat.[12]  Instead of receiving a constructive response, the very next day Mitro was placed on administrative leave by the head of HR and locked out of the building.  Shortly thereafter, late last year, Mitro left the Company under the terms of a confidential settlement.

44.     Razek's behavior was exacerbated by behavior by others involved with Victoria's Secret.  Razek's son was also accused of mistreatment of a female colleague at Victoria's Secret; rather than fire him for cause, the Company merely transferred him to Bath & Body Works.

45.     Epstein, who at one point was Wexner's financial advisor, posed as a recruiter for Victoria's Secret models and, in that guise, assaulted several women.  A photographer, Russell James ("James"), would convince Victoria's Secret models to pose nude.  Then in 2014, James sold a book of these nude photographs, for which he, through a lawyer, claimed he had prior consent.  James's book described itself as a "voyeuristic journey."  Furthermore, James convinced women to attend parties where at least one woman, on the record, thought they were being treated as "high-end prostitutes."  And over the summer, over 100 models called out Victoria's Secret for

---

[12]     *A Top Executive Complained, supra* n.2.

employing photographers Timur Emek, David Bellemere, and Greg Kadel, who have also been accused of sexual misconduct.[13]

46.    Beyond the allegations of individual misconduct, according to the *Times*, six current and former executives discussed how they had tried to steer the Company away from its overtly sexualized marketing and three were subsequently forced to leave the Company.[14]

47.    The reports of a misogynistic culture at Victoria's Secret come as no surprise, unfortunately, because earlier reports about the relationship between Defendant Wexner and Epstein show that Wexner took a laissez-faire approach to oversight in contravention of his fiduciary duties as an officer of the Company.  Previous reports not only revealed that Epstein would use his connections to prey on models, who thought he had hiring power at Victoria's Secret, but he also possibly misappropriated Company assets, such as having the Company sell him a plane for $10 million.[15]

48.    While the Board retained outside counsel to conduct an investigation into Wexner's ties with Epstein, the Board has, to date, not disclosed what results, if any, came out of the probe.  Some reports indicate that the investigation remains ongoing.  But there is reason to doubt that the investigation is truly independent because the counsel retained, Davis Polk and Wardwell LLP ("DPW"), has been the Company's long-time counsel.  The Company's ties to DPW lay deeper than a mere business relationship: recently retired Board member and Wexner's financial advisor,

---

[13]    Lindsay Weinberg, *100 Models and Time's Up Sign Petition for Victoria's Secret to Fight Sexual Harassment*, THE HOLLYWOOD REPORTER (Aug. 6, 2019, 9:30 AM PDT), https://www.hollywoodreporter.com/news/100-models-times-up-sign-petition-victorias-secret-fight-sexual-harassment-1229644.

[14]    *'Angels' in Hell*, *supra* n.1.

[15]    Gregory Zuckerman and Khadeeja Safdar, *Epstein Flourished as He Forged Bond With Retail Billionaire*, WALL ST. J. (July 12, 2019, 7:55 PM ET), https://www.wsj.com/articles/epstein-flourished-as-he-forged-bond-with-retail-billionaire-11562975711.

Dennis Hersh, was a partner there; and Wexner's wife and current director, Abigail, also worked at DPW. Thus, the Company has a strong interest in maintaining good relations with CEO and Chairman Wexner, who it is ostensibly investigating.

49.     In March 2019, activist stockholder Barington Capital Group, L.P. ("Barington") highlighted several business and corporate governance challenges at the Company in a letter to Wexner and L Brands stockholders. The Board implemented several reforms, including replacing two retiring incumbent directors with two independent female directors and agreeing to declassify the Board in 2020. Moreover, the Board began conducting a strategic review to spin off or sell Victoria's Secret, as Barington suggested.

50.     Unfortunately, the reforms enacted by the Board thus far, while salutary, have essentially amounted to rearranging the deck chairs on the Titanic. Some of the most serious allegations stem from actions taken after the corporate governance changes enacted in the midst of the activist campaign, and Victoria's Secret remains kryptonite to serious corporate investors.

51.     The activist-induced corporate governance changes were enacted in April 2019. Starting in July 2019, however, news reports came out about the Epstein connection to Wexner. Reports that the Board initiated an investigation into Wexner's relationship with Epstein also came out in the same month, but it was only approximately a month later that it was revealed that the investigation was being conducted by DPW.

52.     In October 2019, according to the *Times*, Mitro reported her complaint against Razek to Kollat, and only one day later suffered retaliation. And the systemic cultural problems – including the Razek misconduct allegations – were reported in February 2020.

### C.     The Botched Victoria's Secret Spinoff

53.     The Victoria's Secret brand has already suffered damage from its declining sales and from the perception that it is behind the times. The asset did not become unsellable, however,

until the news reports emerged of a widespread misogynistic culture where complaints made to HR or Wexner were dismissed or retaliated against. The Company was left with two untenable options, both of which result in tremendous harm to L Brands and its shareholders: sell Victoria's Secret for far less than its actual value or hold onto it as it continues to siphon value away from the rest of L Brands.

54.     On February 20, 2020, L Brands announced a deal with private equity firm Sycamore Partners ("Sycamore"), in which L Brands would spin off Victoria's Secret into a separate entity, with L Brands retaining a 45% stake while Sycamore buys a 55% stake. The purchase price for Sycamore was to be approximately $525 million, representing a total enterprise value for Victoria's Secret of about $1.1 billion. This valuation appeared to be much lower than contemporary estimates before the transaction and was six times lower than Victoria's Secret's annual sales of around $6.8 billion. A few days later, the Board announced a $730.7 million non-cash impairment charge relating to Victoria's Secret.

55.     The low price for this transaction and dramatic impairment of the brand value are due, in large part, to the cultural problems detailed herein and reflects how owning the asset has become toxic. Further, even this lowball price for Victoria's Secret would not satisfy Sycamore, as they sought to use the stressors of the COVID-19 pandemic to renegotiate the deal.

56.     On April 22, 2020, news emerged that Sycamore was seeking to cancel its proposed majority acquisition of Victoria's Secret. In a lawsuit filed in the Delaware Court of Chancery, Sycamore indicated that it had exercised its right to terminate the transaction and asked the court for a declaratory judgment that the termination was valid. *See SP VS Buyer LP v. L Brands, Inc.*, C.A. No. 2020-0297 (Del. Ch.).

57.    Sycamore objected to several actions taken by L Brands less than one month after agreeing to sell the majority of Victoria's Secret: closing all 1,600 global Victoria's Secret and PINK retail stores; furloughing most of the employees of the Victoria's Secret Business; reducing by 20% the base compensation of all employees at the level of senior vice president and above and deferring annual merit increases for 2020; drastically reducing new merchandise receipts, which, when coupled with L Brands's failure to dispose of existing out-of-season, obsolete, and excess merchandise, stuck Victoria's Secret with a stock of merchandise of greatly diminished value; and failing to pay rent during April 2020 for its retail stores in the United States. Sycamore claims that all of those actions were taken without prior consultation and in breach of the purchase agreement. *See SP VS Buyer LP.* In addition, L Brands announced it had drawn down $950 million from an existing credit line due to financial stressors caused by the pandemic.[16]

58.    Sycamore indicated that it had informed L Brands of the potential breach no later than April 2, 2020, and of the need to renegotiate the terms of the deal no later than April 13, 2020, due to the drastic diminution of value of the Victoria's Secret asset due to L Brands's actions taken in the wake of the COVID-19 pandemic. *See SP VS Buyer LP.* Sycamore's efforts to renegotiate in early April 2020 were confirmed in press reports.

59.    Sycamore postulated several reasons for L Brands's moves: stockpile cash to weather the storm of the COVID-19 pandemic; stave off potential default under its secured credit facility; or to "strengthen [its] financial flexibility." *Id.*

---

[16]    Praveen Paramasivam, *L Brands temporarily closes stores, draws down $950 million from existing credit line*, REUTERS (Mar. 17, 2020, 8:08 AM), https://www.reuters.com/article/us-health-coronavirus-l-brands/l-brands-temporarily-closes-stores-draws-down-950-million-from-existing-credit-line-idUSKBN2141XT.

60.     On this news, L Brands's stock price fell 15.5%, destroying tens of millions of dollars in market capitalization.

61.     One might think that the COVID-19 pandemic would have caused scores of corporate buyers to pull out of signed deals, citing similar factors as those cited by Sycamore.  And while new large deal discussions have mostly stopped, at the time Sycamore pulled the plug on the Victoria's Secret deal, very few similar deals had been terminated.[17]

62.     After the initial lawsuit was filed by Sycamore, L Brands filed its own suit to seek specific performance of the agreement between the two erstwhile partners, as well as monetary damages.  *See L Brands, Inc. v. SP VS Buyer LP*, C.A. No. 2020-0304 (Del. Ch.).  This suit, in turn, was followed by yet another suit by Sycamore seeking equitable relief from a portion of its obligations under the transaction.  *See Sycamore Partners II, L.P. v. L Brands, Inc.*, C.A. No. 2020-0306 (Del. Ch.).

63.     On May 4, 2020, L Brands and Sycamore announced the mutual termination of the Victoria's Secret spinoff deal, as well as the settlement of the above-listed suits and countersuits. Neither party would pay any termination penalty, but both sides would pay their costs to date.  L Brands will now have to navigate the fallout from COVID-19 without the financial boost from Sycamore and is also still on the hook for billions of dollars in lease payments that it would have shed had the deal gone through.[18]

---

[17]     Khadeeja Safdar and Cara Lombard, *Victoria's Secret Buyers Seeks to Cancel Takeover After Coronavirus*, WALL ST. J. (Apr. 22, 2020, 7:21 pm ET), https://www.wsj.com/articles/sycamore-partners-cancels-plan-to-buy-victoria-s-secret-11587568843.

[18]     Kimberly Chin, *L Brands, Sycamore Agree to Scrap Victoria's Secret Deal*, WALL ST. J. (May 4, 2020, 7:11 PM ET), https://www.wsj.com/articles/l-brands-sycamore-agree-to-scrap-victorias-secret-deal-11588633861.

## DAMAGE TO L BRANDS

64.    Defendants' misconduct and breaches of their fiduciary duties have severely damaged the Company's reputation and goodwill, negatively impacted the Company's competitive position, negatively impacted the Company's financial position, and has imperiled the Company's future projects.

65.    Specifically, as a direct and proximate result of Defendants' actions, L Brands has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from being forced to pursue a divestment of its scandal-plagued, fire sale-priced Victoria's Secret business;

(b)    costs incurred from the sudden termination and subsequent litigation of the Sycamore transaction, including defending, settling, or paying any adverse judgment in those actions; and

(c)    costs incurred from compensation and benefits paid to Defendants who have breached their duties to L Brands and were unjustly enriched therefrom.

66.    Finally, L Brands's business, goodwill, and reputation have been, and will continue to be, severely damaged by Defendants' decisions to allow and/or failure to prevent the scandals and generally toxic culture at the Company, turning one of its major assets into corporate quicksand, dragging down the entire Company along with its shareholders.

## DERIVATIVE ALLEGATIONS

67.    Plaintiff brings this action derivatively in the right and for the benefit of L Brands to redress the breaches of fiduciary duty and other violations of law committed by Defendants, as alleged herein.

68. Plaintiff will adequately and fairly represent the interests of L Brands and its stockholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action. Plaintiff has continuously held L Brands stock throughout the relevant period and will continue to hold L Brands stock through the resolution of this action.

69. On February 6, 2020, Plaintiff, through his counsel, made the Demand on the Board to commence this action. In the Demand, Plaintiff demanded that the Board take the following actions:

(a) appoint a Special Committee, comprised of independent directors, to investigate the matters set forth therein and institute legal action for damages against all responsible officers and directors if such legal action were in the best interests of the Company;

(b) empower, by Board resolution, the Special Committee to hire financial, legal, and other advisors, as the Special Committee deemed reasonably necessary, to fulfill its investigatory role;

(c) empower, by Board resolution, the Special Committee to take such independent action, as it deemed appropriate, under the circumstances, including prosecution of litigation or disciplinary action, such as compensation penalties, against Defendants and other culpable management for misleading the Board's independent directors concerning the accuracy of the Company's financial statements;

(d) replace DPW, or retain additional counsel as a check for conflicts, in the ongoing Board investigation into the Wexner-Epstein relationship;

(e)     preserve all documents, communications, and other evidence in the Company's custody, possession, or control of Wexner, Razek, and any other potential directors or employees that the Company may have claims against;

(f)     reform the Company's bonus claw back policy to permit claw back of executive discretionary bonus compensation when the executive is found to have engaged in misconduct that harms the Company; and

(g)     create a sub-committee of the Board ("Board sub-committee") comprised of a majority of independent members, with appropriate advisors, or an independent council of advisors, charged with overseeing corporate governance reforms put into place in response to the Demand and: (i) permit the Board sub-committee to meet in executive session without management; and (ii) require the Board sub-committee to report periodically to the Board regarding the reforms.

70.     Plaintiff also demanded that L Brands nominate at least one additional female director at its next election and retire one of the longest-serving male directors in order to bring the Board to complete gender equity.

71.     In addition, owing to the allegations of widespread misogyny, lack of diversity, and inability to adopt to more inclusive trends in beauty standards, the Company would benefit from committing to establish a Diversity and Inclusion Council that could further enhance gender diversity and ensure a workplace free of sexual harassment and misconduct. Such a council would be composed of both outside workplace experts and Company insiders who would collaboratively review Company policies, procedures, and practices and recommend improvements to the Board.

72.     On February 12, 2020, the Corporate Secretary for L Brands sent an e-mail to Plaintiff's counsel indicating receipt of the Demand and stating that the Board would consider it

24

in due course. On March 12, 2020, counsel for L Brands sent a letter to Plaintiff's counsel, which, among other things, repeated that the Board would consider the Demand in due course.

73.     On April 3, 2020, Plaintiff sent his Supplemental Demand to the Board that noted the public announcement of the proposed spinoff of Victoria's Secret, which transpired after the initial Demand was sent. The Supplemental Demand expressed concern that the proposed deal did not properly value Victoria's Secret or, conversely, locked Company shareholders into a 45% share of a failing asset. The Supplemental Demand requested that the Board investigating the good faith of the Company's two Transaction Committee members in recommending the proposed spinoff to the Board as in the best interests of L Brands. The Supplemental Demand also requested that the Board conduct a fact-gathering investigation to assess the potential value of the litigation asset.

74.     Plaintiff has not received any communication from L Brands or its counsel since the Supplemental Demand was sent.

## CAUSES OF ACTION

### COUNT ONE
**For Breach of Fiduciary Duty**
**(Against All Defendants)**

75.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth above as though fully set forth herein.

76.     Defendants owed, and owe, L Brands the highest fiduciary obligations of good faith, fair dealing, loyalty, and due care in managing the Company's affairs.

77.     Defendants, individually and collectively, violated and breached their fiduciary duties by:

(a)     violating the law to the detriment of L Brands, including by:

(i)     sexually harassing and/or assaulting Company employees; and

(ii)      retaliating against employees for properly reporting misconduct by their superiors;

(b)      failing to abide by the Code and other binding corporate policies;

(c)      negotiating and accepting compensation from L Brands despite knowing that their concealed actions and inactions harmed the Company, misusing their positions of power to benefit themselves rather than advance the Company's corporate purposes;

(d)      failing to ensure that L Brands, and its directors, officers, employees, and others bound to comply, complied with relevant laws, the Code, and other binding corporate policies; and

(e)      failing to conduct an adequate investigation of known potential (and/or actual) violations of law, the Code, and other binding corporate policies.

78.      As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, L Brands has sustained significant damages – both financially and to its corporate image and goodwill.  Such damages include, among other things, the diminution of the value of Victoria's Secret, the costs incurred in trying to sell Victoria's Secret and litigating the Sycamore transaction, and compensation wrongly paid to directors and officers engaged in misconduct.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

79.      Plaintiff, on behalf of L Brands, has no adequate remedy at law.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment in L Brands's favor against Defendants as follows:

A.      Declaring that this action is a proper derivative action, and Plaintiff is an adequate representative on L Brands's behalf;

B.      Declaring that Defendants have breached their fiduciary duties owed to L Brands and its stockholders;

C.      Awarding L Brands the damages it sustained due to the violations alleged herein from each of the Defendants, jointly and severally, together with interest thereon;

D.      Awarding to L Brands restitution from Defendants and ordering disgorgement of all unlawfully obtained profits, benefits, and other compensation obtained by Defendants;

E.      Directing L Brands to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws, and protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 13, 2020

SCOTT+SCOTT ATTORNEYS AT LAW LLP

 /s/ Geoffrey M. Johnson
Geoffrey M. Johnson
Supreme Court ID Number 0073084
*Counsel for Plaintiff Milton Rudi*
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (216) 229-6092
gjohnson@scott-scott.com

Joe Pettigrew
To Be Admitted *Pro Hac Vice*
*Counsel for Plaintiff Milton Rudi*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jpettigrew@scott-scott.com

# VERIFICATION OF MILTON RUDI

I, Milton Rudi, pursuant to OH Civ.R. 23.1, hereby declare as follows:

I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

Executed this 6th day of May, 2020, at   St Louis, Missouri
                                                    (City, State)


_____
MILTON RUDI