# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| MILTON RUDI, | Case No. 2:20-cv-3068 |
| Plaintiff, | District Judge Michael H. Watson |
| vs. | Magistrate Judge Elizabeth P. Deavers |
| LESLIE WEXNER, EDWARD RAZEK, and DAVID T. KOLLAT, | |
| Defendants, | |
| and | |
| L BRANDS, INC., | |
| Nominal Defendant. | |

## PLAINTIFF MILTON RUDI'S MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT

Plaintiff Milton Rudi ("Plaintiff"), on behalf of himself and the Police and Fire Retirement System of the City of Detroit ("Detroit"), Oregon Public Employee Retirement Fund ("Oregon"), John Giarratano ("Giarratano"), Maryann Kualii ("Kualii"), and Nancy A. Lambrecht, Co-Trustee of the Amanda Greenfield 2012 Irrevocable Trust ("Lambrecht") (collectively, the "Settling Shareholders"), respectfully moves the Court for an order granting the final approval of the settlement ("Settlement") as set forth in the Stipulation and Agreement of Settlement (ECF No. 24) (the "Stipulation"),[1] and for entry of the proposed Order Granting Final Approval of Settlement

---

[1] The Stipulation is attached as Exhibit 1 to the Joint Declaration of Deborah Clark-Weintraub and Julie Goldsmith Reiser in Support of Plaintiff's Motion for Final Approval of Settlement and for Plaintiff's and Settling Shareholders' Motion for Attorney's Fees and Expenses

(the "Final Approval Order"), attached as Exhibit A. The proposed Final Approval Order: (i) grants final approval of the Settlement; and (ii) grants approval of the Fee and Expense Award to Settling Shareholders' Counsel.[2]

The grounds for the Motion are set forth in the accompanying Memorandum in Support and the attached exhibits.

---

(the "Joint Decl."), filed concurrently with this motion. All capitalized terms, unless otherwise defined herein, have the same meaning given to them in the Stipulation.

[2] The Motion and Memorandum in Support of Plaintiff's and Settling Shareholders' Motion for an Award of Attorneys' Fees and Expenses (the "Fee Motion") is being filed contemporaneously with this motion.

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL AND PROCEDURAL OVERVIEW .................................................. 2

     A.     The Settling Shareholders' Demands .......................................................... 3

     B.     Settling Shareholders' Investigations and Communications with the SC .. 3

III.    SETTLEMENT DISCUSSIONS AND TERMS ..................................................... 4

     A.     Industry-Leading Commitment to Reduce the Risk of Sexual Misconduct 5

     B.     The Attorneys' Fees and Expense Award ..................................................... 7

IV.     STOCKHOLDERS RECEIVED ADEQUATE NOTICE ..................................... 7

V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ................. 7

     A.     The Legal Standard Governing Final Approval ........................................... 7

     B.     The Settlement Provides Significant Benefits to L Brands ........................ 9

     C.     The Settlement Resulted from an Adversarial and Arms-Length Process 12

     D.     The Complexity, Expense, and Duration of the Litigation Favor Approval
             ................................................................................................................. 13

     E.     The Likelihood of Success on the Merits Favors Final Approval ............ 16

     F.     Settling Shareholders Have Engaged in Targeted but Thorough Discovery
             ................................................................................................................. 17

     G.     The Settling Shareholders and Their Counsel Support the Settlement ..... 18

     H.     Reaction of L Brands' Shareholders Favors Final Approval .................... 19

     I.     The Settlement Is in the Public Interest ................................................... 19

VI.     CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

PAGE(S)

<small>CASES</small>

*Bailey v. AK Steel Corp.*,
 No. 1:06-CV-00468, 2008 WL 495539 (S.D. Ohio Feb. 21, 2008) ....................12, 17, 18, 19

*Brown v. Ferro Corp.*,
 763 F.2d 798 (6th Cir. 1985) .................................................................................................8

*Burks v. Lasker*,
 441 U.S. 471 (1979)..............................................................................................................8

*Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*,
 No. CIV.A. 1091, 2013 WL 458373 (Del. Ch. Feb. 6, 2013)...................................................9

*Gascho v. Glob. Fitness Holdings, L.L.C.*,
 2:11-CV-436, 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014).....................................12, 17, 19

*Granada Invs., Inc. v. DWG Corp.*,
 962 F.2d 1203 (6th Cir. 1992) ..................................................................................... *passim*

*Hainey v. Parrot*,
 617 F. Supp. 2d 668 (S.D. Ohio 2007) ...........................................................................12, 19

*In re Activision Blizzard, Inc. S'holder Litig.*,
 124 A.3d 1025 (Del. Ch. 2015)........................................................................................9, 15

*In re Allion Healthcare Inc. S'holders Litig.*,
 No. 5022, 2011 WL 1135016 (Del. Ch. Mar. 29, 2011).......................................................12

*In re AOL Time Warner S'holder Deriv. Litig.*,
 No. 02 CIV. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)...........................................11

*In re Big Lots, Inc. S'holder Litig.*,
 Case No. 2:12–cv–445, 2018 WL 11356561 (S.D. Ohio Aug. 28, 2018) .............15, 16, 17, 19

*In re Caremark Int'l Inc. Deriv. Litig.*,
 698 A.2d 959 (Del. Ch. 1996)..............................................................................................17

*In re Delphi Corp. Sec., Deriv. & "ERISA" Litig.*,
 248 F.R.D. 483 (E.D. Mich. 2008) ......................................................................................12

*In re Energy Transfer Equity, L.P. Unitholder Litig.*,
 No. 12197, 2019 WL 994045 (Del. Ch. Feb. 28, 2019) ......................................................11

ii

*In re General Tire and Rubber Co. Sec. Litig.*,
726 F.2d 1075 (6th Cir.1984) ................................................................8

*In re Nat'l Century Fin. Enters. Inv. Litig.*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) ..................................................16

*In re Nationwide Fin. Servs. Litig.*,
No. 2:08-CV-00249, 2009 WL 8747486 (S.D. Ohio Aug. 19, 2009)
(Watson, J.) ................................................................................. *passim*

*In re Pfizer Inc. S'holder Deriv. Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011).....................................................10

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ............................................................19

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) .........................................................17

*Fisher ex rel. LendingClub Corp. v. Sanborn*,
No. CV 2019-0631, 2021 WL 1197577 (Del. Ch. Mar. 30, 2021)..........17

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir.1983) .................................................................13

*McDannold v. Star Bank*, *N.A.*,
261 F.3d 478 (6th Cir. 2001) ..................................................................7

*Olden v. Gardner*,
294 F. App'x 210 (6th Cir. 2008) ..........................................................19

*Polk v. Good*,
507 A.2d 531 (Del. 1986) ........................................................................8

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,
636 F.3d 235 (6th Cir. 2011) ...........................................................8, 16

*Prezant v. De Angelis*,
636 A.2d 915 (Del. 1994) ........................................................................8

*Ret. Sys. v. Jeffries*,
No. 2:14-CV-1380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014)..........8

*Ret. Sys. v. Langone*,
No. 2006-CV-122302, 2008 WL 8881628 (Ga. Sup. Ct. June 10, 2008)..............10

*UAW v. Gen. Motors Corp.*,
No. 05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006) .........17

iii

*United Nat'l Ret. Fund v. Watts,*
  No. 04CV3603, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ....................................................11

*Williams v. Vukovich,*
  720 F.2d 909 (6th Cir. 1983) ................................................................................................18

*Zapata Corp. v. Maldonado,*
  430 A.2d 779 (Del. 1981) ....................................................................................................14

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 23.1 ......................................................................................................................7, 8, 13
  Rule 23.1(c).............................................................................................................................7

8 *Del. C.* §220 ............................................................................................................................3

**OTHER AUTHORITIES**

Jessica Silver-Greenberg et al., *'Angels' in Hell: The Culture of Misogyny Inside
  Victoria's Secret*, N.Y. TIMES (Feb. 1, 2020, updated June 16, 2021) ......................................3

## I.       INTRODUCTION

The Settling Shareholders have obtained a groundbreaking Settlement that provides significant and comprehensive reforms that will transform L Brands, Inc. ("L Brands" or the "Company"), into an industry-leader with respect to sexual-harassment best practices.[3] The Settlement resolves all claims asserted or threatened in multiple actions commenced in this Court and in Delaware state court (collectively, the "Actions") on behalf of L Brands against certain current and former officers and directors of the Company (the "Individual Defendants").[4] Under the terms of the Settlement, L Brands has agreed to enact industry-leading workplace and governance reforms that are designed to prevent sexual harassment, sexual misconduct, discrimination, and retaliation, and that will dramatically improve and foster a safe, inclusive, and equitable culture at the Company. These reforms are precisely what the Company needs, as they are targeted to address and prevent the types of harassment and misconduct that has plagued the Company for decades and created a toxic culture of misogyny and harassment. Significantly, as part of the Settlement, L Brands has also agreed to commit *$90 million* to the enactment and implementation of the reforms, which is an unprecedented commitment for a company of this size.

The Settlement is an excellent resolution for L Brands and its shareholders. The agreed-upon reforms are designed to strengthen oversight and increase transparency surrounding claims of sexual misconduct and will reduce the likelihood that L Brands will face these types of breach of fiduciary duty cases in the future. The reforms significantly strengthen L Brand's commitment and capacity to deter and prevent sexual harassment, discrimination, and retaliation and "reflect the Compan[y's] broad and deep commitment to meaningful workplace and governance reforms"

---

[3]       L Brands includes its successors, Bath & Body Works, Inc., and Victoria's Secret & Co.

[4]       The Actions refer collectively to the Litigations and Demands asserted by the Settling Shareholders.  *See* Joint Decl., ¶¶8-12, 14, 17, 18.

by, in part, placing responsibility at the board level. *See* Joint Decl., Ex. 2, ¶7 (Joint Declaration of Professors Joanna L. Grossman, SMU Dedman School of Law, and Vicki Schultz, Yale Law School in Support of the Settlement Agreement ("Grossman & Schultz Decl.")). The reforms are designed to "transform the Company from being a laggard with respect to sexual harassment-related governance to an industry leader employing best practices." *See* Joint Decl., Ex. 3, ¶44 (Declaration of Professor Charles R. Korsmo, Case Western Reserve University of Law, in Support of Settlement of Derivative Actions ("Korsmo Decl.")). Collectively, the reforms will result in a higher valuation for L Brands' stock, a reduction in legal exposure, and will significantly increase shareholder value – likely *in excess of $100 million*. *See* Korsmo Decl., ¶2.

The Settlement provides substantial benefits for L Brands and its current shareholders, avoids further lengthy and costly litigation, and mitigates the risk and expense of proceeding in multiple forums. It is the product of extensive arm's-length negotiations between the Parties with the assistance of a mediator, the Honorable Layn R. Phillips (Ret.) of Phillips ADR ("Judge Phillips"). Here, the Settlement is fair, reasonable, and adequate and warrants final approval.

## II.    FACTUAL AND PROCEDURAL OVERVIEW

This motion seeks final approval of the settlement of multiple shareholder derivative actions arising from the L Brands Board's alleged tolerance and inaction in the face of pervasive and systematic sexual harassment at the Company's subsidiary, Victoria's Secret. In recent years, Victoria's Secret's reputation has been seriously harmed by reports of a toxic workplace environment including sexual harassment and misconduct, retaliation, and a failure of management to address such behavior. Joint Decl., ¶¶6-7. In an attempt to overhaul the Victoria's Secret brand, the Company retained Davis, Polk & Wardwell, LLP in July 2019 to purportedly investigate such matters. However, these efforts proved illusory. In February 2020, just a few months into the Company's purported overhaul, allegations came to light regarding the decades-long culture of

sexual harassment, which included, remarkably, retaliation against a female employee as recently as *November 2019* – confirming that the Company had no intention of adopting the policies and procedures necessary to ensure that misogyny, bullying, and harassment was prevented and corrected. *Id*., ¶7. On February 1, 2020, an expose by the *New York Times* described the culture of sexual harassment and misogyny that has plagued the Company and Victoria's Secret for decades.[5] Joint Decl., ¶7. Even still, it was not until mid-2020, when forced by the circumstances of the pre-suit Demands of the Settling Shareholders, that the Company formed a Special Committee (the "SC") to investigate the material wrongdoing. *Id*., ¶13.

### A.    The Settling Shareholders' Demands

Shortly after *The New York Times* expose, Settling Shareholders served L Brands with litigation demands or demands for books and records pursuant to 8 *Del. C.* §220 ("Section 220") (collectively, the "Demands").[6]

### B.    Settling Shareholders' Investigations and Communications with the SC

Settling Shareholders, through their counsel, each conducted extensive investigations into the alleged breaches of fiduciary duties at L Brands. *Id*., ¶¶19-20. Settling Shareholders' Counsel independently obtained documents and recordings not previously disclosed in any press reports, and reviewed the documents produced by the Company in response to the Settling Shareholders' Section 220 demands.[7] *Id*. In addition, Settling Shareholders' Counsel interviewed over 36

---

[5]    Jessica Silver-Greenberg et al., *'Angels' in Hell: The Culture of Misogyny Inside Victoria's Secret*, N.Y. TIMES (Feb. 1, 2020, updated June 16, 2021), https://www.nytimes.com/2020/02/01/business/victorias-secret-razek-harassment.html.

[6]    The detailed procedural history of each of the demands is set forth in the joint decl.

[7]    These documents included (1) minutes, agendas, board packages, and other materials relating to regularly conducted and special meetings of the Board and Board committees; (2) internal L Brands policies, including the Code of Conduct, investigation manuals, and policies and procedures; and (3) materials relating to the independence of the members of the Special Committee. *See* Joint Decl., ¶19.

3

witnesses, including former Victoria's Secret employees. *Id.*, ¶19. Settling Shareholders' Counsel shared the results of their investigations with the SC through detailed and lengthy presentations, had extensive communications and meetings with the SC and its counsel regarding the SC's investigation, and suggested new avenues for investigation to the SC to ensure that the underlying claims were thoroughly investigated, and that any resolution would be in the best interests of L Brands and its shareholders. *Id.* During those meetings and communications, Settling Shareholders' Counsel pressed the SC and its counsel, Wachtell, Lipton, Rosen & Katz, for detailed descriptions of the SC's process and progress in its investigation, for production of additional relevant documents, and to explore possible paths to resolution. *Id.*, ¶20.

III.     **SETTLEMENT DISCUSSIONS AND TERMS**

Settling Shareholders made a number of settlement demands to the SC throughout the winter of 2020 and 2021. *Id.*, ¶21. On January 17, 2021, the SC determined that it would not be in the Company's best interests to press forward with litigation, but instead recommended that the Company attempt to settle the Actions through a global mediation. *Id.* Before mediation, on January 22, 2021, Settling Shareholders' Counsel listened to a multi-hour report from the SC's counsel regarding its findings and submitted questions in response. *Id.*, ¶22. On February 26, 2021, Settling Shareholders' Counsel listened to a second presentation from the SC's counsel, which included additional factual findings and responses to Settling Shareholders' questions. *Id.*

On April 21, 2021, the Parties engaged in a full-day mediation. *Id.*, ¶24. Judge Phillips, a respected and experienced mediator in derivative and other complex litigation, and a former United States District Judge, served as the mediator. *Id.* Settling Shareholders' Counsel each submitted detailed mediation statements describing the procedural histories and underlying merits of Settling Shareholders' claims. *Id.* While no final resolution was reached at the mediation, the Parties continued arm's-length negotiations with the assistance of the mediator. *Id.*, ¶25. Over the course

of the next two months, the Parties continued to vigorously negotiate a settlement. *Id*. Finally, after

an all-day second mediation session on June 14, 2021, the Parties reached an agreement-in-

principle to resolve the Actions on the terms in the Stipulation. *Id*., ¶26; *see also* Joint Decl., Ex.

4, ¶14 (Declaration of Hon. Layn R. Phillips (Ret.) of Phillips ADR ("Phillips Decl.")).

### A.      Industry-Leading Commitment to Reduce the Risk of Sexual Misconduct

The Settlement is broad in scope and designed to significantly reduce the risk of sexual

misconduct and related issues within the Company. The agreed-upon reforms will be supervised

by corporate officers and independent consultants, and will be anchored by $90 million in funding

over 5 years. *Id*., ¶33. Through the reforms, L Brands is making a clear public commitment to

creating a non-discriminatory, respectful work environment by providing detailed plans for

delivering on that commitment; addressing known organizational risk factors for sexual

harassment; and establishing several accountability systems within the Company to ensure long-

term adherence to the stated values. *See* Grossman & Schultz Decl., ¶5.  Specifically, L Brands

has agreed to the following significant governance reforms:

| | |
|---|---|
| a. | New stand-alone policies against sexual harassment and retaliation, for reporting of harassment and discrimination, and for investigation of harassment and discrimination complaints; |
| b. | Strengthening the process for reporting and investigating claims of sexual harassment, gender discrimination, and retaliation; |
| c. | Improved training for management and employees, including bystander training; |
| d. | Creating and maintaining a Diversity, Equity and Inclusion ("DEI") Council to oversee the reforms; |
| e. | Retaining a DEI expert and consultant to advise the DEI Council and conduct thorough reviews of policies and procedures, and audits to ensure that these policies and procedures are effective; |
| f. | Adopting a set of DEI Principles to foster a diverse and inclusive workplace culture; |
| g. | Collecting and evaluating data relating to harassment, retaliation, and the DEI |

Principles; and

h.    Bringing the Company's policy on non-disclosure agreements into conformity with New York law, ending the use of mandatory arbitration provisions for disputes involving harassment, gender discrimination, and retaliation, and agreeing not to enforce pre-Settlement non-disclosure provisions that prohibit a complainant from discussing the underlying facts and circumstances of a sexual harassment claim.

Notably, in addition to new stand-alone sexual harassment, anti-retaliation, and reporting policies, enhanced training, stronger discipline, and more direct reporting of senior-executive misconduct to the Board, the reforms also include data collection — an unprecedented reform in shareholder derivative actions — including an annual opinion survey of all employees at the Company's corporate offices concerning their experience at the Company with respect to harassment, discrimination, or retaliation. *Id.*, ¶38. Further, L Brands has agreed to end mandatory arbitration of discrimination, harassment, and retaliation claims, and to conform its policy on nondisclosure agreements consistent with New York law (*e.g.*, shall not prohibit complainants from discussing the underlying facts and circumstances of a sexual harassment claim. *Id.*, ¶34(h).

Critically, the reforms also provide for significant oversight through expanded roles for the Human Capital and Compensation Committee, Audit Committee, and Nominating and Governance Committee of the Board, which all consist solely of independent directors. *Id.*, ¶36. At the managerial level, a DEI Council of key executives, including the Chief Diversity Officer as the council lead, the Chief Executive Officer as the Executive Sponsor, and the Chief Human Resources Officer and Chief Legal Officer or head of Ethics & Compliance in a Steering Committee, shall provide C-suite level oversight to ensure the Company's commitment to DEI principles and prevent harassment, discrimination, and retaliation in the workplace. *Id.* Meanwhile, a DEI Consultant and DEI Expert provide further oversight and monitoring of the reforms. *Id.*

6

**B.     The Attorneys' Fees and Expense Award**

Following the execution of the Stipulation, with the assistance of the mediator, the Parties separately negotiated reasonable attorneys' fees and expenses for Settling Shareholders' Counsel to be paid by Defendants and/or their insurance carriers. Based on the recommendation of the mediator, Defendants have agreed not to oppose an application for an award of attorneys' fees and expenses not to exceed $21 million (reflecting 21% of the estimated value of the agreed-upon reforms to the Company.) *See* Joint Decl., ¶63.

**IV.     STOCKHOLDERS RECEIVED ADEQUATE NOTICE**

The Court-approved Notice was posted and published in accordance with this Court's Order (ECF No. 24);[8] Joint Decl., ¶32. The Notice contains a description of the history of the Settling Matters and the Settlement, advises of the time and location of the Settlement Hearing, and informs shareholders of the procedures for objecting to the Settlement. *Id*., ¶32.[9] Further, the Notice advises that the application for a Fee and Expense Award will be presented for approval at the Settlement Hearing, and the reasons supporting the application will be submitted before shareholders are required to file a notice of appearance or submit an objection. *Id*., ¶32.

**V.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

**A.     The Legal Standard Governing Final Approval**

Derivative actions may only be settled with the Court's approval. Fed. R. Civ. P. 23.1(c). The Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs.*,

---

[8]     L Brands' Counsel's Declaration attesting to the Company's compliance with ¶7 of the Court's Preliminary Approval Order is due January 11, 2022 and will also support this motion.

[9]     The deadline to file an objection to the Settlement is December 28, 2021.  To date, no shareholder has objected to the Settlement.  *See* Joint Decl., ¶62.

*Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992)).[10] "Settlements are welcome" in derivative actions and, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada*, 962 F.2d at 1205; *see also Polk v. Good*, 507 A.2d 531, 535 (Del. 1986) ("Delaware law favors the voluntary settlement of contested issues[.]").[11] Settlements are particularly favored in derivative cases because they promote judicial economy. *See Prezant v. De Angelis*, 636 A.2d 915, 923 (Del. 1994). In evaluating a derivative settlement, the Court considers seven factors: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011).[12]

The "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *City of Plantation Police Officers' Emps.' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *5 (S.D. Ohio Dec. 30, 2014). The Court weighs the "give" and the "get" obtained in the settlement to "determine

---

[10]    Unless noted, all internal citations and quotations are omitted and emphasis is added.

[11]    Because L Brands is a Delaware corporation, an analysis of the Settlement under Delaware law is relevant and appropriate (Joint Decl., ¶72). *See Brown v. Ferro Corp.*, 763 F.2d 798, 802-03 (6th Cir. 1985) ("shareholders' derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated[]") (citing *Burks v. Lasker*, 441 U.S. 471 (1979) and *In re General Tire and Rubber Co. Sec. Litig.*, 726 F.2d 1075 (6th Cir.1984)).

[12]    There is little substantive difference between Sixth Circuit and Delaware law with respect to the factors to be considered. *See Polk*, 507 A.D.2d at 536 (describing the relevant factors under Delaware law: (1) the viability of the claims; (2) challenges to enforcing the claims judicially; (3) the delay, expense, and trouble of litigation; (4) the amount of the compromise as compared with the magnitude of any enforceable judgment; and (5) the views of the parties involved.

whether the settlement falls within a range of results that a reasonable party in the position of the plaintiff, not under any compulsion to settle and with the benefit of the information then available, reasonably could accept." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1064 (Del. Ch. 2015) (quoting *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, No. CIV.A. 1091, 2013 WL 458373, at *1 (Del. Ch. Feb. 6, 2013)).

### B.     The Settlement Provides Significant Benefits to L Brands

The Settlement provides substantial benefits to L Brands and its shareholders through the implementation of industry-leading, structural reforms designed to strengthen oversight and increase transparency surrounding claims of sexual misconduct. The Settlement reflects both L Brands' and Settling Shareholders' commitment to bringing about positive change that will prevent the recurrence of misconduct and support transparency at the highest levels of the Company. The toxic workplace culture was a result of a male-dominant executive corps that was not attuned to the needs and concerns of its workforce, which consisted of approximately 90% women. Joint Decl., ¶43. Through the Settlement, L Brands will enact industry-leading workplace and governance reforms that will put the Company on the path to preventing similar toxicity going forward by: 1) providing oversight — including by an outside consultant and an expert — as well as detailed attention by senior executives — into DEI issues; 2) strengthening reporting and investigation mechanisms, including direct reporting to independent Board directors to further increase oversight; 3) creating policies that more clearly set forth prohibited conduct; 4) collecting data and conducting audits on an ongoing basis ensure policies and procedures are functioning effectively and the workplace environment is as free from discrimination, harassment, and retaliation as possible; 5) limiting non-disclosure agreements and eliminating mandatory arbitration so that workers are not chilled from asserting rightful claims or discussing workplace problems; 6) improving training of managers and employees, including bystander intervention

training, to help prevent harassment and retaliation; and 7) ensuring robust funding so that the reforms can be implemented and maintained. *Id.*; *See* Grossman & Schultz Decl., ¶31.

Further, based on the devastating impact the Company's culture of sexual harassment and discrimination had on the Company's public image and, consequently on shareholder value, the reforms reflect a remarkable resolution of the Settling Matters. Korsmo Decl., ¶20. The reforms are designed to reduce the likelihood that L Brands will face these types of breach of fiduciary duty cases again and will result in a higher valuation for L Brands' stock, a reduction in legal exposure, and will significantly increase shareholder value — ***likely in excess of $100 million***. *Id.*, ¶2. Namely, "the [r]eforms will transform the Company from being a laggard with respect to sexual harassment-related governance to an industry leader employing best practices." *Id.*, ¶44.

These types of extensive workplace and governance reforms – reforms that are directly related to the wrongdoing alleged – are routinely recognized as providing real and substantial benefits to shareholders. *See In re Alphabet Inc.*, *S'holder Deriv. Litig.*, Lead Case No. 19-CV-341522, slip op. at 6-9 (Cal. Super. Ct., Santa Clara Cty. Nov. 30, 2020) (approving a similar derivative settlement consisting solely of corporate reforms and a $310 million commitment to fund the reforms where the reforms targeted the specific discrimination and harassment issues giving rise to the litigation); *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011) (approving a derivative settlement consisting of corporate governance reforms and a $75 million commitment to fund the reforms finding that "the settlement is likely to provide considerable corporate benefits to Pfizer and its shareholders, in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone*, No. 2006-CV-122302, 2008 WL 8881628 (Ga. Sup. Ct. June 10, 2008) (approval of

derivative settlement consisting of corporate reforms designed to prevent the improper backdating of options and ensure compliance with the company's policy that was the subject of the litigation); *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02 CIV. 6302, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) ("the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits. The preventive aspect of these provisions is itself a significant benefit of the Settlement").

Indeed, as the Sixth Circuit and other courts have recognized, a trial court can and should consider governance changes as "genuinely beneficial." *Granada Invs.*, 962 F.2d at 1206; *see also, e.g.*, *City of Plantation Police Officers' Employees' Ret. Sys.*, 2014 WL 7404000, at *6 (approving a derivative settlement consisting solely of non-monetary reforms finding that "[a]lthough the actual monetary value of the expected benefits cannot be precisely calculated," the proposed settlement will confer a substantial benefit upon the company and its shareholders); *In re Energy Transfer Equity, L.P. Unitholder Litig.*, No. 12197, 2019 WL 994045, at *3 (Del. Ch. Feb. 28, 2019) ("This Court, and our Supreme Court, have repeatedly found a corporate benefit sufficient to shift fees where a substantial therapeutic benefit to corporate governance was accomplished via the litigation"); *United Nat'l Ret. Fund v. Watts*, No. 04CV3603, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005) (describing "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement").

Here, the industry-leading reforms are beneficial to L Brands and its shareholders — they are targeted to address and prevent the types of misconduct that has plagued Victoria's Secret for decades and has negatively impacted the value of the Company and are estimated to significantly increase shareholder value — ***likely in excess of $100 million***. *See* Korsmo Decl., ¶22.

## C. The Settlement Resulted from an Adversarial and Arms-Length Process

In assessing whether a settlement is fair, considerable weight is placed on whether it was reached through arm's-length negotiations. *See, e.g.*, *In re Allion Healthcare Inc. S'holders Litig.*, No. 5022, 2011 WL 1135016, at *3 (Del. Ch. Mar. 29, 2011). Where, as here, a proposed settlement is the result of arm's-length negotiations among experienced counsel, courts generally presume that the settlement is non-collusive. *See, e.g.*, *Bailey v. AK Steel Corp.*, No. 1:06-CV-00468, 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008) ("Courts presume the absence of fraud or collusion, unless there is evidence to the contrary" (quotation marks and citations omitted)).

Here, the litigations and the extensive arm's-length negotiations were adversarial and emerged from significant initial disputes and disagreements. Indeed, it took numerous meetings and presentations, two separate mediation sessions accompanied by detailed written submissions, and many weeks of follow-up calls and discovery to reach agreement, with Judge Phillips playing a key role in the mediation. Joint Decl., ¶¶21-28; *see* Phillips Decl., ¶12. Judge Phillip's involvement is strong evidence of the integrity of the settlement negotiations. *See Hainey v. Parrot*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007) ("The participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties."); *In re Delphi Corp. Sec., Deriv. & "ERISA" Litig.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) ("[t]here is no question that the Settlements resulted from arm's-length negotiations" as "the parties reached the Settlement Agreements only after numerous and extensive mediation sessions" with a retired district court judge).

In addition, the Parties negotiated and agreed to the mediator's recommendation with respect to the proposed Fee and Expense Award after the substantive terms of the Settlement were agreed upon (¶4.1). *See Gascho v. Glob. Fitness Holdings, L.L.C.*, 2:11-CV-436, 2014 WL

1350509, at *25 (S.D. Ohio Apr. 4, 2014) ("separate negotiations suggest a lower risk of collusion where, as here, relief to the class is fair, reasonable, and adequate").

### D. The Complexity, Expense, and Duration of the Litigation Favor Approval

The Settlement provides substantial benefits to L Brands and its shareholders. The agreed-to reforms are designed to strengthen oversight and increase transparency surrounding claims of sexual misconduct and reflects L Brands' commitment to bringing about positive change at the highest levels of the Company through the nature of the reforms themselves and a $90 million funding guarantee. Joint Decl., ¶¶33-42. The Settlement signals that the Company is dedicated to creating a safe, inclusive, and appropriate workplace for all of its employees and eliminates the risk, expense, and delay of continued litigation. As the Sixth Circuit has noted, derivative actions are "notoriously difficult and unpredictable." *Granada*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir.1983)). "[A]voiding the delay, risks, and costs of continued litigation . . . is a valid reason for counsel to recommend and for the court to approve a settlement." *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *4 (S.D. Ohio Aug. 19, 2009) (Watson, J.). Indeed, derivative actions in particular, contain a variety of procedural and factual hurdles, and attenuated risks, that are generally absent from other complex litigation.

While Settling Shareholders believe strongly in the merits of their claims, they recognize were litigation to continue, numerous complex issues of law and fact would need to be resolved in multiple forums at considerable time and expense to L Brands, the Parties, and the Court, including whether pre-suit demand on the Board was wrongfully refused or, for the Settling Shareholders who made demands pursuant to Section 220 (and who may have pursued claims based on demand futility), whether Rule 23.1 was satisfied and demand was excused. Joint Decl., ¶¶55-61.

Here, Settling Shareholders faced a further complexity since the L Brands' Board delegated full authority to evaluate and pursue litigation to the SC, which is the authority typically granted

to a special litigation committee that is formed ***after*** plaintiffs have already established demand futility. Joint Decl., ¶13. While the SC retained well-qualified counsel and concluded that settlement of the Actions was in the best interests of L Brands, the SC also advised Settling Shareholders' Counsel that it had concluded that Settling Shareholders' claims were not viable and that it would vigorously defend against the claims. Accordingly, had the Parties not reached the Settlement, the SC likely would have surely recommended dismissal of the Actions. *See Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del. 1981) (explaining that a special litigation counsel may "[a]fter an objective and thorough investigation of [the] suit . . . cause [the] corporation to file a . . . motion to dismiss in . . . the best interests of the corporation, as determined by the committee"). While Settling Shareholders would have contested the SC's independence and the reasonableness of its investigation and conclusions, "[i]f . . . the Court is satisfied under Rule 56 standards that [1] the committee was independent and showed reasonable bases for good faith findings and recommendations" and [2] in "its own independent business judgment . . . the motion should be granted," then "the Court may proceed to grant the motion[.]" *Id.* at 789. Thus, dismissal motion practice would have involved complex and nuanced legal and factual issues, including, *inter alia*: (1) what standard of review should be applied to a "Special Committee" that evaluates a litigation demand but has the power usually granted to a "special litigation committee"; (2) whether the SC's legal conclusions were entitled to judicial deference even if they are flawed; (3) whether the SC can be considered independent; and (4) whether the SC properly evaluated all concerns raised by the Demands and investigations pursued by the Settling Shareholders. Accordingly, all parties faced risks in proceeding with such complex motion practice, which would result in significant costs. Joint Decl., ¶¶56-59. *See Alphabet*, No. 19-CV-341522, slip op. at 6 (approving settlement where plaintiffs' "path to wresting control of this action from the Board,

and, in particular, the [Special Litigation Committee ("SLC")], is difficult and uncertain" and continuing to "battle in public may well do the company more harm than good given the nature of the claims and the uncertain recovery at issue").

Even if the Settling Shareholders prevailed on motions to dismiss, numerous substantive issues would remain, requiring intensive discovery, extensive motion practice, expert testimony, a lengthy trial, and the possibility of appeals – with Defendants fighting every step of the way to reduce or eliminate their liability. Establishing a factual record sufficient to defeat a motion for summary judgment or to prevail at trial would be complicated by the passage of time, the faulty memories of witnesses, and in some cases the inability to access key witnesses due to relocation or death (most notably here, Jeffrey Epstein). Thus, the likelihood of long and costly litigations further supports that the Settlement is in the best interests of L Brands and its shareholders. *See In re Big Lots, Inc. S'holder Litig.*, Case No. 2:12–cv–445, 2018 WL 11356561, at *3 (S.D. Ohio Aug. 28, 2018) (finding that "[a]bsent settlement, continued litigation of this case would likely take more than a year and result in the parties incurring significant expense").

Further, the determination of whether Defendants' actions proximately caused damages and the amount of recoverable damages posed significant issues and would have been subject to further litigation. *See Nationwide*, 2009 WL 8747486, at *3 (underscoring that "the question of proximate causation and damages would necessitate expert testimony . . . leading to a battle of the experts . . . which could result in a ruling against Plaintiffs"). And assuming Settling Shareholders established damages, it is unclear if a monetary recovery would have the same long-term benefits as the corporate governance reforms achieved here. Outside of a Settlement, it is unclear if the Court would be able to grant the same types of long-term corporate governance reforms – as opposed to a monetary award and an injunction. *See, e.g.*, *Activision Blizzard, Inc.*, 124 A.3d at

1067 (finding "non-monetary consideration" were "important additional benefits" that could not have been secured through trial); *Alphabet*, No. 19-CV-341522, slip op. at 6 ("Ultimately, the Court believes that preventing further incidents like those described by plaintiffs will be more valuable to the company and its shareholders than any likely financial recovery in this action").

### E. The Likelihood of Success on the Merits Favors Final Approval

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Big Lots*, 2018 WL 11356561, at *5 (quoting *Poplar Creek*, 636 F.3d at 245). In other words, "in assessing the Settlement, the Court should balance the benefits afforded to [shareholders], and the *immediacy* and *certainty* of a substantial recovery for them, against Plaintiffs' likelihood for success on the merits." *Nationwide*, 2009 WL 8747486, at *2 (emphasis in original).

Here, Settling Shareholders faced several significant risks to successfully prosecuting their claims and obtaining meaningful relief for L Brands and its shareholders through litigation. ***First***, Settling Shareholders faced the significant obstacle of establishing that a majority of the L Brands Board could not objectively consider a litigation demand and, even if so, that Defendants' conduct was not a valid exercise of business judgment. As the *Nationwide* court recognized, Settling Shareholders "would certainly have faced challenges that [they] ha[ve] failed to rebut the presumption under the business judgment rule that 'directors are better equipped than courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted in good faith.'" 2009 WL 8747486, at *3 (quoting *In re Nat'l Century Fin. Enters. Inv. Litig.*, 504 F. Supp. 2d 287, 312 (S.D. Ohio 2007)).

***Second***, while Settling Shareholders believe they have meritorious claims, they faced significant risks in establishing Defendants' liability. Settling Shareholders' claims are all, at least

in part, based on director or officer oversight theories – *i.e.*, a *Caremark* claim. Joint Decl., ¶6. "Oversight liability under *Caremark* 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *Fisher ex rel. LendingClub Corp. v. Sanborn*, No. CV 2019-0631, 2021 WL 1197577, at *9 (Del. Ch. Mar. 30, 2021). In the decades since *Caremark* was decided, there have been hundreds of decisions dismissing *Caremark* claims.

**Third**, even if Settling Shareholders ultimately would have succeeded in prosecuting the claims of breaches of fiduciary duty in connection with the alleged failures at the Company, any relief would have come only after protracted litigation and would not likely have produced any better result than that achieved in the Settlement. Lastly, L Brands is "represented by experienced and competent counsel and [would assuredly] mount[] a zealous and thorough defense." *Gascho*, 2014 WL 1350509, at *18. "Under all of these circumstances, it cannot be said that the likelihood of success on the merits . . . is certain." *Id.*

### F. Settling Shareholders Have Engaged in Targeted but Thorough Discovery

In determining whether to approve the Settlement, the Court considers the amount of discovery in order "[t]o insure that Plaintiff[] ha[s] had access to sufficient information to evaluate [its] case and to assess the adequacy of the proposed Settlement." *Nationwide*, 2009 WL 8747486 at *5. Here, "although the parties were able to negotiate the Settlement at a relatively early stage of the proceedings, all of the parties had a 'clear view of the strengths and weaknesses of their cases.'" *Id.* (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)); *Bailey*, 2008 WL 495539, at *3; *Gascho*, 2014 WL 1350509, at *17.

The Court "should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced." *Big Lots*, 2018 WL 11356561, at *3 (quoting *UAW v. Gen. Motors Corp.*, No. 05-CV-73991, 2006 WL 891151, at *19 (E.D. Mich. Mar. 31, 2006)). In this consideration, "the absence of formal discovery is not

unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties." *Id.*

Here, the Settling Shareholders conducted comprehensive investigations and worked extensively with the SC during the SC's investigation. As part of Settling Shareholders' independent investigations, Settling Shareholders' Counsel obtained non-public documents and recordings, as well as documents produced by the Company in response to the Settling Shareholders' Section 220 Demands. Joint Decl., ¶19. Settling Shareholders also interviewed over 36 witnesses, which included former Victoria's Secret employees. *Id.* Finally, after a settlement in principle was agreed to, the Settling Shareholders engaged in confirmatory discovery before signing the Stipulation, which included: (1) a review of numerous versions of the Company's Code of Conduct, anti-harassment, discrimination, and retaliation policies, reporting and investigations protocols, model photoshoot protocols, Board and Committee minutes and presentations, including presentations regarding complaints received, SC minutes, severance and settlement agreements; and internal complaints.; and (2) interviews with Sarah Nash, the Chair of the SC and of the Board, William Savitt, Sarah Eddy, and Cynthia Lumerman, the SC's counsel. *Id.*, ¶27.

### G. The Settling Shareholders and Their Counsel Support the Settlement

"Generally, courts will give deference to plaintiffs counsel's determination to settle a case." *Bailey*, 2008 WL 495539, at *4; *see also Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs"). Here, Settling Shareholders' Counsel have extensive experience in complex litigation of this nature and believe that the Settlement is fair, reasonable, and adequate. A description of Settling Shareholders' Counsel's experience in derivative litigation is provided in the accompanying declarations of Settling Shareholders' Counsel, attached to the Declaration of Geoffrey M. Johnson in support of Plaintiff Milton Rudi's Motion for Final

Approval of Proposed Settlement and Plaintiff's and Settling Shareholders' Motion for Attorneys' Fees and Expenses, Exs. A-H. Because the Settlement was reached only after extensive arm's-length negotiations with a firm understanding of the factual and legal issues presented and the relative strengths and weaknesses of the claims and defenses, the assessments of counsel on the fairness of the Settlement is entitled to great deference. *See In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (when settlement negotiations are conducted at arms' length, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"); *Gascho*, 2014 WL 1350509, at *18 (noting that, "[n]ot insignificantly, the Class Representatives have also approved the Settlement Agreement.").

Finally, L Brands, through the SC, agrees that the Settlement, and each of its components, confers a substantial benefit on L Brands and its shareholders. This is of particular importance because Defendants repeatedly represented that the SC is vested with the authority to evaluate the claims in this litigation and address it in the exercise of its business judgment.

## H. Reaction of L Brands' Shareholders Favors Final Approval

Absent significant objections, final approval is appropriate. *See, e.g.*, *Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79 objections in class of nearly 11,000 members "tends to support a finding that the settlement is fair"); *Hainey*, 617 F. Supp. 2d at 675 ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate."). To date, there have been no objections to the Settlement: "[t]his is strong evidence that shareholders believed the settlement to be fair, reasonable, and adequate." *Big Lots, Inc. S'holder Litig.*, 2018 WL 11356561, at *3.

## I. The Settlement Is in the Public Interest

"There is a strong public interest in encouraging settlement of complex litigation and class-action suits because . . . settlement conserves judicial resources." *Bailey*, 2008 WL 495539, at *4

(citing *Granada*, 962 F.2d at 1205). Indeed, the Sixth Circuit has recognized that "[s]ettlements are welcome in cases such as this because litigation is 'notoriously difficult and unpredictable.'" *Granada*, 962 F.2d at 1205 (quoting *Maher*, 714 F.2d at 455); *Nationwide*, 2009 WL 8747486, at *8 ("there is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve.").

Moreover, the public interest is served by the terms of the Settlement, which provides for corporate governance reforms at a large, prominent public company, guaranteed external and Board-level oversight to ensure the reforms are effectively implemented, and $90 million in funding to ensure that adequate resources are devoted to implementing the reforms. Joint Decl., ¶¶33-42. Doing so also provides a governance model for other companies intent on ensuring that sexual harassment will not be tolerated and embracing diversity, equity, and inclusion. Other boards are likely to see the benefits of such improved governance and look to L Brands' example on preventing sexual harassment and other workplace misconduct and improving reporting and anti-retaliation in connection with such violations. Finally, and most importantly, settlement of the Actions avoids subjecting the victims of sexual harassment, discrimination, and retaliation, to having to testify or re-live traumatic events. *Id.*

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff, on behalf of the Settling Shareholders, respectfully requests that the Court grant final approval of the Settlement.

DATED: December 14, 2021

Respectfully Submitted,

*/s/ Geoffrey M. Johnson*
Geoffrey M. Johnson (0073084)
**SCOTT+SCOTT ATTORNEYS AT LAW**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106

Telephone: (216) 229-6088
Facsimile: (860) 537-4432
Email: gjohnson@scott-scott.com

Deborah Clark-Weintraub (*admitted Pro Hac Vice*)
Jing-Li Yu (*admitted Pro Hac Vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
Email:  dweintraub@scott-scott.com
          jyu@scott-scott.com

*Attorneys for Plaintiff Milton Rudi*

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2021, PLAINTIFF MILTON RUDI'S MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT, and all documents in support thereof, were filed electronically with the Clerk of the Court and to be served by operation of the Court's electronic filing system upon the following:

| | |
|---|---|
| John W. Zeiger (0010707) | Robert W. Trafford (0024447) |
| Marion H. Little, Jr. (0042679) | James A. King (0040270) |
| Matthew S. Zeiger (0075117) | Kirsten R. Fraser (0093951) |
| Zeiger, Tigges & Little LLP | Porter, Wright, Morris & Arthur LLP |
| 41 S. High St., Suite 3500 | 41 S. High St., 29th Floor |
| Columbus, OH 43215 | Columbus, OH 43215 |
| Tel: (614) 365-9900 | Tel: (614) 227-2000 |
| Fax: (614) 365-7900 | Fax: (614) 227-2100 |
| zeiger@litohio.com | rtrafford@porterwright.com |
| little@litohio.com | jking@porterwright.com |
| zeigerm@litohio.com | kfraser@orterwright.com |

*Attorneys for Defendant Leslie H. Wexner*

Roger P. Sugarman (0012007)
6025 Cranberry Ct.
Columbus, OH 43213
Tel: (614) 578-6456
rogerpsugarman@gmail.com

*Attorney for Defendant David T. Kollat*

Carole S. Rendon (0070345)
Baker & Hostetler
127 Public Square, Suite 2000
Cleveland, OH 44114
Tel: (216) 861-7420
Fax: (216) 696-0740
crendon@bakerlaw.com

*Attorney for Defendant Edward Razek*

*Attorneys for the Special Committee of the Board of Directors of L Brands, Inc., acting on behalf of Nominal Defendant L Brands, Inc.*

 */s/ Geoffrey M. Johnson*
Geoffrey M. Johnson (0073084)