# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MILTON RUDI,

        Plaintiff,

vs.

LESLIE WEXNER, EDWARD RAZEK, and
DAVID T. KOLLAT,

        Defendants,

    and

L BRANDS, INC.,

        Nominal Defendant.

Case No. 2:20-cv-3068

District Judge Michael H. Watson

Magistrate Judge Elizabeth P. Deavers

**JOINT DECLARATION OF DEBORAH CLARK-WEINTRAUB AND JULIE
GOLDSMITH REISER IN SUPPORT OF PLAINTIFF'S MOTION FOR
FINAL APPROVAL OF SETTLEMENT AND FOR PLAINTIFF'S AND
<u>SETTLING SHAREHOLDERS' MOTION FOR ATTORNEYS' FEES</u>**

We, Deborah Clark-Weintraub and Julie Goldsmith Reiser, declare as follows:

1. We are partners at the law firms of Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein"), respectively, and are counsel for Settling Shareholders[1] in the above-captioned action. We have personal knowledge of the facts set forth in this declaration. If called upon to do so, we could and would competently testify to such facts.

2. We Plaintiff's Motion for Final Approval of Settlement, as set forth in the

---

[1] Unless otherwise noted, capitalized terms have the meaning set forth in the Stipulation and Agreement of Settlement dated July 29, 2021 ("Stipulation"). ECF No. 21-1. A true and correct copy of the fully executed Stipulation is attached hereto as **Exhibit 1**.

Stipulation, and Plaintiff's and Settling Shareholders' Motion for Attorneys' Fees.

3.     The Settlement represents a historic and nearly unprecedented result, reflecting the Company and Settling Shareholders' powerful commitment to strengthen the Company's corporate governance and provide a safe workplace environment for the Company and its tens of thousands of mostly female employees.  If approved, the Settlement will provide substantial benefits to the Company and its stockholders.

4.     As we demonstrate below, the Settlement is fair, reasonable, and adequate, is in the best interests of the Company and its stockholders,[2] and results from months long and hard-fought, arms'-length negotiations between the Settling Parties.  In these negotiations, the Parties were guided by the Honorable Layn R. Phillips (Ret.), an experienced mediator and a former United States District Judge of the Western District of Oklahoma and the founder of Phillips ADR Enterprises.

5.     In this declaration, we set forth: (a) a brief summary of the allegations in the above-captioned action; (b) the procedural history of the action; (c) the factual investigation and prosecution of this action; (d) the arms-length, extensive negotiations that led to this historic Settlement; (e) the substantial corporate benefit achieved by the Settlement; (f) the shareholders' reaction to the Settlement; and (g) the basis for Settling Shareholders' request for attorneys' fees and expenses.

## I.     BACKGROUND

### A.     Summary of the Allegations

6.     This Action alleges pervasive sexual harassment and misconduct perpetrated or

---

[2]     On August 3, 2021, L Brands spun off Victoria's Secret as a separate business, and renamed the remaining business Bath & Body Works.  Because the funding commitment and corporate reforms apply to these successor entities, references to L Brands or the Company in this declaration shall also apply to its successors.

condoned by key officers of the Company, and the Board's lack of oversight into those matters. It further alleges that this toxic workplace was presided over by a long-term senior officer of the Company, who harassed dozens of women throughout his tenure and was feared for his willingness and ability to retaliate. The Action further alleges that the senior officer groped models, propositioned them for sex, and made disparaging and discriminatory comments about older female employees. The Action also alleges that the senior officer was enabled by another high-ranking officer and stockholder of the Company, who allegedly turned a blind eye to the misconduct and indeed made his own disparaging comments against women.

7.      Because the Company is a consumer-facing business and depends heavily on its brand appeal to a primarily female customer base, allegations that the Company and its top management tolerated and perpetuated a culture of sexual harassment have been a serious threat to the foundation of the Company's business. The toxic workplace was finally exposed to the public through reports in *The New York Times*, other media, and highly publicized petitions by former and current Victoria's Secret models, who called attention to the toxic environment at the Company.

### B.      Procedural Background

8.      On February 6, 2020, Plaintiff Rudi sent the Board a litigation demand in which he demanded that the Board "appoint a special committee of independent directors to immediately investigate and take action to remedy breaches of fiduciary duties committed by certain current and former officers and directors of the Company." On February 7, 2020, Oregon made a demand to inspect L Brands' books and records pursuant to Section 220, seeking to investigate breaches of fiduciary duty by the Company's officers and directors. On February 12, 2020, Giarratano also made a books and records demand pursuant to Section 220, seeking to investigate alleged breaches of fiduciary duty by officers and directors of L Brands.

9.      On February 25, 2020, Oregon made a supplemental books and records demand regarding the potential sale of Victoria's Secret to Sycamore Partners.  On March 6, 2020, Oregon negotiated a confidentiality agreement with L Brands.  By letters dated March 6 and 18, 2020, L Brands agreed to produce certain categories of Section 220 documents to Oregon pursuant to that confidentiality agreement.

10.     On April 3, 2020, Plaintiff Rudi supplemented his litigation demand to also raise concerns regarding the potential sale of Victoria's Secret to Sycamore Partners.  On April 15, 2020, Oregon negotiated a tolling agreement with L Brands regarding its books and records demand. The agreement tolled the statute of limitations and provided that "[f]or purposes of evaluating the requirement of pre-suit demand under Rule 23.1 with respect to any derivative action commenced by Oregon concerning the subject matter of the Demand, the Board of Directors of the Company shall be deemed to consist of the members of the Board as it existed as of March 24, 2020."

11.     On May 7, 2020, Oregon sent a further supplemental demand based on the termination of the transaction to sell 55% of Victoria Secret.  Then, on May 19, 2020, after only receiving a pro forma response to his April 3, 2020 litigation demand that did not commit to an investigation, Plaintiff Rudi filed the above-captioned stockholder derivative action in the Court of Common Pleas in Franklin County, Ohio.

12.     On June 4, 2020, Giarratano sought to enforce his February 12, 2020 books and records demand by filing an action to enforce the demand in the Delaware Court of Chancery on June 4, 2020 (*Giarratano v. L Brands, Inc.*, C.A. No. 2020-0437-JRS).  Then, on June 16, 2020, Defendants removed the above-captioned stockholder derivative action to the United States District Court for the Southern District of Ohio.

13.     On July 6, 2020, the parties to the above-captioned action informed the Court that

the Board had created a Special Committee ("SC"), and had delegated the full power and authority of the Board to review, investigate, and evaluate the subject matter of the litigation and 220 demands, and to take any action it deems reasonably necessary and in the best interests of the Company and its stockholders to address those demands or their subject matter, including any claims or litigation relating to their subject matter. The parties to the above-captioned action also agreed to stay the proceeding in light of the SC's ongoing work. The stay was extended on December 29, 2020; March 26, 2021; and June 30, 2021.

14. On July 10, 2020, Lambrecht made a litigation demand on the Board. Then, on September 4, 2020, Maryann Kualii served a Section 220 books and records demand on the Company.

15. Through the summer and fall of 2020, with a pending trial date of November 23, 2020, regarding Giarratano's books and records demand, the Company refused to produce documents or provide complete interrogatory responses to Giarratano. After going through motion practice, Giarratano sat for a seven-hour deposition in September 2020. On October 14, 2020, Giarratano filed his 50-page pre-trial brief. One month prior to the scheduled trial date of November 23, 2020, in the *Giarratano* action, the Company agreed to produce documents in response to Giarratano's books and records demand. On October 29, 2020, the *Giarratano* action was voluntarily dismissed.

16. The Company produced certain documents and books and records on August 28, November 4, and December 11, 2020, in response to Oregon's books and records demand.

17. On January 12, 2021, Lambrecht filed a stockholder derivative action in the Delaware Court of Chancery, asserting claims for breach of fiduciary duty and waste against the Individual Defendants (*Lambrecht v. Wexner*, C.A. No. 2021-0029-JTL).

18.     On February 23, 2021, Detroit made a litigation demand on the Board, via the SC's counsel, seeking to investigate similar factual allegations as Plaintiff Rudi and requesting similar relief.

### C.     Settling Shareholders' Investigation

19.     The Settling Shareholders, through their counsel, conducted extensive fact investigations both before and during the pendency of their actions or demands.  As part of those investigations, the Settling Shareholders independently obtained documents and recordings not previously disclosed in any press reports, and reviewed the documents produced by the Company in response to the Settling Shareholders' books and records demands.  These documents included (1) minutes, agendas, board packages, and other materials relating to regularly conducted and special meetings of the Board and Board committees; (2) internal L Brands policies, including the Code of Conduct, investigation manuals, and policies and procedures; and (3) materials relating to the independence of the members of the SC.  Settling Shareholders also interviewed over 36 witnesses, which included former Victoria's Secret employees.  Settling Shareholders' Counsel then shared the results of their own independent investigations with the SC in detailed and lengthy presentations.  The Settling Shareholders also suggested new avenues for investigation to the SC.

20.     Counsel for Settling Shareholders also had extensive communications with the SC and its counsel regarding the SC's investigation.  This included numerous meetings and detailed updates on the status of the SC's investigation.  Through these communications, Settling Shareholders' Counsel pressed the SC and its counsel for detailed descriptions of the SC's process and progress in its investigation, for production of relevant documents, the waiver of certain non-disclosure agreements so additional witnesses could be interviewed, and to explore possible paths to resolution.

**D. Settling Shareholders' Initial Settlement Demands**

21.     Throughout the winter of 2020 and 2021, the Settling Shareholders made a number of both oral and written settlement demands to the SC, including demands requesting changes in Company leadership.   On January 17, 2021, the SC determined that it would not be in the Company's best interests to press forward with litigation, but instead the Company should settle the pending actions and 220 demands.   The Settling Parties agreed to retain Judge Phillips, and an initial mediation session with Judge Phillips was scheduled for April 21, 2021.

22.     On January 22, 2021, counsel for the SC presented a multi-hour detailed oral report of their factual findings to counsel for all Settling Shareholders.   Counsel for the Settling Shareholders then submitted questions in response to the SC's presentation, and on February 26, 2021, listened to a second presentation from the SC's counsel with further factual findings and responses to the Settling Shareholders' Counsel's questions.

**E. Settlement Negotiations**

23.     In advance of the proposed mediation scheduled for April 21, 2021, Settling Shareholders reviewed internal documents produced by L Brands, including, *inter alia*, (a) meeting minutes of, and presentations reviewed by, the Board and its committees; (b) internal L Brands policies, including the Code of Conduct, investigational manuals, and policies and procedures; and (c) materials relating to the SC members' independence.  Settling Shareholders' Counsel also met with the SC's counsel numerous times, shared the results of their independent investigations, and provided suggestions to, and pressed for, progress reports from the SC's counsel to monitor and further its investigation.

24.     On April 21, 2021, the first mediation was held under Judge Phillip's guidance via Zoom.  All the parties and the directors' and officers' insurers were represented.  During the first session, Defendants agreed in principle to implement a set of corporate governance reforms.

However, final resolution was not reached.

25.     Over the next two months, the parties continued to negotiate a resolution, with dozens of information mediation sessions between the respective sides' working groups and presided over by Judge Phillips, and numerous negotiations in between and after those mediations to finalize the contours of the Settlement.  Over several sessions, the Parties negotiated the detailed Management & Governance Measures that are attached as Exhibit E to the Stipulation (*see* ECF No. 21-6).

26.     On June 14, 2021, the parties engaged in another full-day mediation through Judge Phillips.  During this session, the parties reached a settlement in principle.  Settling Shareholders' counsel then negotiated a term sheet setting forth the material terms of the Settlement.

27.     In preparation for finalizing the Settlement, Settling Shareholders took confirmatory discovery, which included reviewing relevant documents and conducting targeted interviews.  The documents included the SC's meeting minutes, discrimination and misconduct complaints, and numerous settlements and severance agreements concerning discrimination, harassment, or other misconduct.  The interviews were with one member of the SC and with counsel for the SC.  The discovery confirmed that the terms of the Settlement are fair and reasonable to the Company and its stockholders, and in their best interests.

28.     The Settlement was finalized in the Stipulation, which was executed on July 29, 2021.  The Stipulation was filed with this Court on July 30, 2021.

29.     Finally, only after the Settlement was executed, the parties engaged in extensive arms-length negotiations regarding the proposed fee award, again under the auspices of Judge Phillips.  Defendants do not oppose the Settling Shareholders' Counsel's fee award and the Settling Shareholders support both the Settlement and the proposed fee award.

30.     On August 5, 2021, Plaintiff Rudi, on behalf of the Settling Shareholders, filed a motion for preliminary approval of the Settlement in this Court.

31.     On August 25, 2021, the Court granted preliminary approval of the Settlement, approved the proposed form of notice, and set a case schedule to precede a final fairness hearing on January 18, 2022.

32.     On September 8, 2021, the Company disseminated notice of the Settlement via a Form 8-K filed with the SEC.  Previously, the Company had also announced the Settlement on July 30, 2021, also through a Form 8-K and press release.

## II.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.     The Terms of the Settlement

33.     The Settlement provides for extensive corporate governance reforms, supervised by corporate officers and independent consultants, and anchored by $90 million in funding over five years that L Brands will provide (or $45 million each by its two successor companies).  Two leading workplace experts, Professor Joanna Grossman, the Ellen K. Solender Endowed Chair in Women and the Law at SMU Dedman School of Law, and Professor Vicki Schultz of Yale Law School, Ford Foundation Professor of Law and Social Sciences at the Yale Law School, who have both published extensively on the issues of sexual harassment and discrimination, worked closely with the Settling Shareholders in crafting the Settling Shareholders' demands and were instrumental in crafting the unprecedented reforms detailed below.

34.     The $90 million funding commitment will ensure proper resources for the reforms that include:

    a.  New stand-alone policies against sexual harassment and retaliation, for reporting of harassment and discrimination, and for investigation of harassment and discrimination complaints;

b.  Strengthening the process for reporting and investigating claims of sexual harassment, gender discrimination, and retaliation;

c.  Improved training for management and employees, including bystander training;

d.  Creating and maintaining a Diversity, Equity and Inclusion ("DEI") Council to oversee the reforms;

e.  Retaining a DEI expert and consultant to advise the DEI Council and conduct thorough reviews of policies and procedures, and audits to ensure that these policies and procedures are effective;

f.  Adopting a set of DEI Principles to foster a diverse and inclusive workplace culture;

g.  Collecting and evaluating data relating to harassment, retaliation, and the DEI Principles; and

h.  Bringing the Company's policy on non-disclosure agreements into conformity with New York law, ending the use of mandatory arbitration provisions for disputes involving harassment, gender discrimination, and retaliation, and agreeing not to enforce pre-Settlement non-disclosure provisions that prohibit a complainant from discussing the underlying facts and circumstances of a sexual harassment claim.

35.   The anchor for these reforms is the $90-million-dollar and multi-year funding commitment, which ensures that there are adequate resources to implement these reforms, and that these reforms will last for a sufficient duration to create lasting improvements in the Company's workplace.

36.   The reforms also provide for significant oversight.  It contemplates an expanded role for the Human Capital and Compensation Committee ("HCCC"), Audit Committee, and Nominating and Governance Committee of the Board, which all consist solely of independent

directors. At the managerial level, a DEI Council of key executives, including the Chief Diversity Officer as the council lead, the Chief Executive Officer as the Executive Sponsor, and the Chief Human Resources Officer and Chief Legal Officer or head of Ethics & Compliance in a Steering Committee, shall provide C-suite level oversight to ensure the Company's commitment to DEI principles and prevent harassment, discrimination, and retaliation in the workplace. Meanwhile, a DEI Consultant and DEI Expert provide further oversight and monitoring of the reforms and their ongoing effectiveness.

37.     At a more granular level, the reforms include brand-new stand-alone sexual harassment, anti-retaliation, and reporting policies, which include clear examples of prohibited conduct, as well as enhanced training, including mandatory training of managers, and bystander intervention training. The Company's policies are also being enhanced to ensure stronger discipline against prohibited conduct, as well as more direct reporting of senior-executive misconduct to the Board. The investigations, reporting, and remediation protocols have also all been bolstered, including promulgating clear guidelines and responsibilities for investigating claims.

38.     To ensure that these policies are being effectively followed, the reforms also include data collection — a reform unprecedented in shareholder derivative actions — including an annual opinion survey of all employees at the Company's corporate offices that include questions targeted at understanding whether employees have experienced harassment, discrimination, or retaliation, or perceive that management tolerates harassment, discrimination, or retaliation, or are aware of the Company's policies, and are comfortable with reporting or believe the Company encourages employees to speak up when they observe discrimination, harassment, retaliation, or other misconduct. The Company will also implement improved

recording, tracking, and analysis of harassment, discrimination, and retaliation complaints. Furthermore, the Company will conduct audits supervised by the DEI Consultant, who will issue an annual report to the HCCC.

39.    Furthermore, the reforms are not limited to employees but will also cover vendors and other contractors.

40.    The Company will also end mandatory arbitration of discrimination, harassment, and retaliation claims, and will also allow for the discussion of underlying facts and claims of discrimination, harassment, and retaliation despite non-disclosure provisions in an employment agreement.

41.    The reforms also commit the Company to express and implement improved DEI principles, reflected in commitment statements and the Code of Conduct.

42.    Together, these reforms — and the funding that enables these reforms to be robustly maintained — provide a significant benefit to L Brands and its stockholders.

**B.    The Settlement Achieves Historic Benefits for the Company and Its Stockholders**

43.    As the Settlement terms summarized above reflect, the Settlement achieves historic benefits for the Company and its stockholders.  The toxic workplace culture at the Company was a result of male-dominated executive suite that was not attuned to the needs and concerns of its workforce, which consisted of approximately 90% women.  The reforms put the Company on the path to preventing similar toxicity going forward by: 1) providing oversight — including by an outside consultant and an expert as well as detailed attention by senior executives — into DEI issues; 2) strengthening reporting and investigation mechanisms, including direct reporting to independent Board directors to further increase oversight; 3) creating policies that more clearly set forth prohibited conduct; 4) collecting data and conducting audits on an ongoing basis ensure

policies and procedures are functioning effectively and the workplace environment is as free from discrimination, harassment, and retaliation as possible; 5) limiting non-disclosure agreements and eliminating mandatory arbitration so that workers are not chilled from asserting rightful claims or discussing workplace problems; 6) improving training of managers and employees, including bystander intervention training, to help prevent harassment and retaliation; and 7) ensuring robust funding so that all these reforms can be implemented and maintained.

44.     Professor Joanna Grossman and Professor Vicki Schultz have prepared a joint declaration opining on the significance of the Settlement. The joint declaration is attached as **Exhibit 2.** In the joint declaration, Professors Grossman and Schultz opine that the provisions of the Settlement Agreement "significantly strengthen L Brand and Victoria's Secret's commitment and capacity to deter and prevent sexual harassment, discrimination, and retaliation; to hear and address complaints that arise; to identify and correct severe or recurring problems or larger risk factors that exist or emerge; and to promote diversity, equity and inclusion throughout the Companies." Thus, the Settlement Agreement "build[s] upon significant changes in the composition of the Companies' boards and executive leadership" that "pave[] the way for meaningful and effective reform."

45.     Professor Charles R. Korsmo opines on the value of the corporate benefits achieved through this Settlement. In his declaration, attached hereto as **Exhibit 3**, Professor Korsmo opines that the Settlement provided "significant value to the Company and its stockholders, likely in excess of $100 million." Professor Korsmo employed the following three generally-accepted methods in arriving at this value, each of which led to similar conclusions: (i) estimation of the magnitude of the negative effect of the Company's sexual harassment and misconduct scandals on stockholder value and the likely reduction in likelihood of recurrence due to the Reforms; (ii)

consideration of recent empirical academic research on the value of good corporate governance practices akin to those implemented by the Settlement; and (iii) examination of market evidence of the increase in the market value of Victoria's Secret attributable in part to the reforms triggered by the Action.

46.     Another indication of the value of the reforms is the several-fold increase in value between Victoria's Secret after the settlement was reached versus before the settlement.  In April 2020, when a deal was first proposed between L Brands and Sycamore Partners to jointly run Victoria's Secret, the business had an implied valuation of $1.1 billion despite $6 billion in annual sales.  However, reports as of the time of the preliminary approval motion valued Victoria's Secret from $5 billion to $7 billion.

47.     Beyond the experts' declarations, our independent judgment, and the judgment of all other counsel representing the Settling Shareholders, as well as counsel for the SC and for Defendants, have all led us to conclude that the Settlement confers historic benefits for the Company, its successors, and their stockholders.  The Settling Shareholders all approve of the Settlement.

C.     **The Settlement Was Negotiated by Experienced and Informed Counsel and Only After Substantive Investigation and Extensive Arms' Length Negotiations Overseen by an Experienced and Respected Mediator**

48.     The Settlement was reached after extensive arms'-length negotiations between counsel for the Settling Parties and counsel for the SC, including two full-day mediation sessions and numerous working group sessions.  During these sessions, the parties exchanged numerous proposals and demands, finally securing a significant $90 million commitment to fund numerous reforms, and robust unprecedented reforms that include monitoring of progress.

49.     Counsel for the Settling Shareholders were well-informed because they conducted

their own extensive investigation, which confirmed their understanding of the strengths and weaknesses of the case, including interviewing 36 witnesses, reviewing documents and mediation statements that were produced during the mediation, as well as the documents that were produced in response to the Settling Shareholders' Section 220 books and records demands and uncovered as part of the Settling Shareholders proprietary investigations. The Settling Shareholders further confirmed the fairness of the settlement through review of confirmatory discovery produced after the Settlement was reached. These documents included: (1) numerous versions of the Company's Code of Conduct, anti-harassment, discrimination, and retaliation policies, reporting and investigations protocols, and model photo-shooting protocols; (2) Board and Committee minutes and presentations, including presentations regarding the complaints they received; (3) SC minutes; (4) severance and settlement agreements; and (5) internal complaints. Beyond reviewing documents, the Settling Shareholders' counsel also interviewed Sarah Nash, the independent director who served as both Chair of the Board and the SC, as well as the lead counsel for the SC: William Savitt, Sarah Eddy, and Cynthia Fernandez Lumermann.

50. Counsel for Settling Shareholders, as noted above, have also attended numerous meetings with counsel for the SC, where they learned about the SC's investigations. In particular, on January 22, 2021, the SC's Counsel gave a detailed multi-hour oral presentation of its findings to counsel for all Settling Shareholders, and gave a follow-up multi-hour presentation to respond to Settling Shareholders' Counsel's questions and present further factual findings on February 26, 2021.

51. After these presentations, and after having reviewed documents produced in response to 220 and litigation demands, Settling Shareholders' counsel engaged in a full-day mediation with the SC and Defendants' counsel on April 21, 2021. After negotiating the contours

of the Settlement in the interim, the parties held another full-day mediation on June 14, 2021, and shortly afterwards, executed a term sheet including all the material terms of the Settlement. Furthermore, the Settlement negotiations were overseen by Judge Phillips. Judge Phillips is the go-to mediator for high profile shareholder and securities actions, and in particular has handled numerous other cases involving allegations of sexual harassment, including *In re Signet Jewelers Ltd. Sec. Litig.* and *City of Monroe Emps.' Ret. Sys., deriv. ex rel. Twenty-First Century Fox, Inc. v. Rupert Murdoch*. Judge Phillips has prepared a declaration (the "Phillips Declaration") describing the negotiations and his role in the process, which is attached hereto as **Exhibit 4.**

52. Counsel for each Settling Shareholder have substantial experience in prosecuting and settling shareholder derivative actions arising out allegations of sexual misconduct and harassment, including *City of Monroe Emps.' Ret. Sys., deriv. ex rel. Twenty-First Century Fox, Inc. v. Rupert Murdoch*.; and *Wynn Resorts, Ltd. Deriv. Litig.*; *In re Pinterest Deriv. Litig.*; and *In re Alphabet Deriv. Litig./Irving Firemen's Relief and Ret. Fund v. Page*.

53. Notably, *In re Alphabet S'holder Deriv. Litig.* and *Irving Firemen's Relief and Ret. Fund v. Page* had a similar settlement structure to that here — robust corporate governance and workplace reforms meant to address a toxic workplace culture, including a DEI council to oversee the reforms, and a funding commitment by the Company.

54. After arms'-length negotiations, all counsel strongly endorse this settlement.

**D.     Consideration of the Claims and Defenses, and the Risks, Expense, and Likely Duration of Further Litigation, All Favor Final Approval**

55. The Settling Shareholders maintain that their claims are strong. In particular, the Settling Shareholders believe that there is evidence in the SC's own presentations to the Settling Shareholders to support Plaintiff's allegations that the officer defendants engaged in years-long misconduct, or failed to supervise when they turned a blind eye or failed to adequately investigate

complaints.

56.    However, the Settling Shareholders also recognize that significant risk attends the further prosecution of their claims.  With respect to the Settling Shareholders who had planned to assert demand futility, Defendants would have argued that the Company had reporting processes and policies in place, and, therefore, Director Defendants fulfilled their oversight duties, and therefore, demand would not have been futile.  With respect to Plaintiffs Rudi and Lambrecht, who made litigation demands before commencing suit, Defendants would have argued that demand was rightfully refused because the Board, through the SC, conducted a reasonable investigation into those claims.  Furthermore, much of the misconduct occurred more than three years ago — sometimes more than a decade ago — and thus, a statute of limitations defense may be raised.

57.    Moreover, even if the claims survived motions to dismiss on wrongful refusal or demand futility grounds, there would have been issues with establishing the underlying fiduciary duty breaches, because Defendants would have vigorously contested whether they engaged in or condoned misconduct.  Because most of the claims against Individual Defendants were settled, Defendants would have argued that they did not establish liability.

58.    Furthermore, even if liability could be established, damages would have been difficult to prove.  Whether the amounts in the settlements — amounting to the low millions of dollars — constitute damages to the Company that the Defendants are liable for would also have been challenged.  Furthermore, the major source of damages Settling Shareholders would have claimed — the loss in value of the Victoria's Secret brand — would have been difficult to establish because Victoria's Secret also suffered from major business challenges that would have been difficult to separately assess from the workplace issues.

59.    Moreover, the Company would have been distracted by the time and cost of

17

defending litigation, which arguably is not in the Company's best interests.  There also was a significant risk that the SC would seek dismissal of the case on grounds that pursuing a shareholder derivative action was not in the best interests of the Company.

60.     In contrast to the risks and costs of litigation, the Settlement confers substantial — and historic — benefits, as outlined above.  The Settlement achieves benefits that could not have been established following trial.  Rather than recover for the Company a few millions of dollars following trial, the corporate reforms that were achieved in the Settlement bolster the Company's long-term prospects, including its ability to recruit top-flight talent.  The additional value to the Company, as Professor Korsmo opines, would be in excess of $100 million.

61.     We took into account the risks of continuing to litigate this case versus the substantial benefits of the Settlement, including those that cannot be achieved through a post-trial damages award, in negotiating, finalizing, and evaluating the Settlement.  In particular, we considered that settlements of cases where the underlying misconduct involved allegations of sexual assault, harassment, or discrimination.  We also took into account the public benefit of sparing victims from having to testify and potentially having to re-live the trauma of the underlying events in the event that the case was not settled.  Based on this evaluation of the risks of continuing to litigate versus the benefits of the Settlement, we have determined that the Settlement is in the best interests of the Company and its stockholders.

E.     **The Reaction of Stockholders Thus Far Further Counsels in Favor of Approval**

62.     On September 8, 2021, the date L Brands published its Form 8-K giving notice of the Settlement to the Company's stockholders, L Brands had approximately 278,897,853 shares outstanding.  To date, the Settling Parties have received no objections to this Settlement.  Should any timely objections be raised, the Settling Shareholders will respond by the date that any reply

in support of the Settlement is due. To date, because there have been no objections, the reaction of stockholders to the Settlement appears to be overwhelmingly positive.

## III. THE AGREED-TO FEE AND EXPENSES AWARD IS FAIR AND REASONABLE, AND SHOULD BE APPROVED

63. In addition to seeking final approval of the Settlement, and in light of the substantial benefits achieved by the Settlement for L Brands and its shareholders and employees, the Settling Shareholders respectfully submit that the Fee and Expense Award of $21 million, which was negotiated at arms-length and is unopposed by Defendants, is reasonable and fair and warrants approval.

64. The Settling Shareholders have devoted 7,919.05 hours to this Action through December 3, 2021, resulting in a total lodestar of $7,528,264.25.

65. A full analysis of the factors courts in Delaware and in this Circuit consider in evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in detail in the Memorandum in Support of Plaintiff's and Settling Shareholders' Motion for an Award of Attorneys' Fees and Expenses. Summarized below are the factual bases for the Settling Shareholders' request for court approval of the Fee and Expense Award.

### A. The Settling Shareholders Prosecuted This Action on a Wholly Contingent Basis

66. The Settling Shareholders' work on this case was performed on a wholly contingent basis. We have not received any amount in connection with this case. Indeed, from the outset, our firms understood that we were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require. In undertaking that responsibility, our firms were obliged to ensure that sufficient attorney

resources were dedicated to the prosecution of the litigation and that funds were available to compensate staff and to pay for the considerable litigation expenses.

67.     Because of the nature of complex litigation, where cases commonly last several years, contingent litigation firms not only have to pay regular overhead, but also advance the expenses of the litigation.  With an average lag time of several years for cases to conclude, the financial burden on contingent counsel is far greater than on a firm paid on a monthly basis.  It is axiomatic that a law firm handling complex, contingent derivative litigation does not always win. There are numerous examples of plaintiffs' counsel in contingency-fee cases having worked thousands of hours and advanced substantial expenses, only to receive no compensation. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

68.     Furthermore, the contingent nature of this action was particularly risky for a number of reasons, including that: (i) the Board delegated authority to an independent SC which, at any point in time, could have, and likely would have, moved in the name of the Company to dismiss the suit on the ground that the SC has concluded that dismissal was in the best interests of the Company; (ii) many of the underlying claims at issue in the litigation took place long before the three-year statute of limitations (which could only be overcome under "unusual conditions or extraordinary circumstances"); (iii) the SC was unable to find, during its exhaustive investigation, witnesses regarding many of Settling Shareholders' claims; (iv) it was contested whether the Board could be held responsible for the actions of independent contractors; and (v) there was a risk that insurers could disclaim responsibility on the basis of intentionality, even if Settling Shareholders' claims were found to be true.  Furthermore, to date only one derivative case involving allegations

of sexual misconduct has ever survived a demand futility challenge.

**B.     Approving the Fee and Expense Award Will Further Important Societal Interests**

69.     Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce corporate fiduciary laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of corporate fiduciary laws can only occur if private investors take an active role in protecting the interests of investors and can retain counsel with expertise to represent them.  Indeed, the United States Supreme Court has long recognized the value of derivative actions.  *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) ("This remedy [derivative actions] born of stockholder helplessness was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of shareholders' interests.  It is argued, and not without reason, that without it there would be little practical check on such abuses.")  To carry out this important public policy, we respectfully submit that fees should be awarded to adequately compensate law firms for their decision to undertake the considerable risks in shareholder derivative actions.  As described more fully above, Settling Shareholders' Counsel have achieved significant corporate governance reforms that are critical, not only for changing corporate culture specifically at Victoria's Secret and L Brands, but also more broadly for changing the corporate landscape in the #MeToo era.

**C.     The Agreed-upon Fee and Expense Award Was Reached Through Extensive and Arms-Length Negotiations Overseen by an Experienced Mediator and Was Approved by the Settling Shareholders**

70.     After agreeing to the Settlement, the Parties separately negotiated in good faith to attempt to reach agreement concerning the amount of the Fee and Expense Award for Settling Shareholders' Counsel, subject to approval by the Court.  The negotiations were extensive, and

involved multiple formal and information mediation sessions with Judge Phillips, multiple presentations to Defendants and their insurers, and expert analysis of the valuation of the Corporate Governance achieved. Ultimately, as set forth in the Phillips Declaration, Judge Phillips proposed a mediator's recommendation, which was accepted by the Parties. L Brands and its SC has also independently made a business judgment that the Fee and Expense Award is appropriate. The Settling Shareholders have also approved the Fee and Expense Award.

**D.     The Quality of the Settling Shareholders' Representation Must Be Considered**

71.     Our firms are among the foremost securities and derivative litigation firms in the United States, and the attorneys who worked on this litigation have decades of experience in derivative litigation on behalf of some of the largest corporations in America and their shareholders. Copies of our firms' resumes are attached to our declarations. The expertise and experience of counsel are important factors in setting a fair fee.

72.     We believe that the retention of out-of-District counsel was reasonable. While L Brands is based in Ohio, it is incorporated in Delaware, this action is governed by Delaware law, there were Section 220 books and records demands made under Delaware law, a Section 220 action was filed in the Delaware Court of Chancery, and another derivative action was filed in the Delaware Court of Chancery. Furthermore, Plaintiffs are L Brands shareholders from numerous states nationwide, and the issues in this case are complex and extend well beyond the bounds of this District. While this action could have been settled either in this Court or the Delaware Court of Chancery, the parties agreed to this Court as it was the first-filed action.

73.     In addition, the out-of-District counsel have specific expertise in derivative cases arising out of allegations of sexual misconduct and harassment, having personally been involved in and served as Lead Counsel in such cases. In particular, Cohen Milstein was lead counsel in

*Wynn Resorts, Ltd. Deriv. Litig.*, which settled for $90 million and is, to date, the only derivative case to survive demand futility in a derivative case involving allegations of sexual misconduct, co-lead counsel in *In re Alphabet S'holder Deriv. Litig.*, and is currently interim lead counsel in *In re Pinterest Deriv. Litig.*; Bernstein Litowitz Berger & Grossman LLP was lead counsel in *City of Monroe Emps.' Ret. Sys., deriv. ex rel. Twenty-First Century Fox, Inc. v. Rupert Murdoch*, which was the first settlement in a derivative case involving allegations of sexual misconduct; and Scott+Scott separately represented shareholders in a Delaware derivative action, *Irving Firemen's Relief and Ret. Fund v. Page*, arising out of the claims at Alphabet, Inc. As set forth in the declarations submitted by the Settling Shareholders attached as Exhibits A-H to the accompanying Declaration of Geoffrey M. Johnson in Support of Plaintiff Milton Rudi's Motion for Final Approval of Proposed Settlement and Plaintiff's and Settling Shareholders' Motion for Attorneys' Fees and Expenses ("Johnson Decl."), out-of-District counsel's rates are regularly approved by courts in cases throughout the country.

### E. The Settling Shareholders Devoted Significant Time and Labor to the Actions

74. The requested fee and expense award is consistent with the substantial amount of time and work undertaken by the Settling Shareholders in investigating and prosecuting the Actions and arriving at the Settlement. As described above, the Settlement was achieved only after the Settling Shareholders: (i) made a litigation demand on the L Brands Board demanding that the Board form the SC and retain outside counsel to investigate the claims in the litigation demand; (ii) monitored the SC's investigation during numerous phone calls and suggested additional areas of inquiry; (iii) conducted an extensive investigation into the underlying facts, including the review of publicly available documents and interviews with potential witnesses; (iv) researched and prepared multiple comprehensive complaints; (v) prepared several Section 220

books and records demands; (vi) conducted a Section 220 hearing and sat for a Section 220 deposition; (vii) obtained and analyzed thousands of documents; (viii) consulted with retained experts in Title VII, sexual harassment and corporate governance; (ix) interviewed one member of the SC and representatives of counsel for the SC to determine whether the terms of the Settlement were fair and reasonable; (x) made multiple presentations to the SC regarding the findings of the Settling Shareholders' investigations; (xi) participated in vigorous and extensive months-long settlement discussions and negotiations, which included, among other things, a full-day mediation conducted over Zoom on April 21, 2021, and another full-day mediation conducted over Zoom on June 14, 2021, and dozens of information meetings and calls; and (xii) prepared the Stipulation and related settlement documents and conducted additional negotiations over the specific terms of the Settlement. Through these efforts, the Settling Shareholders were able to negotiate for and achieve the historic governance measures relating to workplace enhancements and commitment to diversity, equity, and inclusion throughout L Brands described above.

75. The Actions thus presented a wide array of complex legal and factual issues, requiring the experience and creativity of counsel. Settling Shareholders' Counsel used their considerable experience and spent considerable time investigating the underlying facts and defenses in order to properly determine the strength and weaknesses of the case. Our firms also conducted appropriate legal research and economic analysis to assess the proper legal claims, damages, and relief. And at all times throughout the pendency of the Actions, Settling Shareholders Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for L Brands and its shareholders, whether through settlement or trial, by the most efficient means possible. Settling Shareholders' Counsel allocated work among themselves to avoid duplication of effort and to ensure the efficient prosecution of the Actions. To

this end, we, along with other partners at our respective firms, maintained daily control and monitoring of the work performed on the case. Experienced attorneys undertook particular tasks appropriate for their levels of expertise, skill, and experience, and more junior attorneys and paralegals worked on matters appropriate for their experience level. By allocating resources in this fashion, Settling Shareholders' Counsel sought to ensure that they were prosecuting the Actions as efficiently as possible and avoiding duplication of resource expenditures.

76. As discussed further in Plaintiff's and Settling Shareholders' Motion and Memorandum in Support of Plaintiff's and Settling Shareholders' Motion for an Award of Attorneys' Fees and Expenses, filed concurrently herewith, Settling Shareholders' Counsel expended 7,919.05 hours on the investigation, prosecution, and resolution of their claims for an aggregate lodestar of $7,528,264.25, as reflected in their separate declarations attached to the Johnson Decl. As stated in those declarations, the lodestar calculations were prepared based on the contemporaneous, daily time records maintained by our firms. Similarly, the hourly rates for the attorneys and professional support staff at our firms are their standard rates, which have been accepted in other securities or shareholder litigation. Based on our review, the time set forth in our own firms' declarations are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the Actions.

77. Overall, Settling Shareholders' Counsel's fee request results in a fractional multiplier of approximately 2.75 on Settling Shareholders' Counsel's total lodestar. The multiplier here falls well within the range of multipliers awarded in other complex cases by courts in Delaware, this Circuit, and elsewhere.

78. The chart below provides a breakdown of each firm's hours and lodestar:

| FIRM LODESTAR | | |
|---|---|---|
| **FIRM** | **HOURS** | **LODESTAR** |
| Bernstein Liebhard LLP | 591.50 | $551,706.25 |
| Bernstein Litowitz Berger & Grossmann LLP | 760.50 | $690,056.25 |
| Cohen Milstein Sellers & Toll PLLC | 2,472.5 | $1,767,465 |
| deLeeuw Law LLC | 297 | $222,750 |
| Greenfield & Goodman LLC | 147.25 | $174,491.25 |
| Scott+Scott Attorneys at Law LLP | 2,531 | $2,705,407 |
| Smith, Katzenstein & Jenkins LLP | 118.50 | $77,025 |
| Quinn Emanuel Urquhart & Sullivan LLP | 1,000.8 | $1,339,363.50 |
| **TOTALS** | **7,919.05** | **$7,528,264.25** |

79.     As described above, the work was time-consuming and challenging, involving complex legal and factual issues, and numerous obstacles presented by Defendants' aggressive defense and through vigorous settlement negotiations.  From the outset, our firms appreciated the unique and significant risks inherent in this litigation.

80.     Our firms also engaged in protracted settlement negotiations with experienced counsel in multiple sessions and on a continuing basis until Settlement, under the auspices of Judge Phillips.  Thus, the lodestar amount is justified given the substantial work performed and the numerous hurdles overcome by Settling Shareholders' Counsel's diligent efforts.

81.     Included in Settling Shareholders' Counsel's requested fee award is reimbursement of $311,884.21 in litigation expenses incurred by Settling Shareholders' Counsel in connection with commencing and prosecuting the claims against the Defendants over the course of the litigations.  Our firms' expenses are reflected on the books and records as maintained by our firms, and are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.  Similarly, Settling Shareholders' Counsel were directed

and required to attest that their expenses were reflected on the books and records maintained by their firms, prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred. Based on our review of the declarations prepared by Settling Shareholders' Counsel, attached to the accompanying Johnson Decl., as well as our own firms' books and records, we believe that the expenses identified below were reasonably necessary in the prosecution of the Actions. Courts have typically found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of shareholders.

82. The chart below provides a breakdown of each firm's expenses. In addition, the declarations submitted by Settling Shareholders' Counsel, attached to the accompanying Johnson Decl., include charts itemizing the amounts and categories of expenses advanced by each firm.

| FIRM EXPENSES | |
|---|---|
| **FIRM** | **EXPENSES** |
| Bernstein Liebhard LLP | $21,146.83 |
| Bernstein Litowitz Berger & Grossmann LLP | $19,377.69 |
| Cohen Milstein Sellers & Toll PLLC | $52,924.31 |
| deLeeuw Law LLC | $1,337.50 |
| Greenfield & Goodman LLC | $35 |
| Scott+Scott Attorneys at Law LLP | $137,924.86 |
| Smith, Katzenstein & Jenkins LLP | $6,291.63 |
| Quinn Emanuel Urquhart & Sullivan LLP | $72,846.39 |
| **TOTALS** | **$311,884.21** |

## IV. SETTLING SHAREHOLDERS RUDI, DETROIT, LAMBRECHT, AND GIARRATANO SHOULD BE AWARDED SERVICE AWARDS

83. Each of the Settling Shareholders are responsible for the Settlement obtained in this action. However, only Settling Shareholders Rudi, Detroit, Lambrecht, and Giarratano are seeking an incentive award of $10,000 each from the total attorneys' fees that are awarded by the Court for their roles in bringing and pursuing the Actions, and in consideration of their general releases. Specifically, Settling Shareholders' Counsel served litigation and 220 demands that caused the Company to form a Special Committee, hire outside counsel, and investigate the claims at issue in this suit. Settling Shareholders' Counsel also communicated frequently with Counsel regarding the status of the SC's investigation, provided important documents and information to Counsel, reviewed the complaints, pleadings, and litigation and 220 demands, participated in settlement discussions, and were instrumental in achieving a settlement. Accordingly, for the reasons set forth above, we respectfully request that the Court approve the Fee and Expense Award of $21 million in attorneys' fees, which includes $311,884.21 in expenses and $10,000 each to Settling Shareholders Rudi, Detroit, Lambrecht, and Giarratano.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed this 14 day of December 2021.

_____
Deborah Clark-Weintraub

*Attorney for Plaintiff Milton Rudi and the Police and Firemen's Retirement System of the City of Detroit*

_____
Julie Goldsmith Reiser

*Attorney for the Oregon State Treasurer, on behalf of the Oregon Public Employee Retirement Fund*

29

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 14, 2021, the foregoing Declaration and all attachments thereto were filed electronically with the Clerk of the Court and to be served by operation of the Court's electronic filing system upon the following:

John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
Matthew S. Zeiger (0075117)
Zeiger, Tigges & Little LLP
41 S. High St., Suite 3500
Columbus, OH 43215
Tel: (614) 365-9900
Fax: (614) 365-7900
zeiger@litohio.com
little@litohio.com
zeigerm@litohio.com

*Attorneys for Defendant Leslie H. Wexner*

Roger P. Sugarman (0012007)
6025 Cranberry Ct.
Columbus, OH 43213
Tel: (614) 578-6456
rogerpsugarman@gmail.com

*Attorney for Defendant David T. Kollat*

Carole S. Rendon (0070345)
Baker & Hostetler
127 Public Square, Suite 2000
Cleveland, OH 44114
Tel: (216) 861-7420
Fax: (216) 696-0740
crendon@bakerlaw.com

*Attorney for Defendant Edward Razek*

Robert W. Trafford (0024447)
James A. King (0040270)
Kirsten R. Fraser (0093951)
Porter, Wright, Morris & Arthur LLP
41 S. High St., 29th Floor
Columbus, OH 43215
Tel: (614) 227-2000
Fax: (614) 227-2100
rtrafford@porterwright.com
jking@porterwright.com
kfraser@orterwright.com

*Attorneys for the Special Committee of the Board of Directors of L Brands, Inc., acting on behalf of Nominal Defendant L Brands, Inc.*

 */s/ Geoffrey M. Johnson*
Geoffrey M. Johnson (0073084)

3