# EXHIBIT 2

MILTON RUDI,

        Plaintiff,

vs.

LESLIE WEXNER, EDWARD RAZEK, and
DAVID T. KOLLAT,

        Defendants,

    and

L BRANDS, INC.,

        Nominal Defendant.

Case No. 2:20-cv-3068

District Judge Michael H. Watson

Magistrate Judge Elizabeth P. Deavers

**DECLARATION OF PROFESSORS
JOANNA L. GROSSMAN, SMU DEDMAN SCHOOL OF LAW,
AND VICKI SCHULTZ, YALE LAW SCHOOL,
IN SUPPORT OF THE SETTLEMENT AGREEMENT**

I, Joanna L. Grossman and I, Vicki Schultz, declare as follows:

1.      This declaration provides our opinion and reasoning regarding the Stipulation and

Agreement of Settlement, Compromise, and Release ("Agreement") agreed to by (1) the Oregon

Department of Justice, on behalf of the Oregon Public Employee Retirement Fund ("Oregon"),

(2) Milton Rudi ("Rudi"), (3) Detroit Police and Fire Retirement System of the City of Detroit

("Detroit"), (4) Nancy A. Lambrecht, Co-Trustee of the Amanda Greenfield 2012 Irrevocable

Trust ("Lambrecht"), (5) John Giarratano ("Giarratano"); and (6) Maryann Kualii ("Kualii")

(collectively with Oregon, Rudi, Detroit, Lambrecht, and Giarratano, the "Settling Shareholders");

(7) current and former members of the Board of Directors of L Brands, Inc. (the "Board"), named

in the Agreement; (8) former officers of L Brands, Inc., Leslie H. Wexner and Edward Razek (the "Officers,"), (9) Nominal Defendant L Brands, Inc. ("L Brands" or the "Company,")[1], and (10) the Special Committee of the L Brands Board (the "Special Committee").[2]

2.      The declaration describes our involvement in consulting on the structure and terms of the Agreement, and states the basis for our opinions.

3.      The alleged misconduct that is the subject of this litigation was revealed through a cascade of public revelations by employees, former employees, and models. Their stories described L Brands as a company in which workplace sexual harassment and discrimination were normalized and those who might have challenged that misconduct feared retaliation. The use of non-disclosure agreements to protect the highest level executives at Victoria's Secret kept complaints and settlements confidential, and the Board failed to take corrective action against those who committed or were complicit in the alleged misconduct, a failure for which the Board was never held to account.

4.      In our opinion, the provisions of this Agreement significantly strengthen L Brands and Victoria's Secret's commitment and capacity to deter and prevent sexual harassment, discrimination, and retaliation; to hear and address complaints that arise; to identify and correct severe or recurring problems or larger risk factors that exist or emerge; and to promote diversity, equity, and inclusion throughout the Companies.

5.      To summarize key features, the Agreement makes a clear public commitment to creating a non-discriminatory, respectful work environment; provides detailed plans for delivering

---

[1]      In describing prospective reforms undertaken by both L Brands and Victoria's Secret as separate entities, we refer to "the Companies."

[2]      Attached hereto as Exhibits A and B, respectively, please find the Resume of Prof. Vicki Schultz and the Resume of Prof. Joanna L. Grossman.

on that commitment through the development, implementation, and oversight of concrete mechanisms for educating the workforce about preventing and redressing sexual harassment, discrimination, and retaliation; addresses known organizational risk factors for sexual harassment; and establishes several accountability systems within the Companies to ensure assessment and adaptation as necessary to ensure long-term adherence to the stated values.

6. These terms of the Agreement build upon changes in the composition of the Companies' boards and executive leadership that signal a commitment to, and can pave the way for, meaningful change. By backing these reforms with a $90 million funding commitment over the course of at least five years, the Companies further convey the seriousness with which they take their obligation to eliminate harassment, discrimination, and retaliation, and to create a more equitable and inclusive workplace. The tone will start at the top and be reinforced throughout each company with a combination of concrete mechanisms designed to prevent and correct these issues and accountability measures designed to ensure the mechanisms are effective and can be adapted as necessary to be effective over the long term.

7. It is our opinion that the reforms in the Agreement reflect the Companies' broad and deep commitment to meaningful workplace and governance reforms. The Agreement places responsibility at the board level for implementation of updated values, creates mechanisms for identifying and redressing misconduct by high-level managers and executives, releases former employees from non-disclosure agreements, eliminates the use of involuntary non-disclosure provisions going forward, and eliminates the application of mandatory arbitration provisions to claims of harassment or discrimination.

8. It is our opinion that the reforms in the Management and Governance Measures ("measures") that are being implemented as a result of this Agreement constitute a best practices

approach because they adopt industry-leading approaches to policies, training, complaint-handling, and disciplinary processes; they monitor and address larger organizational risk factors; and they create multiple, mutually reinforcing mechanisms and systems of accountability for reducing and preventing sexual harassment and retaliation at the organization level. The reforms appropriately vest overarching responsibility with the Board of Directors and senior executives to address these problems, while also creatively enlisting other managers and outside experts, collecting and analyzing data to evaluate results and correct ongoing problems, and empowering workers to speak up about alleged misconduct inside and outside the Companies. Comprehensive reform, which combines attention to values with evidence-based mechanisms to address misconduct and accountability measures to assess the effectiveness of the system, is the best formula for changing workplace culture.

### Qualifications — Grossman

9.      I, Joanna L. Grossman, have been retained in this matter by Counsel for Oregon Public Employees Retirement Fund as an expert in law and policy related to workplace sexual harassment and other forms of employment discrimination.

10.      I am the Ellen K. Solender Endowed Chair in Women and Law and Professor of Law at SMU Dedman School of Law in Dallas, Texas. Prior to joining the faculty at SMU in 2016, I served as the Sidney and Walter Siben Distinguished Professor of Family Law at Hofstra University School of Law in Hempstead, New York. I have been a tenured full professor since 2005 and a chaired professor since 2012. I have also taught at Stanford Law School, Vanderbilt Law School, University of North Carolina Law School, Tulane Law School, and Cardozo Law School. Since 1996, I have regularly taught courses in sex discrimination law and policy, including one that focuses exclusively on sexual harassment.

11.     My scholarship has focused primarily on gender law, with special emphasis on sexual harassment law.  As my full curriculum vitae reflects, I have published a book, two textbooks, significant scholarly articles, encyclopedia entries, and myriad shorter pieces on current developments in this area of law and research.  My most recent article, *Sexual Harassment in the Post-Weinstein World*, 11 U.C. IRVINE L. REV. 943 (2020), explores the impact of the #MeToo Movement, with particular attention to the influence on the lessons for employers about handling the problem of sexual harassment.  My book, *Nine to Five: How Gender, Sex, and Sexuality Continue to Define the American Workplace* (Cambridge 2016), chronicles the most important developments in sexual harassment law in the past two decades and situates them within the theoretical and empirical frameworks researchers have developed to study sexual harassment.  I am the lead author on *Gender and Law: Theory, Doctrine, Commentary* (8th ed. 2020) and *Gender Law & Policy* (3d ed. 2020) and solely responsible for the extensive coverage of sexual harassment in both textbooks.  My research focuses on the intersection of legal rules governing employer liability for sexual harassment and social science research about the organizational policies and practices that affect the nature, prevalence, and response to harassment.  I have special expertise on sexual harassment in the workplace, including evaluating the nature and scope of sexual harassment liability and assessing the legal and practical effectiveness of efforts by employers to prevent and correct problems of workplace harassment.

12.     I am licensed to practice law in California, New York, Texas, and the District of Columbia.  I am a member of the bars of various state and federal courts as well as the U.S. Supreme Court.  I have a B.A. from Amherst College (1990) and a J.D. with distinction from Stanford Law School (1994), where I was elected to Order of the Coif.  Before becoming a law professor, I clerked for the Honorable William A. Norris of the United States Court of Appeals for

the Ninth Circuit (1994-95). I also worked as a staff attorney for the National Women's Law Center (1995-96), as a recipient of the Women's Law and Public Policy Fellowship, where I worked on sexual harassment litigation and law reform.

13. I served on the Editorial Board of Perspectives, the magazine of the ABA Commission on Women in the Legal Profession. I am an elected member of the American Law Institute. I am also a regular columnist for *Justia's Verdict*, an online source for legal commentary, where I have chronicled the most important developments in sexual harassment law (among other topics) for more than 20 years. I am regularly cited on sexual harassment issues by newspapers and magazines and frequently asked to provide commentary on radio and television news.

14. Throughout my career, I have participated in numerous conferences and workshops for lawyers, judges, employers, c-suite executives, professional associations, and other groups on gender equity issues, in general, and sexual harassment, in particular. In addition, I present sexual harassment research to academic audiences. Recent presentations have included:

> Keynote Speaker, *Measuring #MeToo: The Movement's Impact on Civil Law, Criminal Law, and Alternative Justice*, Washington & Lee University School of Law (Sept. 18, 2020)
>
> Invited Speaker, University of Illinois Summit to Prevent Sexual Harassment, Champaign-Urbana, Illinois (Oct. 16, 2019)
>
> Presenter, *Rethinking Institutional Response to Sexual Harassment*. Law and Society Association Annual Meeting, Washington, D.C. (June 2, 2019)
>
> Presenter, Panel on Sexual Harassment, National Diversity Equity Workshop, OXIDE, Alexandria, VA (Apr. 9, 2019)
>
> Keynote speaker, *Sexual Harassment in the Wake of #MeToo*, American Music Therapy Association Annual Meeting (Nov. 16, 2018)
>
> Presenter, *Sexual Harassment Training, Gender Law and Policy Colloquium*, Boston University School of Law (Nov. 4, 2018)

Keynote Speaker, *Sexual Harassment in the Judiciary*, Annual Conference of the Texas Judiciary (Sept. 6, 2018)

Keynote Speaker, *Sexual Harassment in the Post-Weinstein World*, Zeughauser Roundtable, Newport Beach, CA (Mar. 22 & May 21-22, 2018)

Panelist, *Knowing Your Rights: Sexual Harassment and Assault*, Women Galore, Wild Detectives, Dallas, TX (May 16, 2018)

Presentation, *Sexual Harassment in Universities*, National Academy of Sciences, Engineering, and Math, Boston, MA (Oct. 3, 2017)

I have done extensive research on issues of harassment and other forms of discrimination.

Selected relevant publications include:

*Sexual Harassment in the Post-Weinstein World*, 11 U.C. IRVINE L. REV. 943 (2020)

*Gender Bias and the Law*, in ELIMINATING GENDER BIAS (Am. Chem. Soc'y 2020)

*Legal Regulation of Sexual Misconduct at Work*, in RESEARCH HANDBOOK OF SEXUAL HARASSMENT IN THE WORKPLACE (forthcoming 2020) (book chapter)

*What to Do if You've Been Sexually Harassed*, in HARV. BUS. REV., GUIDE TO WOMEN AT WORK (2019) (with Deborah Rhode)

*NFL Cheerleaders Have to Follow Bizarre, Sexist Rules. But Are They Illegal?*, VOX.COM, Apr. 11, 2018

*Groping is a Crime*, VOX.COM (Jan. 2, 2018)

*Do Sexual Harassment Prevention Trainings Really Work?*, SCI. AM., Nov. 10, 2017 (with Vicki J. Magley)

*It's Time for America's Catcallers to be Punished*, FORTUNE.COM (Sept. 6, 2017)

*Understanding Your Legal Options if You've Been Sexually Harassed*, HARV. BUS. REV., June 22, 2017 (with Deborah Rhode)

*The Potential Legal Train Wreck Ahead for Fox News and Bill O'Reilly*, VOX.COM (Apr. 11, 2017)

*Looking Forward, Moving Back: A Retrospective on Sexual Harassment Law*, BOSTON U. L. REV. (2015)

*The Failure of Title VII as a Rights-Claiming System*, 86 N. CAROLINA L. REV. 859 (2008)

*The Culture of Compliance: The Final Triumph of Form over Substance in Sexual Harassment Law*, 26 HARV. WOMEN'S L. J. 1 (2003)

*The First Bite is Free: Employer Liability for Sexual Harassment*, 61 U. OF PITTSBURGH L. REV. 671 (2000)

15.     As part of my own consulting practice, I work with employers (including private companies, publicly traded companies, governmental entities, and universities) on issues related to sexual harassment complaints and lawsuits, draft anti-harassment policies, develop internal grievance procedures, and create and conduct anti-harassment training programs. I consult with employers, academic institutions, and other organizations about handling investigations of sexual harassment complaints or imposing appropriate discipline at the conclusion of such investigations. I also work with employers to study and address deeper problems of gender inequity and bias; analyze employer data on gender equity; work with employee resource groups to advocate for and achieve inclusion goals; and make evidence-based recommendations to clients for reaching diversity and inclusion goals.

16.     I have served as an expert witness in several cases involving sex discrimination and sexual harassment, including most recently *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-CV-06728-JMF (S.D.N.Y. 2019).

17.     Through my teaching, research, scholarship, and other work on discrimination matters, I have become deeply familiar with the law and best practices — as well as the underlying social science evidence — for addressing harassment and discrimination in the corporate workplace.

## Qualifications — Schultz

18.     I, Vicki Schultz, am the Ford Foundation Professor of Law and Social Science at Yale Law School, where I teach courses in Employment Discrimination Law, Constitutional Law, Workplace Theory and Policy, Work and Gender, and Feminist Legal Theory, among other offerings.  I have been teaching at Yale since 1992.  Before that I was an Assistant Professor at the University of Wisconsin Law School, where I also taught Employment Discrimination Law.

19.     I am a member (inactive) of the bars of Massachusetts and the District of Columbia. I earned my B.A. in Government, with Highest Honors, from the University of Texas at Austin, and my J.D., *cum laude*, from Harvard Law School.  After graduation I served as a law clerk for United States District Judge Robert E. Keeton (former Harvard Law School professor) and for Senior United States District Judge Charles E. Wyzanski, Jr. (former Solicitor of the U.S. Department of Labor under FDR), who sat with several federal circuit courts that year.

20.     I have held visiting professorships at top law schools, including Harvard Law School and UCLA School of Law.  I have also held several prestigious academic fellowships, for example, at the Radcliffe Institute for Advanced Study at Harvard, the Center for Advanced Study in the Behavioral Sciences at Stanford, and the Whitney Humanity Center at Yale.  These opportunities have enabled me to deepen my understanding of antidiscrimination law.

21.     Before becoming a law professor, I served as a Trial Attorney at the U.S. Department of Justice, Civil Rights Division's Employment Litigation Section, where I successfully prosecuted cases involving a pattern or practice of employment discrimination under Title VII of the Civil Rights Act.  In the course of that work, I learned expert methods to ferret out discrimination, to eliminate it, and to monitor, detect, and prevent its recurrence.

22.     My scholarship focuses on antidiscrimination law, primarily employment discrimination law and sexual harassment law.  My work in these fields has achieved national

prominence.  My first law review piece, *Telling Stories About Women and Work: Judicial Interpretations of Sex Segregation in the Workplace in Title VII Cases Raising the Lack of Interest Defense,* 103 HARV. L. REV. 1749 (1990), has been reprinted in scores of casebooks and cited widely in the academic literature; it is regarded as a seminal work on job segregation and preference formation.  My two early Yale Law Journal articles on sexual harassment, *Reconceptualizing Sexual Harassment*, 107 YALE L. J. 1683 (1998) and *The Sanitized Workplace*, 112 YALE L. J. 2061 (2003), are considered ground-breaking pieces that have changed the way experts in law, management, and social science understand, study, and address the phenomenon of sexual harassment.

23.    Sexual harassment continues to be a major focus of my research, writing, and teaching.  In addition to the two Yale Law Journal articles cited above, I have written numerous other works on the subject and lectured about it extensively.  In 2018, for example, I wrote the lead articles for two leading symposia that clarified applicable principles, suggested reforms, and updated the relevant research in this area.  *See Reconceptualizing Sexual Harassment, Again*, 128 YALE L. J. F. 22 (2018) and *Open Statement on Sexual Harassment by Employment Discrimination Law Scholars*, STANFORD L. REV., Vol. 71, No. 17 (2018).  My work has been widely cited by scholars and relied upon by authorities such as the U.S. Equal Employment Opportunity Commission ("EEOC") and the National Academy of Sciences and by federal and state courts.  I have also spoken and appeared frequently in the news media.

24.    As my resume reveals, I have delivered numerous lectures and talks and participated in countless workshops and conferences over the years.  These include informational talks to judges and lawyers, named lectures and keynote addresses to law faculty and students, and speeches to non-legal academics.  I have also been invited to give lectures abroad, for example, at

the Supreme Court of Mexico and universities in Israel. I have been a regular participant in faculty workshops and academic conferences such as the annual meetings of the American Association of Law Schools, the Law and Society Association (in which I have held leadership positions), and the Colloquium on Scholarship in Labor and Employment Law. I am also a co-founder of UNLEASH Equality, a group of law professors promoting the use of evidence-based analysis to address sexual harassment.

25.     As a result of my scholarship, research, teaching, and professional activities as a law professor, I have acquired familiarity with and expertise in the law, research, and best practice policies for addressing sexual harassment and other forms of discrimination in the workplace.

### Background

26.     We were retained by Plaintiffs as experts in sexual harassment and discrimination law, policy, and social science in connection with this matter. Before this retention, Professor Grossman was aware of some of the claims of sexual harassment and sex discrimination against L Brands and its senior executives based on public reporting, including the investigative article in the *New York Times* entitled *Angels in Hell: The Culture of Misogyny Inside Victoria's Secret*. Professor Schultz was not aware of these matters.

27.     We each reviewed all available materials in this matter, including mediation statements by all parties, litigation complaints, and materials produced by the Special Committee to Plaintiffs' counsel.

28.     In addition, we each reviewed reports and settlement agreements in similar lawsuits, consulted guidance from the EEOC and other relevant legal authorities, and updated our familiarity with social science literature on identifying, remedying, and preventing harassment and discrimination in the workplace.

29. From the time we were retained, we have consulted with Plaintiffs' counsel on all aspects of the development of the Agreement, and in particular, best practices in seeking to improve corporate culture and climate, as described below.

## Features of the Settlement Agreement

30. Successful, comprehensive reform in a corporate environment that has been plagued by systemic problems of sexual harassment and discrimination depends on four key elements: (i) a strong and public commitment to nondiscrimination, diversity, equity, and inclusion from the highest levels of the Company; (ii) concrete mechanisms to identify, prevent, and redress problems of sexual harassment, discrimination, and retaliation before they become pervasive; (iii) measures to identify and address any important risk factors for sexual harassment; and (iv) a system of oversight (including data collection, tracking and analysis) that enables the Company to assess the effectiveness of these various mechanisms and measures on an ongoing basis and make necessary adjustments.

31. The Agreement contains a variety of significant reforms designed to foster a workplace and environment that is nondiscriminatory, inclusive, and free from sexual harassment. The reforms influence hiring and promotion, internal reporting and investigations, disciplinary processes, and corporate governance (including Board oversight). The key reforms relate to leadership, statement of values, waiver of non-disclosure agreements and mandatory arbitration, new policies on harassment and retaliation, behavioral expectations for managers and executives, enhanced training and education, improved reporting and grievance procedures, retention of a Diversity, Equity, and Inclusion ("DEI") Consultant, creation of a DEI council, and data collection, tracking, and analysis.

32. These reforms have been publicly embraced by L Brands and Victoria's Secret's

new leadership. They are accompanied by a funding commitment of $90 million over five years, which strongly signals and supports the Company's commitment to change.

33.    In our opinion, these reforms incorporate all four of the elements identified above as necessary to succeed in creating a nondiscriminatory, respectful workplace and environment. Thus, we believe that with this Agreement in place, L Brands and Victoria's Secret will be able to move forward on a more secure footing. The headings below organize discussion of the reforms around the four elements necessary to achieve effective, lasting change.

## Clear Public Commitment to Nondiscrimination and Equality

34.    <u>Leadership</u>.    A company's leadership sets a crucial tone and example for its workforce and provides the foundation for a healthy workplace culture. An environment free from pervasive sexual harassment and discrimination begins with the commitments and modeling provided by top corporate leadership.

35.    The attitudes and behaviors of high-ranking executives are an important indicator of a company's culture — and an important indicator of the likelihood of effective reform. Executive misconduct is less likely to be held in check by run-of-the-mill policies and procedures, and unchecked misconduct can reverberate throughout the company. Leaders shape attitudes and behaviors throughout the company, and levels of harassment are affected by the behaviors of those at the top. Leaders model behavior and subordinates watch how leaders behave and whether they are rewarded or punished for their behavior. The conduct of leaders, then, sets general norms for employees' behavior; this is true whether the modeled conduct is ethical or unethical, kind or abusive, positive or negative. Like top leaders, managers throughout the organization can also influence behavior and shape the environment.

36.    The research about the impact of leader behavior applies in the context of sexual

harassment. Managers' attitudes toward harassment positively correlate with the level of harassment in a particular workplace. Moreover, research shows that when those in power display sexist attitudes and engage in sexually harassing behavior, they signal to others that sexual harassment is tolerated, if not condoned. Studies show, for example, that men with a high propensity to sexually harass women based on the men's individual characteristics are more likely to act on that propensity after witnessing an authority figure engage in sexually exploitative behavior, and less likely to engage in misconduct in an environment that does not openly condone harassing behaviors or imposes strong consequences for them.

37. Misconduct by leaders or high-level employees presents challenges that must be tackled directly. "High-value" personnel and significant power disparities are risk factors for harassment, and a challenge for dealing with it effectively. Subordinates are more likely to fear retaliation from high-level employees and thus refrain from complaining; high-power employees are more likely to feel immune from the rules governing the workplace. Measures to impose accountability and avoid perceptions of organizational tolerance include good written policies and effective, even-handed enforcement, regardless of rank. Organizations can also take steps to rein in unnecessary, unchecked, subjective authority of superiors over subordinates. This Agreement includes both types of reforms.

38. With this Agreement in place, L Brands is poised to transform into a company that embraces equal opportunity and makes it possible for all employees to use their talents and ability, unhampered by sexual harassment, discrimination, or retaliation.

39. <u>Statement of Values</u>. The revision to the statement of values included in the L Brands Code of Conduct reinforces the company's commitment to core principles of nondiscrimination, equality, respect, and fairness. "We strive to integrate Diversity, Equity, and

Inclusion into every corner and every level of our business," the statement reads. "We will treat everyone respectfully and fairly and provide and foster an environment in which everyone feels safe and empowered to be successful."

40. Importantly, the statement enumerates the specific forms of unlawful discrimination that prompted this settlement, makes clear that those behaviors will not be tolerated, and makes clear that the core values of nondiscrimination, equality, diversity, and inclusion will be integrated into all aspects of the business in a central rather than peripheral way for their businesses. The Companies are adopting a fundamental principle that every employee is valued and empowered to capitalize on their talents and abilities.

41. <u>Arbitration Waiver and Commitment to NDAs</u>. L Brands and Victoria's Secret have agreed to major changes regarding their use and enforcement of mandatory arbitration clauses and non-disclosure agreements ("NDAs").

42. For future settlements, the Companies will conform their policies to comply with New York law, N.Y. Gen. Obligations Law §5-336 (McKinney 2021), enacted in 2019 in direct response to the #MeToo movement. Under this provision, an employer may not include any provision in a settlement agreement or other resolution of a claim involving discrimination that purports to prevent disclosure of the underlying facts and circumstances to the claim "unless the condition of confidentiality is the complainant's preference." Any non-disclosure provision in a discrimination case must be given to all parties in writing, and a complainant has 21 days to consider whether to express a preference that the term be included, and a period of seven days after expressing such a preference to revoke it. The Companies also agree that a complainant's preference regarding the inclusion or omission of a non-disclosure provision will not affect either the Companies' willingness to enter into a settlement nor the amount of any settlement.

43.     In addition to vastly restricting the use of non-disclosure agreements going forward, the Agreement provides that the Companies will narrow their enforcement of past settlements that include a non-disclosure provision. Specifically, the Companies agree that they will not enforce a non-disclosure provision in any agreement that predates the settlement to the extent the provision prohibits a complainant from discussing the underlying facts and circumstances of a sexual harassment claim.

44.     An equally significant feature of the Agreement is that the Companies have committed to exempt claims of sexual harassment, gender discrimination, and retaliation from mandatory arbitration provisions, retroactively and prospectively. Arbitration will be available to complainants who elect it, but it will not be imposed over their objection.

45.     These changes are important to the overall functioning of the harassment prevention system. The #MeToo movement has shed light on the role that settlements with NDAs have played in permitting sexual harassers to continue engaging in misconduct, sometimes over the course of decades. Many of the highest-profile harassers (including Steve Wynn ("Wynn"), Harvey Weinstein ("Weinstein"), Roger Ailes ("Ailes"), and Bill O'Reilly ("O'Reilly")) relied on settlements with NDAs to resolve complaints quietly without suffering any consequences in position or power. Although NDAs can play an important role in the settlement of some disputes, they have proven costly in the context of sexual harassment and discrimination. By agreeing to cease imposing or enforcing such clauses, L Brands and Victoria's Secret have taken a significant step toward changing this harmful pattern and forcing themselves to grapple with the consequences of sexual harassment problems as they arise. Without the ability to hide behind an NDA, the Companies will have a stronger incentive to take effective action against an employee, officer, or director who commits sexual harassment, as well as to take measures to prevent recurrence and

remediate any harm to the target.

46.     We believe, and research supports our view, that mandatory arbitration is a major disincentive to corporate accountability. Arbitration can allow employers to avoid publicity in cases of sexual misconduct or discrimination, and it gives them significant control over the external dispute resolution process. Exempting sexual harassment, gender discrimination, and retaliation claims from mandatory arbitration gives L Brands another incentive to effectively address and prevent these issues before they become pervasive. It also conveys the Company's genuine commitment to eliminating sexual harassment, discrimination, and retaliation, and will encourage future complaints, as employees will have less reason to worry that their complaints will be ignored, will be heard in a biased forum, or will result in retaliation. Thus, ending mandatory arbitration in these cases will promote the Companies' values and benefit them and their employees, as swift and effective action will convey their meaningful commitment to stopping these behaviors.

47.     <u>Adoption of New Policies</u>. The Agreement calls for the adoption of a new sexual harassment policy, a new anti-retaliation policy, and a new policy governing reporting violations for those subject to the Code of Conduct. While policies alone do not stop sexual harassment, they provide an important framework for addressing the problem. The most effective policies in this context are ones, like these, that have been drafted following an assessment of the work environment, its structure, the organizational environment, and the particular problems that have recurred in the organization's recent history.

48.     <u>Sexual Harassment Policy</u>. A well-constructed sexual harassment policy creates a grievance procedure that both encourages targets to come forward, ensures a prompt and appropriate resolution of their complaints, and creates consistency in outcomes. The Companies' commitment to a harassment-free workplace is expressed and solidified in a new, state-of-the-art,

standalone Sexual Harassment policy that will be given to all employees and published on the company's website and intranet. The policy follows evidence-based reform suggestions and reflects thoughtful planning about the best ways to overcome common pitfalls.

49.     One notable feature of the policy is that it prohibits and defines sexual harassment in the broadest possible terms. Research shows most corporate harassment policies continue to limit the definition of sexual harassment to sexually-themed conduct, despite research showing the prevalence of many broader forms of discriminatory sex-based harassment.

50.     L Brands' policy makes clear that the term sexual harassment includes not only unwanted sexual advances and *quid pro quo* sexual coercion — it covers **all** unwanted sex-based harassment, including harassment based on a person's self-defined or perceived sex, sexual orientation, gender identity and expression, or transgender status; harassment based on sex stereotyping; and harassment based on pregnancy, childbirth, or related medical conditions.

51.     The policy specifies that prohibited harassment need not be severe or pervasive, so long as it consists of more than petty slights or mere inconveniences. This definition purposefully abandons the widely criticized "severity or pervasiveness" requirement in federal law, providing employees greater protection from harassment.

52.     The policy expressly reiterates that harassment does not have to be sexual in motivation or theme, or overtly gendered in content. Harassment need not consist of unwanted sexual advances, derogatory sexual remarks, or comments that women don't belong in management, in other words — it can also consist of bullying, belittling, yelling, physical assault, sabotage, ostracism, or any other unwanted conduct that is directed at an individual because of the person's sex. Including this language, and reinforcing it in training, should help correct widely shared misperceptions that the term sexual harassment refers only to overtly sexual forms of abuse,

when it actually includes the full spectrum of sexism and mistreatment.

53.    The policy will contain examples of these diverse forms of sexual harassment and will emphasize that violations of the Sexual Harassment Policy may lead to discipline, including termination and loss of compensation — thus providing fair notice of potential violations and consequences.

54.    Importantly, the policy covers not only employees, but also independent contractors and others not traditionally defined as employees, including applicants, interns and externs, trainees, temporary workers, consultants, vendors, and people conducting business or providing services in the Company's workplace (such as photographers on photo shoots). This extension of the anti-harassment policy to non-employees represents a big leap forward in coverage and commitment, well beyond that made by most companies.

55.    <u>Behavioral Expectations for Managers</u>. Pursuant to the Agreement, L Brands and Victoria's Secret will modify their Codes of Conduct to regulate the conduct of executives and managers more closely. As discussed earlier, leaders set a tone that can either inhibit or encourage sexual harassment and discrimination and inhibit or encourage targets to complain about misconduct. Thus, it is important to acknowledge managers' role in affecting the workplace environment for everyone. Accordingly, the new Code provides that:

   a.    Managers are held to a higher standard of conduct, which they must observe even when off-site.

   b.    Company executives at the level of Senior Vice President and above ("senior managers") are prohibited from having romantic or sexual relationships with other employees.

c.  Romantic and sexual relationships between Company employees who are in a direct reporting relationship must be disclosed to Human Resources ("HR").

56.  In sum, these provisions reinforce the expectation that those with workplace power model professional behavior in general and take care not to abuse the authority they have been delegated by the Companies.

57.  <u>Revised Reporting Policy</u>.  Sexual harassment is often common despite the widespread adoption of anti-harassment policies because there are so many barriers to reporting misconduct.  Employees who experience harassment in the workplace frequently fail to report harassment; they often respond in ways that seek to avoid confrontation with company authorities and fall back on personal, internal coping strategies.  Yet, employers tend to rely on victim reports before taking action to address misconduct.  People who experience sexual harassment cite two primary reasons for not filing a formal report: fear of retaliation and a sense of futility.  Because retaliation is common and causes harm that offsets or even exceeds any benefit from reporting, many employees who experience harassment opt to do nothing about it.  The harm to the victim goes unaddressed, the harasser goes unpunished, the organization misses a chance to investigate and address larger risk factors, and no plan for remediating or preventing the harassment is put in place.  This in turn sends a message to others that harassment is tolerated or even condoned.

58.  The Agreement takes this issue head-on by requiring a standalone policy against retaliation — with strict rules and harsh consequences.  It also requires that the anti-retaliation message be incorporated into the Code of Conduct and the Sexual Harassment Policy, and requires the policy to be widely disseminated and easily accessible, to guide employees about the process and protections in place for reporting violations.

59. L Brands and Victoria's Secret will substantially improve their processes for reporting, hearing, investigating, and responding to sexual harassment, sex discrimination, and related retaliation complaints. Amendments to these policies will ensure that alleged misconduct by high-ranking employees is reported in a systematic way to those in a position to address it, including the Chief Legal Officers, the DEI Consultants, the Ethics & Compliance departments and the Chief Human Resources Officers. As part of this effort, the Companies will adopt new standalone Reporting policies which commit the Companies to, and educates their workforce about, key features of the new complaint process, including the following:

a. Based on the best practice to encourage employees to come forward, L Brands and Victoria's Secret will allow employees to choose flexibly among multiple avenues for reporting sexual harassment, sex discrimination, or related retaliation. They may report internally to any supervisor or manager (not only those directly above them in the chain of command), to HR, or to the Legal Department; or they can report externally through an outside Ethics Hotline, in which case their complaint can be anonymous.

b. Contractors, including models, may also choose to report to any company manager, to the photo shoot monitor, or through the Ethics Hotline.

c. Employees will be advised that all complaints will receive a prompt, thorough, and impartial investigation; confidentiality will be observed to the extent possible within these parameters.

d. The Companies will undertake interim remedial measures and accommodations to ensure complainants' safety, health, emotional well-being, and ability to work (providing counseling or paid time off to a complainant, for example, or no-communication orders

to respondents). This commitment signals an additional level of commitment to complainants' welfare, as interim measures are not typically adopted by employers,

e. Complainants may talk to and provide evidence to investigators separately from respondents. They may also bring people with them to provide emotional support during investigatory proceedings.

f. L Brands also assures employees that respondents will be treated fairly. It promises to use proportionate corrective action, to hold violators accountable in even-handed ways regardless of their position within the Company, and to refrain from using harassment allegations as a pretext for imposing discipline for other reasons.

60. <u>Revised Retaliation Policy</u>. The Company's values are also reflected in its adoption of a new standalone Retaliation policy, which will clearly communicate the following commitments:

a. The Company prohibits retaliation against anyone who reports harassment or suggests they may report it, or who investigates or provides information in connection with such a report.

b. Retaliation is defined to include not only firing someone or imposing formal discipline, but also taking ***any*** adverse action that is reasonably likely to deter a person from reporting misconduct.

c. Any employee who engages in retaliation will be subject to discipline, which may include termination and disgorgement of compensation and cancellation of unvested options.

61.     <u>Financial Commitment</u>.  The Companies have agreed to spend $90 million dollars, with each successor company investing $45 million over at least five years to fund the reform Measures.

<u>**Enhanced Mechanisms to Detect, Address, and Deter Harassment**</u>

62.     Corporate commitments and values are an important first step.  But they hold little meaning without effective mechanisms to implement them and give them life and vitality in the day-to-day workplace culture.  In addition to the enhanced policies described in the previous section, the Companies have agreed to numerous reforms that will strengthen their capacity to detect, remedy, and deter sexual harassment and misconduct.  The most important are described below.

63.     <u>Enhanced, State-of-the-Art Training and Education</u>.  Evidence suggests sexual harassment training often lacks effectiveness.  In order to affect attitudes and behaviors, training must be evidence-based and developed with clear goals.  Researchers caution against one-size-fits-all, online training programs designed mainly to avoid legal liability.  Best practices recommend interactive training which should be customized to a particular company and workforce, should be grounded in achieving specific organizational objectives, and should educate employees about how eliminating sexual harassment advances those objectives.  Training should enlist employees' cooperation to create a respectful, inclusive culture, rather than pointing fingers and casting blame.

64.     The Agreement requires the Companies to retain an independent expert to administer a customized, interactive harassment prevention training, which must include bystander intervention and reporting components.  The training must be comprehensive, mandatory, repeated on an annual basis, and re-administered to employees who do not demonstrate adequate learning.

65. Rather than being designed simply to meet legal obligations, the training will be grounded in achieving specific organizational objectives, and will include:

a. hiring an independent expert to provide customized, interactive harassment prevention and workplace civility training, to be conducted separately for employees versus executives and managers consistent with best practices;

b. including bystander intervention training to teach both managers and employees how to intervene proactively to stop harassment, bullying, and ostracism before it worsens; and

c. providing training to Board members, along with fiduciary training.

66. By requiring the retention of an independent expert to develop these trainings, the Companies will ensure that the required trainings are appropriate for their workplaces and consistent with other goals articulated in this Agreement and in the Companies' policies. The additional Board training will help ensure that the Boards are able to perform effective oversight for these matters.

67. <u>Effective Enforcement Through Improved Complaint-Handling and Disciplinary Process for Sexual Harassment, Discrimination, and Related Retaliation Complaints</u>. One good way to encourage reports of misconduct is to handle prior reports effectively. When employees perceive that internal complaints are handled expeditiously and effectively, they are more likely to come forward with their own complaints. Although counterintuitive, a workplace with a steady stream of complaints can sometimes be a sign of a healthy, nondiscriminatory workplace culture. It can still, however, be difficult for employers to address misconduct by managers and executives.

68. Internal grievance structures are least likely to effectively resolve complaints involving a high-power employee or executive, partly because those with oversight authority may

be hesitant to take action against high-ranking executives for fear of damaging the operational side of the business, the company's reputation, or the career of a colleague who they might otherwise hold in high regard. The recent scandals involving Wynn, Weinstein, Ailes, and Les Moonves illustrate these challenges — and also the serious risks of not tackling executive sexual misconduct.

69.     Sexual harassment causes well-established harms to the targets, including career, emotional, and physiological effects. How the employer responds to a complaint or known problem of harassment is important to mitigating these harms. It is also important to prevent future harms and to reinforce the Companies' commitment to a nondiscriminatory work environment. Discipline must be sufficiently *certain*, consistent, and appropriately severe to convince employees that the Companies are serious about stopping harassment and preventing future incidents. The most important touchstone is that employees understand that engaging in or facilitating misconduct will result in certain, serious, even-handed discipline within the Companies, regardless of organizational rank. The new protocols are consistent with evidence-based recommendations about severity of the discipline and post-disciplinary monitoring. This approach also creates accountability by encouraging those who are aware of wrongdoing to take immediate steps to report it.

70.     Toward this end, the Agreement imposes a variety of safeguards designed to ensure that complaints are handled with the care and attention they deserve — even (or especially) when they involve allegations about the conduct of high-ranked executives.

71.     Features of the Agreement related to complaint handling and discipline are also important for shaping the culture and attitudes around sexual harassment. When Companies hold their leaders to high standards, subordinate employees are more likely to trust the processes the Company has put in place to protect them.

72.     For example, any external complaint or lawsuit that relates to an employee at the rank of Vice President or above must be reported immediately to Ethics & Compliance, the Chief Legal Officer ("CLO"), the Chief Human Resources Officer ("CHRO"), and the DEI Consultant. The Ethics & Compliance Department, in turn, must make quarterly reports to a dedicated committee of the Board about such complaints, thus ensuring that the Company is not able to quietly settle complaints against higher-ups.

73.     The Agreement includes the following key elements designed to ensure effective enforcement of the Companies' harassment policies, which will help ensure that investigations of complaints are adequate and are procedurally and substantively fair:

a.     Enhanced training and guidance for employees with investigatory roles, which will address the need for care and empathy in interviewing, the importance of maintaining confidentiality, the content of thorough and timely investigations, and the appropriate use of two-investigator teams.  Research shows that this type of training is effective to aid the investigator in the skills necessary to carry out an effective investigation, such as interviewing, factfinding, and recordkeeping.  Studies show that investigators who receive such training know more about sexual harassment and are better able to provide effective service to victims.  Training will also help combat the internal bias that is endemic to such investigations; it teaches the investigator about implicit bias, about the low likelihood of false complaints, and about the need to make credibility determinations.

b.     Clear guidelines for the use of outside counsel to conduct investigations, which will include the mandatory use of outside counsel to investigate allegations involving senior managers.  This, in conjunction with other special measures applicable to cases involving higher-ranked employees, will enable the Companies to protect targeted employees even when there is a

power differential. In-house factfinders often face conflicting incentives. They may desire to improve the environment for the complainant, but not at the cost of ruining the career or status of the person accused. By externalizing certain investigations, the Companies will mitigate the risk of an investigator acting out of self-interest to protect the Companies from future litigation arising from the complaint.

        c.        <u>Protocols for concluding investigations</u>, which will include directions for investigators to share findings with complainants, targets, and witnesses, for HR to check in with complainants after hearings are concluded and to monitor their performance ratings over time to detect and guard against retaliation, and for staff to evaluate and state conclusions about any "lessons learned." These provisions are important not only for fairly resolving the complainant's concerns, but also for conveying to other employees that the Company is determined to remediate any harm from misconduct and to learn from each case. The "lessons learned" component of the Agreement is one of many features that will help the Companies continuously grow and improve their mission to establish and maintain a nondiscriminatory work environment.

        d.        <u>Written record-keeping requirements</u>, which include standardized investigation reports maintained in a centralized database with accessibility restrictions tailored to protect confidentiality, consistent with best practices identified by sexual harassment researchers. Research shows that record-keeping requirements help ensure employers respond well by preventing them from making mistakes about the seriousness of a complaint or allegation, due to selective memory or cognitive recall bias, for example, or from failing to respond due to organizational inertia.

        e.        <u>New remediation guidelines</u> to further ensure appropriate, consistent disciplinary action for violations, which will include:

i.          A well-publicized corrective action matrix that sets forth the type of discipline that will be imposed for likely forms of misconduct, with actions tethered to the type of misconduct regardless of seniority or position.

ii.          A policy that, unless required by prior contract, any employee who is terminated will not receive severance, and any employee who leaves while under investigation will not receive severance or be allowed to vest stock awards unless the investigation concludes with a finding of no misconduct.

iii.          A provision in executive contracts allowing the Company to recoup bonus and other incentive compensation if an employee is terminated for misconduct.

iv.          Oversight by an executive committee that includes the CLO and the CHRO to ensure these guidelines are followed.

74.      These guidelines respond to important criticisms that most employers' disciplinary processes lack rules or guidelines to promote fairness and consistency, thus allowing personal dislike or discriminatory bias to influence outcomes and punishments. Ensuring even-handed treatment of harassers based on similarity of proven violations, while avoiding favoritism or pretextual motives, reduces the likelihood of resentment and backlash that often accompanies sexual harassment remediation programs. Similarly, taking away higher-level compensation from senior executives who commit terminable offenses minimizes both the risk and the impression that they can afford to act with impunity, while others who are lower down on the corporate ladder must suffer consequences. These steps can promote respect for the Company's processes, policies, and values.

75.      <u>Retention of a DEI Consultant</u>. The Companies have agreed to hire a DEI Consultant, an independent expert with expertise on sexual harassment in the corporate setting to

assist in designing and implementing the reform Measures and monitoring their effectiveness. An external expert will be better situated to oversee implementation of the reforms which otherwise might be hampered by internal resistance or clinging to the status quo. An expert can help ensure that the spirit as well as the text of the Agreement guide implementation; an outside expert can also ensure that the concrete mechanisms that are so important to the effective operation of a non-discrimination system are set up appropriately and fine-tuned once implemented.

76.     The person to be appointed must be approved by the parties and by the Boards' Human Capital and Compensation Committee ("HCCC"). The stockholder plaintiffs must approve any decision to replace the DEI Consultant as well as the selection of the new consultant.

a.     <u>Role</u>. The DEI Consultant is charged with broad responsibility and authority to review existing policies and procedures for preventing and remediating sexual harassment, evaluate their effectiveness, and recommend modifications or new policies. The DEI Consultant is to perform an annual evaluation of these matters, meeting with representatives of the DEI Council, reviewing company data, and partnering with independent experts, as necessary, to fulfill this role. **Specific duties are highlighted below.**

b.     <u>Complaint-Handling and Disciplinary Process</u>. The DEI Consultant conducts an annual audit of the Complaint Data and Investigations Report, to assess whether complaints were adequately documented, investigated, and remediated, and to determine whether outcomes are reasonably consistent across cases; and working with staff to periodically test the adequacy of the complaint-handling system.

c.     <u>Annual Corporate Survey and Training Program</u>. The DEI Consultant also reviews the results of the Annual Corporate Survey and works with the Company to evaluate and adjust the sexual harassment training programs as necessary.

d.     <u>Report and Recommendations</u>. The DEI Consultant presents the annual audit and an overall evaluation of the adequacy of the success of the Company's policies and procedures in addressing sexual harassment and achieving DEI objectives, and proposes recommendations to address any gaps or shortcomings to the HCCC (or equivalent Board Committee). The Companies and Boards must work in good faith with the DEI consultant to achieve stated purposes.

**Measures to Address Organizational Risk Factors for Sexual Harassment**

77.     <u>Background</u>. Well-designed and well-executed training programs, complaint-handling processes, and disciplinary policies are essential components of a successful initiative to reduce and prevent sexual harassment. But an employer cannot simply correct individual instances of harassment — and discipline individual harassers — one by one. Harassment will continue to occur unless the company also attends to larger organizational "risk factors" that promote or facilitate harassment.

78.     <u>Sex Segregation</u>. One important risk factor is vertical sex segregation, which refers to an organizational situation in which women are significantly underrepresented in Director, executive, managerial, and/or supervisory roles, while being overconcentrated in subordinate or lower-level positions. Vertical sex segregation can afford male managers greater freedom to impose sexual and other sex-based demands on female subordinates, because the Company lacks female managers with sufficient representation and power to demand policies that curb such discriminatory treatment. Thus, researchers agree that in order to reduce and prevent sexual harassment, companies must take steps to eliminate sex segregation. This requires that companies follow best practices to train, attract, recruit, hire, and promote women on an equal basis into all positions at all levels of the organization, especially managerial ones.

79. <u>Unchecked Subjective Authority</u>.  Evidence suggests that companies can also reduce harassment and discrimination by restructuring managerial positions to curb unchecked, subjective criteria for the exercise of authority.  Managers who have unfettered discretion to hire, direct, fire, or otherwise "make or break" subordinates' careers based on their own subjective say-so can indulge personal and discriminatory biases and exclude and punish those who fail to meet them.  Research suggests that those who are given such unconstrained authority are more likely to abuse it.

80. These two organizational risk factors, sex segregation and unchecked managerial authority, may have played a role in fostering and facilitating the problems alleged at L Brands and Victoria's Secret.  Evidence suggests that 90% of the company's employees (and 100% of its models) are female, while the Directors, executives, managers, and contractors (such as photographers) who supervise them are predominantly male.  Absent constraints, it would be unsurprising if some of the men with unfettered power abused it to prey on and mistreat female subordinates.

81. Through the Agreement, L Brands has agreed to review and address such risk factors through industry-leading reform initiatives, the key features of which are described below.

82. <u>DEI Council and Initiatives</u>.  One of the most significant reforms called for by the Agreement is the creation of a Diversity, Equity, and Inclusion Council within each Company.  By structure and design, these DEI Councils will be a touchstone for the Companies' commitment to a non-discriminatory environment.  Several features of the DEI Councils will ensure their power and success.  First, the Companies' CEOs will serve as Executive Sponsors of the Councils, ensuring a direct line of communication between the person in charge of general business operations and the person in charge of DEI.  The DEI Councils are broadly empowered to integrate

DEI principles into every aspect of the businesses, including outreach, hiring, promotion, and advancement. The Councils have the authority and responsibility to gather data on their own initiative. These Councils offer the best of both worlds. By drawing on outside expertise first through a DEI Consultant, the Councils will be armed with the knowledge and power to lead the Companies' DEI efforts. By involving corporate leadership, the Councils will help develop knowledge, expertise, and accountability that will persist after the period of the formal Agreement concludes.

83.  Each DEI Council is composed of senior executives, assisted by an independent expert, and charged with achieving important DEI aims.

a.  <u>Composition</u>. The DEI Council is to be led by the Chief Executive Officer ("CEO") as Executive Sponsor; the Chief Diversity Officer ("CDO"), the CHRO and the CLO or Head of Ethics & Compliance also serve.

b.  <u>DEI Council Principles and Objectives</u> include (1) diversifying the ranks of management and the workforce overall; (2) ensuring equal opportunity and resources for all who work or wish to work for the Company; (3) creating a nondiscriminatory, inclusive culture in which everyone can feel a sense of belonging and can contribute fully to the Company's success, regardless of sex, race, or other social identity; (4) providing development and training that educates employees on diversity, equity, and inclusion and equips them to grow and embody the Company's values; (5) investing in diverse communities representative of the Company's customers and employees; and (6) bringing an inclusive lens to the Company's external brand presence and communications.

c.  <u>Diversifying Management with the Aid of a DEI Expert</u>. The DEI Council is assisted by an independent expert, chosen by the CDO and CHRO, to help achieve DEI aims,

especially the goal of diversifying management. Specifically, the DEI expert will focus on helping the Council develop and implement effective policies and practices "to eliminate any underrepresentation of women or other underrepresented groups from any management positions at the company." In other words, one of the DEI Expert's main goals is to alleviate vertical sex segregation by ensuring women are integrated fully and equally into the ranks of management.

d. To accomplish this objective, the Agreement specifies a series of concrete steps to be taken by the DEI Council and Expert, summarized below. These steps are rooted in time-honored principles from employment discrimination law and social science research suggesting their effectiveness in eliminating discrimination and related patterns of segregation. Creating greater openness, transparency, objectivity, and consistency in recruiting and selecting employees reduces the room for decisionmakers to exercise insider favoritism, stereotyping, and bias, and communicates a greater sense of equal opportunity and welcomeness to people associated with underrepresented groups.

i. Revamp external and internal recruiting and outreach to attract more women of all races to management positions.

ii. Create an evidence-based management training program available to all employees (as an additional strategy for attracting more diverse talent).

iii. Develop transparent career paths to management from inside and outside the Company.

iv. Hire and promote for management using written, objective, job-related criteria and avoiding the use of unnecessarily subjective criteria and discretion, which facilitate the exercise of stereotyping and bias.

v.      Communicate the criteria openly in advance and apply them consistently and even-handedly to all candidates.

vi.      Post all vacant positions (at least internally) and specifically encourage women and underrepresented groups to apply.

vii.      Collect and analyze data to evaluate the Company's record in recruiting and hiring women of all races for management for positions at the level of Vice President or above.

e.      <u>DEI Reporting and Recommendations.</u>  The DEI Council is required to take the following reporting steps:

i.      Meet at least twice annually with the HCCC (or an equivalent Board committee) and make recommendations, as appropriate, which the Committee must consider in good faith.

ii.      report annually to the Board of Directors, the Chair of which can no longer be the Company's CEO under the terms of this Agreement.

iii.      Assist the Company in preparing an annual DEI report to stockholders discussing the Company's specific DEI objectives, progress in meeting them, and accompanying metrics.

84.      These provisions, together with the use of an independent DEI expert, simultaneously serve to provide some oversight of the DEI Council's work and to facilitate change based on its work and recommendations.  The DEI Consultant is also specifically charged with investigating the potential contribution of larger organizational risk factors for sexual harassment, as identified by experts and researchers in the field.

## Oversight and Accountability, Including Data Collection and Analysis

85.     To succeed in transforming a company's record and culture of sexual harassment and retaliation, as discussed above, corporate leadership must commit to and model core principles and put in place well-designed programs and processes to guide managers and employees in understanding and achieving those principles and remedying organizational risk factors.  But organizations must also establish systems of oversight and accountability to ensure that these mechanisms are working.  These systems must hold key organizational players responsible for attaining desired outcomes; actively involve a diverse, independent Board of Directors; collect and evaluate data to measure progress; require and implement changes when necessary, report to stockholders on outcomes to increase accountability; and actively enlist multiple constituencies inside and outside the Company in the reform process.

86.     The Agreement contains numerous provisions that combine to ensure effective oversight and accountability and the ability to self-correct as necessary.  Major elements are summarized below.

87.     <u>Governance and Oversight by the Board of Directors</u>.  The Board of Directors bears primary responsibility for monitoring and overseeing the reforms in the Agreement.

a.     <u>Best Efforts</u>.  The Board pledges to use best efforts to implement the DEI Council's and DEI Consultant's recommendations.  The Board must provide notice of objections to any recommendations and discuss tailored modifications.  Relevant discussions at the Board level must be reflected in the accompanying minutes.  Committee charters will be amended and updated to reflect their oversight and responsibility for the subject matter of the reforms.

b.     <u>Human Capital Compensation Committee</u>.  This Committee's charter will expressly state its responsibility for the following matters:

i.	overseeing and review data related to the handling of sexual harassment claims (i.e., the Investigations Report);

ii.	reviewing periodically the Company's programs and policies related to diversity, equal employment opportunity, inclusion, and culture, including compliance with the Sexual Harassment Policy and Anti-Retaliation Policy, aided by quarterly reports from the Ethics & Compliance Department and reports and recommendations from the DEI Consultant and DEI Council;

iii.	reviewing and overseeing, along with the Audit Committee, the facts and circumstances surrounding any allegation into a claim of discrimination, harassment, or retaliation (a) involving or allegedly undertaken with the authority of senior management or (b) presenting a material risk to the business of the Company;

iv.	receiving an annual report from the CDO;

v.	reviewing compensation and benefits policies with reference to, among other things, (1) advancing of the Company's Code of Conduct and values; (2) increasing the presence of underrepresented groups in leadership roles; (3) creating a strong culture of inclusion within the Company;

vi.	policy documents will require the HCCC to report at least annually to the entire Board on allegations, investigations, and settlements of sexual harassment, sex discrimination, and related retaliation claims; and

vii.	The HCCC must also review and report to the Board any compensation or severance decisions concerning any senior manager found by the Company to have engaged in such misconduct.

c.	<u>Audit Committee</u>.  The Audit Committee's charter will be amended to:

> > > i.      expressly state its oversight of Ethics & Compliance and to call for
it to receive at least quarterly reports from that department; and

> > > ii.      require annual reports from the from the Audit Committee to the
Board as a whole concerning the operations and effectiveness of the compliance function.

> > d.      <u>Nominating & Governance Committee.</u>   This Committee's charter will be
amended to require the following important changes promoting greater independence and diversity
of the Board of Directors:

> > > i.      require the Chair to be distinct from the Company's CEO;

> > > ii.      require annual review of committee membership and review of
committee chairs every three years;

> > > iii.      require 50% diversity on the Board; and

> > > iv.      require that the initial pool of candidates to be considered for any
Board vacancy include at least one woman and at least one person of color.

> 88.      <u>Data Collection and Analysis.</u>   The Board is assisted in carrying out its oversight
responsibilities by three sets of data related to reform initiatives. The data collection and analysis
provisions in this Agreement represent an important, unprecedented benefit to shareholders.
Description of the three key sets of data collection and analysis provisions follows:

> > a.      <u>DEI Initiative.</u>   Data collection and analysis will aid oversight of Company
efforts to attain DEI objectives with respect to upper management positions. Appendix 4 of the
Agreement requires the DEI expert and Council to collect the following information for each
managerial position at the level of Vice President or above throughout the Company:

i. An organizational chart showing the relationship of each position to each other, vertically and horizontally, within each organizational entity, and department or other unit;

ii. a job description and job analysis;

iii. a set of written objective minimal qualifications, plus any other criteria used in selecting candidates for hiring or promotion;

iv. hiring and leaving data, by name and date of the person who was hired and/or left, including any available information (including through exit interviews) about reasons for leaving, for each position; and

v. applicant data showing who applied for the job, on what date, with the complete application file retained for five years. The Agreement requires these data to be analyzed to show the number and percentage of women and men, by race and other demographic characteristics, who applied for each position annually.

Additional analyses of these and related data will permit enhanced evaluation of Company efforts to achieve nondiscrimination and greater diversity in upper management. Comparing the number and share of women of each race who applied for a particular management position to their number or share among employees holding similar positions in the relevant labor market and/or among recent graduates of relevant educational programs, for example, can help gauge the effectiveness of recruiting and outreach efforts. Similarly, comparing the number and share of women of each race who were hired for a particular position to their number and share among applicants, among those holding similar positions in the relevant labor market, and/or among recent graduates of relevant educational programs can help assess conformity with principles of nondiscrimination, equal opportunity, and diversity. Applications can also be analyzed to assess

the role of various qualifications in producing these outcomes. Such analyses are crucial to evaluating progress toward organizational goals and identifying any necessary changes.

        b.      <u>Complaint-Handling Data and Investigations Report</u>. Data collection and analysis will also assist in evaluating the adequacy of the Company's complaint-handling system.

        i.      <u>Complaint Data</u>. The Agreement requires the Company to "record, track, and analyze all complaints of harassment and discrimination based on race, gender, and sexual orientation, and complaints of retaliation related to the same, received through all reporting avenues, including such information as date, name of reporter, target of complaint, organization, department, positions (of accused and victim), type of conduct, list and summary of all evidence presented, names and summaries of witness testimony, findings, and outcome (including specifics of any discipline or other remedy imposed, and any remedies or accommodations granted the complainant)."

        ii.      <u>Investigations Report</u>. Ethics & Compliance reviews the Complaint Data to track (a) the number of complaints of various types from all reporting channels, broken down by channel; (b) length of time between reporting and closure; (c) number of claims substantiated and not; and (d) categories of discipline imposed in substantiated cases.

As noted above, the DEI Consultant reviews these analyses to report to the HCCC on the adequacy, fairness, and consistency of the Company's reporting, intake, investigation, and remediation processes, and the consistency of disciplinary outcomes — and to propose changes to remedy any problems. The data thus provide a valuable resource to the Board in evaluating the merits of the Company's harassment remediation and prevention strategy and making appropriate changes.

c. <u>Annual Corporate Survey</u>.  Research confirms that the most effective first step for preventing and correcting sexual harassment is a climate assessment, which reveals information that is specific to a particular employer.  This kind of assessment offers three distinct benefits: (1) reducing the risk of liability for misconduct that has already occurred but not otherwise been addressed; (2) reducing the risk of liability for future misconduct that was likely to occur because of the failure to address past problems; and (3) reducing harm to employees targeted by harassing behavior whether or not it rose to the level of actionable harassment in an individual instance.

89.      The Agreement requires the Companies to conduct Annual Corporate Surveys, which will be completed by all employees and by any model who participates in at least three photoshoots per year.  The surveys gather information targeted at understanding whether employees (1) have experienced harassment, discrimination, retaliation, or a hostile work environment; (2) perceive that their supervisors or management tolerate such misconduct; (3) know about the Company's Sexual Harassment Policy, Retaliation Policy, and Reporting Policy, and feel comfortable reporting misconduct to management; (4) believe that the Company encourages employees to speak up about any misconduct they experience or observe; and (5) similar issues related to workplace culture and climate.

90.      Research supports conducting organizational climate assessments to gather information about the nature and extent of the problem and to make determinations about the best way to address problems that exist, including by informing training and assessing its effectiveness. The Companies' Annual Corporate Surveys will serve that purpose and will invite candid responses from current employees who might feel inhibited in more direct communications with senior management.  This is particularly true given the concerns about retaliation for complaints

in the past. This type of ongoing commitment to gathering data will enable the Companies to adapt and adjust, as necessary, which will help ensure enduring reform. As noted above, the DEI Consultant reviews the results of this survey and works with the Company and Board to evaluate and adjust the sexual harassment training programs as necessary to realize DEI and Company principles.

91. <u>Managerial Accountability</u>. The Agreement vests primary responsibility for overseeing the reform initiative with a newly constituted, more diverse and independent Board. But it also actively holds Company managers responsible, at both an organizational and individual level, for eradicating sexual harassment, discrimination, and retaliation.

a. Senior managers play important organizational oversight roles. The CEO, CDO, CHRO, CLO all serve on the DEI Council, as noted above. Ethics and Compliance makes quarterly reports to the HCCC, and the CLO and CHRO meet with the HCCC at least annually to discuss the complaint-handling process. The CLO and CHRO serve on a committee charged with ensuring that the new disciplinary protocol is followed. Additional crucial managerial responsibilities for collecting and analyzing data are also noted below. The successful implementation of the reforms in this Agreement are, thus, components of many senior manager's jobs. Their performance turns on it.

b. A similar expectation is imposed on all managers in the Company Code of Conduct, which is being amended to "make clear that the advancement of diversity, equity, and inclusion is a performance expectation for all managerial employees."

c. Managers are also held accountable at an individual level. Senior managers must forego romantic or sexual relationships with employees, as noted above. They risk termination, recoupment or forfeiture of bonuses or incentives, and cancellation of stock options

for violations of Company policy. The Company Code of Conduct expressly acknowledges that managers are held to a higher standard of conduct. They are no longer protected by a veil of secrecy, in light of the Company's agreement to forego mandatory non-disclosure agreements.

92. <u>Independent Experts</u>. The Agreement makes extensive use of outside experts (the DEI Consultant, the DEI Expert, and the training expert). Their involvement brings scientific knowledge, fresh perspectives, and an additional layer of independent input and oversight to the reform process.

93. <u>Employees</u>. The Agreement also activates employees and others who work for the Company to become change agents who can contribute to ending sexual harassment and creating a better work environment. The Code of Conduct encourages employees to do their part by reporting harassment through one of several flexible avenues, including an anonymous hotline. The new training program introduces bystander intervention, which teaches employees how to safely intervene to help people who are victimized. The restrictions on the future use of non-disclosure agreements (NDAs) and the release of current and former employees from past NDAs, frees employees who have experienced sexual harassment to tell their stories publicly and to demand accountability. And the agreement to exempt sexual harassment, gender discrimination, and retaliation from mandatory arbitration empowers those who have experienced this misconduct to seek accountability and justice in a forum of their own choosing — including a court of law.

## **Conclusion**

94.     As set forth above, our opinion is that the Agreement sets out a clear corporate commitment to respond effectively, appropriately, and lawfully to complaints and incidents of sexual harassment, discrimination, and retaliation at L Brands and Victoria's Secret.  It was agreed upon following a substantial amount of executive and director turnover and with leaders who committed not to invoke mandatory arbitration clauses or to insist on NDAs where there is a report of sexual harassment, misconduct, retaliation or gender discrimination.  Indeed, the Agreement goes even further to release those who have already signed NDAs from those obligations.

95.     The Agreement also provides numerous mechanisms to successfully implement the Companies' commitment to anti-discrimination from a values statement, to sweeping policy reforms, including at the Board and executive level where the tone at the top, along with improved policy enforcement throughout the Companies, will influence daily operations.

96.     The Agreement provides external guidance to the Boards on these issues (through the DEI Consultant), creates a $90 million funding commitment for programs that will support the Companies' goals, and ensures regular and comprehensive data-gathering and analysis necessary to assess the changes over time.  It also commits the Companies to identifying and addressing organizational risk factors for sexual harassment, such as vertical sex segregation, unchecked subjective authority among managers, and significant power disparities among employees.

97.     The Agreement is calculated to bring about significant reforms that will inure to the benefit of the Companies and their shareholders.  It is our opinion that this comprehensive and company-specific set of reforms will position L Brands and Victoria's Secret to become workplaces where harassment, retaliation, and other forms of discrimination are rare, and when they occur, properly handled.  On the heels of significant changes in leadership, the Agreement

will ensure that L Brands makes good on its stated commitment to meaningful and long-term change.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed this 10th day of December 2021.

Joanna L. Grossman

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed this 10th day of December 2021.

Vicki Schultz

# EXHIBIT A

# Vicki Schultz

Law Professor

vicki.schultz@yale.edu

---

## EMPLOYMENT AND POSITIONS

**Yale Law School, New Haven, CT**
> Ford Foundation Professor of Law and Social Sciences; Professor of Law; Visiting Associate Professor of Law.

**Yale Department of Sociology, New Haven, CT**
> Courtesy Appointment; Faculty Associate, Center for Comparative Research; Faculty Associate, Center for Research on Inequalities and the Life Course.

**University of California, Los Angeles, School of Law, Los Angeles, CA**
> MacDonald-Wright Visiting Professor of Law and Faculty Chair, Williams Institute; Visiting Professor of Law.

**University of California, Berkeley, School of Law, Berkeley, CA**
> Professor in Residence.

**Harvard Law School, Cambridge, MA**
> Visiting Professor of Law.

**University of Wisconsin Law School, Madison, WI**
> Professor of Law; Assistant Professor of Law.

**U. S. Department of Justice, Civil Rights Division, Washington, DC**
> Trial Attorney, Employment Litigation Section.

**Senior Judge Charles E. Wyzanski, Jr., United States District Court, District of Massachusetts, Boston, MA**
> Law Clerk.

**Judge Robert E. Keeton, United States District Court, District of Massachusetts, Boston, MA**
> Law Clerk.

---

## EDUCATION

**Harvard Law School, Cambridge, MA**
> J.D., cum laude.

**University of Texas at Austin, Austin, TX**
   B.A., Government, With Highest Honors.

---

## SELECTED PUBLICATIONS

---

*How Andrew Cuomo Exploits Public Confusion Over the Definition of Sexual Harassment,* NBC Think, April 30, 2021 (with Brian Soucek).

*Sexual Harassment By Any Other Name*, UNIVERSITY OF CHICAGO LEGAL FORUM, Vol. 2019 , Article 8 (2019) (with Brian Soucek).

*Open Statement on Sexual Harassment from Employment Discrimination Law Scholars*, 71 STAN. L. REV. ONLINE 17 (2018).

*Reconceptualizing Sexual Harassment, Again*, 128 YALE L.J.F. 22 (2018). *Reprinted in* FEMINISM AND LAW (Anna Micaela Alterio, Alejandra Martinez Veràstegui, Suprema Corta de Justicia de la Naciòn, 2020, pp. 1-75).

*Taking Sex Discrimination Seriously*, 91 DENVER U. L. REV. 995 (2015). (Lead article in symposium issue, Revisiting Sex: Gender and Sex Discrimination Fifty Years after the Civil Rights Act). *Reprinted in* WOMEN AND THE LAW (Tracy A. Thomas, ed., Thomson Reuters. 2016, pp. 465-594).

**Interview with David L. Rose**, *in Employment Discrimination: 45 Years of Enforcement of Title VII of the Civil Rights Act of 1964*, 1 AM. U. LABOR. & EMP. L.F. 161, 181 (2011).

*Feminism and Workplace Flexibility*, 42 CONN. L. REV. 1203 (2010).

*The Sanitized Workplace Revisited*, *in* FEMINIST AND QUEER LEGAL THEORY: INTIMATE ENCOUNTERS, UNCOMFORTABLE CONVERSATIONS 65 (Martha Albertson Fineman, Jack E. Jackson & Adam P. Romero eds., Ashgate Pub. 2009) (reply in the same anthology by Jack Jackson & Tucker Culbertson, *Proper Objects, Different Subjects, and Juridical Horizons in Radical Legal Critique*, p. 135).

*Understanding Sexual Harassment Law in Action – What Has Gone Wrong and What We Can Do About It*, 29 T. JEFFERSON L. REV. 1 (2006) (lead article in symposium issue with responses by Ruben J. Garcia, Barbara A. Lawless, M. Isabel Medina, Christine Williams, and Richard A. Paul).

*Sex and Work*, 18 YALE J.L. & FEMINISM 233 (2006).

***The Need for a Reduced Workweek in the United States***, *in* PRECARIOUS WORK, WOMEN, AND THE NEW ECONOMY: THE CHALLENGE TO LEGAL NORMS 131 (Judith Fudge & Rosemary Owen eds., Hart Pub. 2006) (with Allison Hoffman).

***A Tribute Honoring James E. Jones, Jr.***, 9 EMPL. RTS. & EMPLOY. POL'Y J. 525 (2005).

***Global Perspectives on Workplace Harassment Law***, 8 EMPL. RTS. & EMPLOY. POL'Y J. 151, 187 (2004).

***The Sanitized Workplace***, 112 YALE L.J. 2061 (2003).
  *Reprinted in* NYU SELECTED ESSAYS ON LABOR AND EMPLOYMENT LAW: BEHAVIORAL ANALYSES OF WORKPLACE DISCRIMINATION (Mitu Gulati & Michael Yelnosky eds., Kluwer Acad. 2007, pp. 205-327); WILLIAM N. ESKRIDGE & NAN D. HUNTER, SEXUALITY, GENDER, AND THE LAW (Foundation Press 2d ed. 2004, pp. 762-64; 3d ed. 2011, pp. 564-66).

***Roundtable Discussion: Subversive Legal Moments?*** 12 TEXAS J. WOMEN & L. 197, 203 (2003) (remarks delivered at the University of Texas School of Law, Symposium on Subversive Legacies: Learning from History / Constructing the Future).

***El lugar de trabajo higienizado***, 7 REVISTA JURÍDICA DE LA UNIVERSIDAD DE PALERMO 101 (María Luisa Piqué trans., 2006) (*The Sanitized Workplace*, translated and reissued as subject of a symposium, with responses by Paola Bergallo and María Luisa Piqué).

***Race and Competence in the Academy***, 6 EMPL. RTS. & EMPLOY. POL'Y J. 129, 178 (2002).

***Labor's Subjects***, *in* LIVES IN THE LAW 132-213 (Austin Sarat, Martha Umphrey & Lawrence Douglas eds., U. Mich. Press 2002).

***Sexual Harassment: Legal Perspectives***, *in* INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL AND BEHAVIORAL SCIENCES 13982-13987 (Paul B. Bates & Neil J. Smelser eds., Elsevier Pub. Ltd. 2001) (with Eileen Goldsmith).

***Talking About Harassment***, 9 J.L. & POL'Y 417 (2001).
  *Reprinted in* MARK ROTHSTEIN & LANCE LIEBMAN, EMPLOYMENT LAW: CASES AND MATERIALS (Foundation Press 6th ed. 2007, pp. 595-96; 7th ed. 2011, pp. 588-89; 8ᵗʰ ed. 2015).

***Religion in the Workplace***, 4 EMPL. RTS. & EMPLOY. POL'Y J. 87, 130 (2000) (remarks delivered at 2000 Annual Meeting of the Association of

American Law Schools Section on Law and Religion, Symposium on Religion in the Workplace).

***Life's Work***, 100 COLUM. L. REV. 1881 (2000) (responses by Martha Ertmann, Deborah Rhode, and Joan Williams, 102 COLUMBIA L. REV. 812-64 (2002)).
*Reprinted in* MARTHA MAHONEY, JOHN O. CALMORE & STEPHANIE WILDMAN, CASES AND MATERIALS ON SOCIAL JUSTICE: PROFESSIONALS, COMMUNITIES, AND LAW (Thompson West 1st ed. 2003, pp. 551-56; 2d ed. 2013, pp. 587-93); KATHARINE T. BARTLETT, ANGELA P. HARRIS & DEBORAH L. RHODE, GENDER AND LAW: THEORY, DOCTRINE AND COMMENTARY (Aspen Pub. 3d ed. 2002, pp. 839-42, 1173-79; 4th ed. 2006, pp. 668-71, 950-52; 5th ed. 2009, pp. 457-61, 651; 6th ed. 2013, pp. 534-37, 766-68).

***Reconceptualizing Sexual Harassment***, 107 YALE L.J. 1683 (1998).
*Reprinted in* LIBBY ADLER, LISA CROOMS-ROBINSON, JUDITH GREENBERG, MARTHA MINOW & DOROTHY ROBERTS, MARY JOE FRUG'S WOMEN AND THE LAW, (Foundation Press 3d ed. 2004, pp. 155-64; 4th ed. 2008, pp. 718-28); ROBIN D. BARNES, THE NATURE AND SCOPE OF INDIVIDUAL RIGHTS: EMERGING DEBATES IN CONSTITUTIONAL LAW (Carolina Acad. Press 2007); GENDER AND FEMINIST THEORY IN LAW AND SOCIETY (Madhavi Sunder ed., Ashgate Pub. 2007); KATHARINE T. BARTLETT, ANGELA P. HARRIS, AND DEBORAH L. RHODE, GENDER AND LAW: THEORY, DOCTRINE AND COMMENTARY (Aspen Pub. 4th ed. 2006, pp. 418; 5th ed. 2009, pp. 291; 6th ed. 2015, pp. 337); CATHARINE MACKINNON, SEX EQUALITY: LESBIAN AND GAY RIGHTS, (Foundation Press 2d ed. 2007, pp. 160-61); MICHAEL J. ZIMMER, CHARLES A. SULLIVAN, RICHARD F. RICHARDS, DEBORACH A. CALLOWAY, CASES AND MATERIALS ON EMPLOYMENT DISCRIMINATION (Aspen Pub. 6th ed. 2003).

***Una explicación Alternative del acoso por un Ambiente Laboral Hostil: Un Paradigma Basado en La Competencia***, DERECHO Y GRUPOS DESAVENTAJADOS, Editorial Gedisa Project (Roberto Gargarella ed., Barcelona 1999, pp. 103-36) (*Reconceptualizing Sexual Harassment* translated and reissued).

***Sex is the Least of It: Let's Refocus Harassment Law on Work, Not Sex***, THE NATION 11 (May 25, 1998), *Reprinted in* BUSINESS ETHICS (John Richardson ed., McGraw-Hill 11th ed. 1999); *Reprinted as **Male Domination of the Workplace Causes Sexual Harassment***, *in* SEXUAL HARASSMENT 80 (Louise I Gerdes ed., Greenhaven Press 1999).

***Race, Gender, Work and Choice: An Empirical Study of the Lack of Interest Defense in Title VII Cases Challenging Job Segregation***, 59 U. CHI. L. REV. 1073 (1992) (with Stephen Petterson).

*Reprinted in* CATHARINE MACKINNON, SEX EQUALITY: LESBIAN AND GAY RIGHTS (Foundation Press 2d ed. 2007, p. 208).

**Women 'Before' the Law: Judicial Stories About Women and Work**, *in* FEMINISTS THEORIZE THE POLITICAL 297-338 (Judith Butler & Joan Scott eds., Routledge 1992).
*Reprinted in* FEMINIST LEGAL THEORY: READINGS IN LAW AND GENDER (Katharine Bartlett & Rosanne Kennedy eds., Westview Press 1991).

**Telling Stories About Women and Work: Judicial Interpretations of Sex Segregation in the Workplace in Title VII Cases Raising the Lack of Interest Argument**, 103 Harvard L. Rev. 1749 (1990).
*Reprinted in* KATHARINE T. BARTLETT, ANGELA P. HARRIS & DEBORAH L. RHODE, GENDER AND LAW: THEORY, DOCTRINE AND COMMENTARY (Aspen Publishers 6th ed. 2013, p. 166); WILLIAM ESKRIDGE & NAN HUNTER, SEXUALITY, GENDER, AND THE LAW (Foundation Press 2d ed. 2004, pp. 834-38; JUDITH GREENBERG, MARTHA MINOW & DOROTHY ROBERTS, MARY JOE FRUG'S WOMEN AND THE LAW (Foundation Press, 3d ed. 2004, pp. 187-95; 4th ed. 2008, pp. 538-47); FOUNDATIONS OF EMPLOYMENT LAW (John J. Donohue III ed., Foundation Press 2d ed. 1997, pp. 355-64; 3d ed. 2003); MICHAEL J. ZIMMER, CHARLES A. SULLIVAN, RICHARD F. RICHARDS, DEBORACH A. CALLOWAY, CASES AND MATERIALS ON EMPLOYMENT DISCRIMINATION (Aspen Pub. 5th ed. 2000); FEMINIST LEGAL THEORY, VOLUME II: POSITIONING FEMINIST THEORY WITHIN THE LAW (Frances E. Olsen ed., NYU Press 1995, pp. 361-75); FEMINIST LEGAL THEORY: READINGS IN LAW AND GENDER (Bartlett & Kennedy eds., Westview Press 1991, pp. 124-55).

**Room to Maneuver (f)or a Room of One's Own? Practice Theory and Feminist Practice**, 14 LAW & SOC. INQUIRY 123 (1989).

## WORKS IN PROGRESS

**Will Marriage Make Gay and Lesbian Couples Less Egalitarian? Toward a New Theory of Marriage as Social Status** (Analyzing whether and how access to legal marriage will affect the distribution of household labor within gay and lesbian couples).

**Reimagining Affirmative Action** (Proposing a new way of conceiving and defending race- and sex-conscious affirmative action measures).

**Antidiscrimination Law as Disruption:  The Emergence of a New Approach to Understanding and Addressing Discrimination** (Tracing the emergence of new theory of antidiscrimination law and elaborating its main features).

**Rationalizing the Workplace: Title VII's Lasting Contribution to American Society**
(Analyzing Title VII's role in prompting the adoption of more open, objective selection processes).

## INTERVIEWS

***Discrimination at Work: Comparing European, French, and American Law,***
Marie Mercat-Bruns, University of California Press, California: 139-140, 161-166, 170-174 (February 2016).

***Four Frameworks for Reading Constitutional Jurisprudence on Antidiscrimination, and Other Selected Works: An Interview with Vicki Schultz***, *in* EMPLOYMENT DISCRIMINATION LAW: A DIALOGUE ON AMERICAN LEGAL DOCTRINE (Marie Mercat-Bruns ed., Dalloz 2013) (in French; English translation forthcoming, UC Press 2015).

***More Than Sex: Why the Courts Are Missing the Point; An Interview with Vicki Schultz***, 8 MS. MAGAZINE 56 (May/June 1998).

## LECTURES AND PRESENTATIONS

"The Making of the Open Statement on Sexual Harassment," presented at ACS Progressive Scholars series, Yale Law School, New Haven, CT, November 16, 2021.

"Sexual Harassment After Bostock and #MeToo," presented at Critical Perspectives Series with Professor Brian Soucek, Yale Law School, New Haven, CT, April 22, 2021.

"Feminist Theory," presented at Foundations of American Legal Thought, Yale Law School, New Haven, CT, April 14, 2021.

Admitted Students Program: Gender Justice and LGBTQIA+ Rights @YLS: A Faculty and Student Perspective, Panelist, Yale Law School, New Haven, CT, April 12, 2021.

"Confidence and Ambition," presented at Women's Empowerment Conference**,** Law Panel, Yale University, New Haven, CT, April 11, 2021.

"Get to Know Your Professor," Yale Law School, New Haven, CT, November 9, 2020.

"Sexual Harassment Law in the Age of #Me Too," presented at Sexual

Harassment Policy Lab, University of Pennsylvania, Philadelphia, PA, October 26th, 2020.

**"The Sanitized Workplace,"** presented at Theories of Sexuality, Gender, Law, Yale Law School, New Haven, CT, April 7, 2020.

**"Feminist Legal Theory,"** presented at Foundations of American Legal Thought, Yale Law School, New Haven, CT, April 1, 2020.

**"Sexual Harassment Law in the Age of #MeToo,"** presented at USC Center for Law, History, and Culture, USC Gould School of Law, November 15, 2018.

**"Sexual Harassment by Any Other Name,"** presented at Law in the Era of #MeToo Legal Forum Symposium, University of Chicago Law School, Chicago, IL, November 2, 2018.

**"Rationalizing the Workplace: Title VII's Lasting Contribution to American Society,"** presented to Workshop of Regulating Family, Sex, and Gender, University of Chicago Law School, Chicago, IL, October 31, 2018.

**"Rationalizing the Workplace: Title VII's Lasting Contribution to American Society,"** presented to ACS Workshop, Yale Law School, New Haven, CT, October 1, 2018.

**"The Future of Job Guarantee Advocacy,"** roundtable discussion presented at Second International Conference of Modern Monetary Theory: Public Money, Public Purpose, Public Power, New School for Social Research, New York, NY, September 28, 2018.

**"Structural Causes of Sex-Based Harassment,"** presented at Symposium on Feminisms and the Constitution, Center for Constitutional Studies, Supreme Judicial Court of Mexico, June 4, 2018.

**"Sexual Harassment Law in the Age of #MeToo,"** presented at Law Review Panel, Stanford Law School, Stanford, CA, May 10, 2018.

**"Reconceptualizing Sexual Harassment, Again,"** presented at Workplace Law Program Lecture Series, UNLV William S. Boyd School of Law, Las Vegas, NV, April 20, 2018.

**"Sexual Harassment Law in the Age of #MeToo,"** presented at Faculty Workshop, Vanderbilt Law School, Nashville, TN, April 12, 2018.

**"Sexual Harassment Law in the Age of #MeToo,"** presented at

Equal Pay Day event, Yale Law School, New Haven, CT, April 10, 2018.

**"Reconceptualizing Sexual Harassment, Again,"** presented at panel on Relationships in Employment Discrimination Law, 2018 Association of American Law Schools Annual Meeting, San Diego, CA, January 5, 2018.

**"Reimagining Affirmative Action**," presented at Twelfth Annual Colloquium on Employment and Labor Law, Texas A&M Law School, Fort Worth, TX, September 15, 2017.

**"The Importance of Linking Harassment to Other Forms of Workplace Discrimination, and Demanding Effective Forms of Enforcement to Achieve Change,"** presented at Harassment in Employment Conference, Centro de Investigación y Docencia Económicas, Mexico City, Mexico, June 26, 2017.

**"Rationalizing the Workplace: Title VII's Lasting Contribution to American Society**," presented at International Meeting on Law and Society, Law and Society Association, Mexico City, Mexico, June 22, 2017.

**"Equal Pay Day: History, Causes, and Personal Stories of the Gender Wage Gap,"** panelist discussing the gender wage gap, sponsored by Law Students for Reproductive Justice at Yale, New Haven, CT, April 4, 2017.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at The Center for LGBTQ Studies (CLAGS) After Marriage Conference, panel on Birth, Life, and Death in LGBTQ Families, John Jay College of Criminal Justice, UCNY, New York, NY, Oct. 1-2, 2016.

**"Taking Sex Discrimination Seriously,"** presented at George Washington University Law School Faculty Workshop, Washington, DC, October 21, 2015.

**"Taking Sex Discrimination Seriously,"** presented at Yale American Constitution Society (ACS) Progressive Scholarship Workshop, Yale Law School, New Haven, CT, September 22, 2015.

**"Challenging Difference**," presented at plenary session on Employment / The Civil Rights Act, AALS workshop on New Generation Issues of Sex, Gender, and the Law, Orlando, FL, June 25, 2015.

**"The History and Future of Sex Discrimination Law**," presented at plenary session on Employment / The Civil Rights Act, AALS workshop on New Generation Issues of Sex, Gender, and the Law, Orlando, FL, June 24, 2015.

**"Reimagining Affirmative Action,"** presented on panel on The Limits and Future of Antidiscrimination Law, symposium on The Civil Rights Act at 50, Boston University Law School, Boston, MA, November 15, 2014.

**"Reimagining Affirmative Action,"** presented on panel on The Civil Rights Act at 50: Rethinking Antidiscrimination, Annual Law & Society Association Conference, Minneapolis, MN, May 29, 2014.

**"Taking Sex Discrimination Seriously: Lessons from the U.S. Campaign against Employment Discrimination Based on Sex,"** keynote lecture presented at Gender Blossom Research Students Conference, Bar Ilan University, Tel Aviv, Israel, March 19, 2014.

**"Antidiscrimination Law as Disruption: The Emergence of a New Approach to Understanding and Addressing Discrimination,"** presented to the Buchmann Faculty of Law, Tel Aviv University, Tel Aviv, Israel, March 18, 2014 (comments by Yofi Tirosh and Tamar Kricheli-Katz).

**"Reimagining Affirmative Action,"** presented at Law and Public Affairs seminar, Princeton University, Princeton, NJ, February 10, 2014.

**"Taking Sex Discrimination Seriously,"** keynote lecture presented at symposium, Revisiting Sex: Gender and Sex Discrimination Fifty Years After the Civil Rights Act, at Sturm College of Law, University of Denver, Denver, CO, January 31, 2014.

**"Fighting Sex Discrimination in the Workplace: The U.S. Experience,"** presented at Centro de Investigación y Docencia Económicas (CIDE), Mexico City, Mexico, November 25, 2013.

**"Sexual Harassment Law: Lessons from the U.S. Experience,"** presented to the National Supreme Court of Mexico, Forum on Fighting Labor Violence against Women in Mexico: Improvements and Challenges, Mexico City, Mexico, November 22, 2013.

**"Affirmative Action,"** presented at the Yale American Constitution Society (ACS) Law and Policy workshop, Yale Law School, New Haven, CT, November 19, 2013.

**"Reimaging Affirmative Action,"** presented at symposium on The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI, October 11, 2013.

**"Work Makes Gender**," presented on panel on Bodies/States/Norms/Police at Keywords on Gender and Sexuality event, Yale University, New Haven, CT, October 4, 2013.

**"Rationalizing the Workplace: Title VII's Lasting Contribution After 50 Years**," keynote lecture presented at symposium on The 50th Anniversary of Title VII of the Civil Rights Act, Eighth Annual Colloquium on Current Scholarship in Labor and Employment Law, University of Nevada, Las Vegas William S. Boyd School of Law, Las Vegas, September 27, 2013.

 **"Comment on Hendrick Hartog, SOMEDAY ALL THIS WILL BE YOURS: A HISTORY OF INHERITANCE AND OLD AGE,"** presented at Author Meets Readers panel, Law and Society Association Annual Meeting, Boston, MA, May 31, 2013.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at Cornell Law School faculty workshop, Ithaca, New York, April 26, 2013.

**"Gender & Work: Challenging Conventional Wisdom,"** presented at Harvard Business School Symposium, Cambridge, MA, February 28, 2013.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at American University Washington College of Law faculty workshop, Washington, D.C., February 1, 2013.

**"Inspiration**," speech presented in accepting the Distinguished Alumnus Award, Texarkana Independent School District, Texarkana, TX, December 14, 2012.

**"Commitment**," speech presented to students at Texas High School, given in conjunction with the Distinguished Alumnus Award, Texarkana Independent School District, Texarkana, TX, December 14, 2012.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at University of Texas School of Law faculty colloquium, Austin, TX, December 8, 2012.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at University of San Francisco School of Law School faculty workshop, Centennial Celebration Speaker Series, San Francisco, CA, November 2, 2012.

**"Meaningful Work, A Meaningful Life,"** presented to University of San Francisco Law School students, San Francisco, CA, Nov. 1, 2012.

Discussant, panel on the movie "Separation," Debating Law and Religion Series, Yale Law School, October 9, 2012.

Discussant, panel on Interrogating Sexual Harassment, 2012 Annual Law & Society Conference, Honolulu, HI, June 5, 2012.

Moderator for Keynote Address "The Big Count: LGBT People and the U.S. Census," at the 11th Annual Update Conference, Fair Play? LGBT People, Civic Participation, & Political Process, UCLA School of Law, Williams Institute, Los Angeles, CA, April 13, 2012.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at Yale Law School faculty workshop, New Haven, CT, April 9, 2012.

Interviewee, Yale Law Women (YLW) for the YLW "Speak Up" Study published every ten years about the gender climate at Yale Law School, Yale Law School, New Haven, CT, January 30, 2012.

Commentator, panel on Equal Protection, conference on The Constitutionalization of Labor and Employment Law, The University of Wisconsin Law School, Madison, WI, October 28, 2011.

**"Work and Inequality**," presented at symposium on Context and Consequences: The Hill-Thomas Hearings Twenty Years Later, Georgetown Law School, Washington, D.C., October 6, 2011.

**"Redefining Discrimination**," presented at plenary session on The Workplace as a Site of Inequality, AALS Workshop on Women Rethinking Equality, Washington, D.C., June 21, 2011.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented to UCLA Dept. of Sociology Gender Working Group, Los Angeles, CA, April 27, 2011.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at USC Law School faculty workshop, Los Angeles, CA, April 15, 2011.

**"Antidiscrimination Law as Disruption: The Emergence of a New Framework for Understanding and Addressing Discrimination**," presented at Pepperdine University School of Law faculty workshop, Malibu, CA, April 11, 2011.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at UCLA School of Law faculty workshop, Los Angeles, CA, March 4, 2011.

**"A New Way of Thinking About Discrimination**," presented at The Law and The Practice Series, Renaissance Weekend, Laguna Beach, CA, February 20, 2011.

**"Encourage the States to Invest in Higher Education, Not Prison,"** presented on Cornerstone panel on Advice to the President, Renaissance Weekend, Laguna Beach, CA, February 20, 2011.

**"Rethinking Sexual Harassment**," presented on Cornerstone panel on Incredible Innovators' Inventive Ideas, Renaissance Weekend, Laguna Beach, CA, February 19, 2011.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented to UCLA Center for the Study of Women, UCLA Faculty Center, Los Angeles, CA, February 3, 2011.

**"Marriage and the Division of Labor: Three Theories of the Relationship Between the Two**," presented on Roundtable on Marriage, Williams Institute, UCLA School of Law, Los Angeles, CA, January 13, 2011.

**"The Sanitized Workplace Revisited, 2009**," presented at a workshop on What the Law says about Domestic Violence, and Other Gender Issues, The School of Law and the Graduate School of Sciences Po, Paris, France, June 24, 2010.

**"A Conceptual History of American Antidiscrimination Law**," presented at Jurisprudence – A Critical Journal symposium on Gender, a Legal Issue, University of Paris, Pantheon-Sorbonne, France, June 24, 2010.

**"Feminism and Sexuality**," presented at Ce que le Droit dit des Violences Domestieques, et Autres Questions de Genre workshop, Sciences Po, Paris, France, June 21, 2010.

**"Antidiscrimination Law as Disruption: The Emergence of a New Paradigm for Understanding and Addressing Discrimination**," presented at Chicago Kent Law School faculty workshop, Chicago, IL, April 20, 2010.

**"Will Marriage Make Gays and Lesbian Couples Less Egalitarian? A Cautionary Tale**," presented at workshop on Regulation of Family, Sex, and Gender, University of Chicago Law School, Chicago, IL, April 20, 2010.

**"Fair Housing 2010: Time to Act,"** keynote lecture presented to Miami Valley Fair Housing Center, Dayton, OH, April 8, 2010.

**"Movie 'Out at Work' and Proposed EDNA legislation,"** discussion held with Professor William Eskridge, co-sponsored by Yale American Constitution Society (ACS) and Outlaws, Yale Law School, New Haven, CT, November 2, 2009.

**"Feminism and Workplace Flexibility**," presented at Connecticut Law Review symposium on Redefining Work: Implications of the Four-Day Work Week, University of Connecticut Law School, Hartford, CT, October 30, 2009.

**"Social Rights,"** panel comments presented at conference on The Constitution in 2020, Yale Law School, New Haven, CT, October 3-4, 2009.

**"Changing the Paradigm,"** panel comments presented at conference on The Changing Nature of Employment Discrimination, AALS Conference on Worklaw, Long Beach, CA, June 10, 2009.

**"Antidiscrimination Law as Disruption: The Emergency of a New Paradigm for Understanding and Addressing Discrimination**," presented at faculty seminar, University of Iowa College of Law, Iowa City, IA, April 3, 2009.

**"Defining the 'OptOut' Problem,"** panel moderated at conference on 'Opt Out' or Pushed Out: Are Women Choosing to Leave the Legal Profession?, Yale Law School, New Haven, CT, March 27, 2009.

**"Does Marriage Lead to Inequality in Family Life?**," panel comments presented at conference on The Market, the Family, and Economic Power, at Gender & the Law Conference: Unintended Consequences, Unsettled Questions, Radcliffe Institute for Advanced Study, Harvard University, Cambridge, MA, March 13, 2009.

**"Antidiscrimination Law as Disruption: The Emergency of a New Paradigm for Understanding and Addressing Discrimination**," presented at Sociology Department Colloquium, Yale University, New Haven, CT January 29, 2009.

An Informal Student-Faculty Conversation with Vicki Schultz, American Constitution Society, UCLA Chapter, Los Angeles, CA, January 14, 2009.

**"Beyond Civil Rights**," keynote lecture presented at University of Chicago Legal Forum Symposium on Civil Rights Law and the Low-Wage Worker, University of Chicago Law School, Chicago, IL, November 14, 2008.

**"Expanding Coverage: How Complementary Legislation Can Supplement the PDA,"** moderated panel at conference on Respecting Expecting: The 30th Anniversary of the Pregnancy Discrimination Act Conference, Yale Law School, New Haven, CT, November 8, 2008.

**"Antidiscrimination Law as Disruption: The Emergency of a New Paradigm for Understanding and Addressing Discrimination**," panel comments presented at conference on The Contours and Limits of Anti-Discrimination Law, Conference on Richard T. Ford's, THE RACE CARD: THINKING ABOUT CIVIL RIGHTS IN THE NEW MILLENNIUM, Stanford Law School, Stanford, CA, October 25, 2008.

**"Employing Identity: Implications of Disruption Theory for Representing the Homeless**," presented at the Homeless Action Center, Social Justice Summer Brownbag Series, Berkeley, CA, July 8, 2008.

**"Antidiscrimination Law as Disruption: The Emergence of a New Legal Paradigm for Understanding and Addressing Discrimination**," Fellows Lecture presented at Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, May 5, 2008.

**"Antidiscrimination Law as Disruption**," presented at faculty workshop, UCLA Law School, Los Angeles, CA, April 11, 2008.

**"Feminism of the Future: The Implications of the New Legal Paradigm Called Disruption Theory for Feminism and Gender Theory**," presented at Working from the World Up: Equality's Future, A New Legal Realism Conference Celebrating the 25th Anniversary of the Feminism and Legal Theory Project, University of Wisconsin Law School, Madison, WI, March 14, 2008.

**"Reclaiming Sexual Harassment Law: Where the Courts and Companies Have Gone Wrong and What We Can Do About It**," Public Lecture presented at Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, March 4, 2008.

**"Will Marriage Make Gays and Lesbians Less Egalitarian? A Cautionary Tale**," presented to Yale Law School alumni group, San Francisco, CA, January 31, 2008.

**"Antidiscrimination Law as Disruption**," presented at Boalt Hall Law School and the Center for the Study of Law and Society, University of California at Berkeley, Berkeley, CA, November 19, 2007.

**"What the Department of Justice, Civil Rights Division Enforcement Should Look Like over the Next Twenty Years**," presented at Commemoration of the 50th Anniversary of the Civil Rights Division, U.S. Department of Justice, conference on Law Enforcement Role of the Civil Rights Division, Past & Future, panel on Looking to the Future of Federal Civil Rights Enforcement, Georgetown Law School, Washington, D.C., September 29, 2007.

**"Antidiscrimination Law as Disruption: The Emergency of a New Paradigm for Understanding and Addressing Discrimination**," presented at Washington College of Law, American University, Washington, D.C., September 28, 2007.

**"My Research Agenda,"** presented at the Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, September 14, 2007.

**"Gender,"** panel comments presented at Inaugural Conference: Generating Social Inequalities, Center for Research on Inequalities and the Life Course, Yale Law School, New Haven, CT, May 5, 2007.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian?,"** presented at the University of Nevada, Las Vegas, William S. Boyd School of Law, Las Vegas, NV, April 23, 2007.

**"A Theory of Antidiscrimination Law as Disruption:  How the Law Can Target Stereotyping and Transcend Group Boundaries**," presented at the UCLA Law School and School of Industrial Relations, Los Angeles, CA, April 19, 2007.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian? Some Cautionary Notes**," presented to the Comparative Research Workshop, Yale University, New Haven, CT, April 11, 2007.

**"Notes from a Post-Feminist World**," comments presented on panel on Is Legal Academia a Gendered Environment?, at Legally Female: What Does It Mean to be Ms. JD?, conference at Yale Law School, New Haven, CT, March 31, 2007.

**"Will Marriage Make Gay and Lesbian Couples Less Egalitarian?"** presented at faculty workshop, University of San Diego Law School, San Diego, CA, March 6, 2007.

**"Gender in the Law School Classroom**," panel comments presented at Legally Female: What Does it Mean to Be Ms. JD?, Yale Law School, New Haven, CT, November 9, 2006.

**"Work and Citizenship,"** presented as guest speaker to the American
Constitution Society Reading Group, Yale Law School, New Haven, CT,
November 6, 2006.

**"The Sanitized Workplace,"** presented to the Social Science Perspectives on
Employment Discrimination in Organizations group, Palo Alto, California,
November 4, 2006.

**"Toward a New Model for Antidiscrimination Law**," presented on panel on
Workplace Discrimination, conference on Gender and Labor: What's
Working?, University of Texas Law School, Austin, Texas, October 20,
2006.

**"Cycles of Work,"** presented on panel moderated at Yale Law School Alumni
Weekend, October 14, 2006.

**"The Present and Future of Legal Education: Comparative Perspectives,"**
chaired panel at International Conference on Access to Justice: Policy and
Institutions, New Delhi, India, August 13, 2006.

**"Comments on Maia Goodell's 'Physical Strength Rationales for Exclusion
of Women from Military Combat Positions,'"** presented at Yale Law
Women Works-in-Progress Series, Yale Law School, New Haven, CT,
April 28, 2006.

**"Assessing Mediation in Sri Lanka**," panel on Alternative Dispute Resolution,
session on Formal and Informal dispute Resolution Systems, International
Conference on Access to Justice: Policy and Institutions, New Delhi,
India, August 12, 2006.

**"The Need for a Reduced Workweek**," presented at Workplace Theory &
Policy Workshop, Yale Law School, New Haven, CT, April 20, 2006.

**"Things Are Not Always What They Seem: Toward a Sociological
Understanding of the Law**," presented to the Yale Club of Cleveland,
Cleveland, Ohio, April 7, 2006.

**"Sexuality and Gender in the Workplace: Making Sense of Sexual
Harassment Law**," Duvin Cahn Distinguished Lecture in Labor and
Employment Law presented at Cleveland State Law School, Cleveland,
Ohio, April 6, 2006.

Guest Lecture, presented to course on Putting People into Organizations, Yale
School of Management, New Haven, CT, March 27, 2006.

**"Composing a Personal/Public Life**," presented to Yale Law Women, Yale Law School, New Haven, CT, March 1, 2006.

**"Sexuality and the Law**," presented to Linkages Program students, Yale Law School, New Haven, CT, February 16, 2006.

**"Understanding Sexual Harassment**," The Ruth Bader Ginsburg Lecture presented at Thomas Jefferson Law School, San Diego, CA, February 10, 2006.

 **"Prostitution,"** panel comments presented at Sex for Sale conference, Yale Law School, New Haven, CT, February 4, 2006.

**"Sex in the Workplace**," presented to Innovations in Private Law and Legal Scholarship seminar, University of North Carolina Law School, Chapel Hill, North Carolina, October 17, 2005.

**"The Sanitized Workplace**," presented at special symposium panel, Doing the Taboo: Discussing Sexuality at Work, American Management Association annual meeting, Honolulu, Hawaii, August 7, 2005.

**"What's the Matter with Wal-Mart? Resisting Sex Discrimination, Unfair Labor Practices and International Human Rights Abuses by the World's Largest Corporation,"** commentary presented at Yale Law School, New Haven, CT, April 27, 2005.

**"Sex and Work**," presented at faculty workshop, Roger Williams School of Law, Roger Williams University, Bristol, Rhode Island, April 15, 2005.

**"An Agenda for Research in Employment Discrimination Law**," presented at Social Scientific Perspectives on Employment Discrimination within Organizations, Center for Advanced Study of the Behavioral Sciences, Palo Alto, CA, March 25-26, 2005.

**"A Sociological Understanding of Law**," presented at Linkages Program, Yale Law School, New Haven, CT, February 8, 2005.

**"Sexual Harassment Law: Lessons from the United States**," presented at the University of the West Indies, Bridgetown, Barbados, November 25, 2004.

**"The Case for a Reduced Workweek in the United States**," presented at Workshop on Precarious Work, Women, and the New Economy: The Challenge to Legal Norms, International Institute for Law and Sociology, Oñati, Spain, July 2, 2004.

**"Why Feminists Should Support a Reduced Workweek,"** presented on panel on Civil Rights in the Workplace, Law and Society Association Annual Meeting, Chicago, IL, May 28, 2004.

**"Family Decision-making and Discrimination Avoidance,"** presented on panel on Re-imagining Academic Work and Family, Yale University, New Haven, CT, April 1, 2004.

**"Looking for Sex Harassment Law: Law and Culture in a Contemporary Context,"** plenary lecture presented at Law, Culture, and the Humanities Annual Conference, University of Connecticut Law School, Hartford, CT, March 13, 2004.

**"The Sanitized Workplace,"** presented at legal theory workshop, University of Miami Law School, Coral Gables, FL, February 27, 2004.

**"Global Perspectives on Workplace Harassment,"** led and commented on panel, Section on Labor Relations and Employment Law, Association of American Law Schools annual meeting, Atlanta, GA, January 5, 2004.

**"Comments on Barbara Reskin,"** presented at plenary on The Discrimination System: Race, Social Structures, and Social Policy, Association of American Law Schools annual meeting, Atlanta, GA, January 4, 2004.

**"Changes in Employment Discrimination Law,"** presented on panel on New Forms of Employment Discrimination, conference on Change at Work: Implications for Labor Law, Cornell Law School, Ithaca, New York, October 25, 2003.

**"The Sanitized Workplace,"** presented at Law and Society Association Annual Meeting, Pittsburg, PA, June 4, 2003.

**"Law and Sexuality,"** presented at faculty seminar, Scripps College, Los Angeles, CA, April 18, 2003.

**"Beyond the Sanitized Workplace: A New Vision of Feminism, Sexuality, and Gender Equality,"** presented at Voices of Public Intellectuals Series, Radcliffe Institute for Advanced Study, Harvard University, Cambridge, MA, February 20, 2003.

**"The Sanitized Workplace,"** presented on panel on Sexual Harassment, Subversive Legacies/Constructing the Future conference, University of Texas Law School, Austin, TX, November 22, 2002.

**"From *Frontiero* to *Oncale*,"** presented on Opening Roundtable, Subversive
    Legacies / Constructing the Future conference, University of Texas Law
    School, Austin, TX, November 21, 2002.

 **"The Sanitized Workplace,"** presented at Center for Organizational Behavior,
    Harvard Business School, Cambridge, MA, November 8, 2002.

**"Life's Work,"** presented to Public Interest Reading Group, Yale Law School,
    New Haven, CT, October 15, 2002.

**"Working/Womanhood,"** presented on panel on Work/Family Conflict, Annual
    Meeting of the Law and Society Association, Vancouver, Canada, June 1,
    2002.

**"Things Are Not What They Seem: Below the Surface of Sexual Harassment
    Law,"** presented at Faculty Tea, Yale Law School, New Haven, CT, April
    25, 2002.

**"The Sanitized Workplace,"** presented at University of Toronto Law School,
    Toronto, Canada, April 6, 2002.

**"The Sanitized Workplace,"** presented at Yale Law School faculty workshop,
    New Haven, CT, April 1, 2002.

**"The Sanitized Workplace,"** presented at Workshop Jointly Sponsored by
    University of Southern California Law School and the Center for Law,
    Culture, and the Humanities, Los Angeles, CA, March 26, 2002.

**"Things Are Not What They Seem: How a Law-and-Society Approach
    Deepens a Feminist Understanding of the Law,"** presented at Center for
    Feminist Research, University of Southern California, Los Angeles, CA,
    March 25, 2002.

Commentary, presented on Roundtable, Yale Law Women Coffee Connection,
    New Haven, CT, March 7, 2002.

**"A Little Corner of Heaven: Life in the Civil Rights Division,"** presented to
    Civil Rights Action Group, Yale Law School, New Haven, CT, March 5,
    2002.

**"Race and Hostile Work Environments,"** presented on panel on Labor and
    Employment in the Academy:  A Critical Look at the Ivory Tower, a joint
    program of Section on Labor Relations and Employment Law and the
    Section on Minority Groups, Association of American Law Schools
    annual meeting, New Orleans, LA, January 3, 2002.

**"The Sanitized Workplace**," presented at faculty workshop, Harvard Law School Cambridge, MA, December 14, 2001.

**"The 'Law' in 'Sexual Harassment Law**,'" presented on Roundtable on Sexual Harassment, with Janet Halley and Duncan Kennedy, Harvard Law School, Cambridge, MA, September 27, 2001.

**"What's Sex Got to Do With It? Sexual Harassment in Law and Culture**," presented at Bunting Colloquium, Radcliffe Institute for Advanced Study, Harvard University, Cambridge, MA, May 16, 2001.

**"Life's Work**," presented at faculty workshop, Cornell Law School, Ithaca, NY, April 27, 2001.

**"The Problem That Still Has No Name**," presented on panel on Inventing Rights: Yale Law School and the Law of Sexual Harassment, Yale Tercentennial Celebration, Alumni Leadership Convocation – 300 Years of Creativity and Discovery, Yale Law School, New Haven, CT, April 21, 2001.

**"Harassment**," presented on panel on Sexual Harassment, Transgressing Borders: Women's Bodies, Identities, and Families conference, New England School of Law, Boston, MA, March 31, 2001.

Guest Lecture, presented at Kennedy School of Government, Course on Gender, Movement Politics and Public Policy, Harvard University, Cambridge, MA, March 23, 2001.

 **"The Future of Women and Social Policy,"** commented on roundtable, Bunting Fellowship Program, Radcliffe Institute for Advanced Study, Harvard University, Cambridge, MA, March 13, 2001.

**"Life's Work**," presented to Seminar on Distributive Justice, Stanford Law School, Stanford, CA, March 6, 2001.

**"Sex and Work**," Distinguished Lecture presented at Golden Gate University Law School, San Francisco, CA, March 5, 2001.

**"Reexamining Sexual Harassment**," First Lecture in a Series on Sex and the Law presented to Ethics Project, Lafayette College, Easton, PA, February 8, 2001.

**"Sexual Harassment in the Workplace: What's Sex Got to Do With It?**," First Lecture in the Gender and Justice Series presented to Dartmouth College, Hanover, NH, January 26, 2001.

Presentation, Bunting Fellowship, Board of Advisors, Radcliffe Institute for
Advanced Study, Harvard University, Cambridge, MA, October 12, 2000.

**"Re-Examining Sexual Harassment,"** chaired panel at Law & Society
Association Annual meeting, Miami, FL, May 27, 2000.

**"Life's Work**," presented on Re-imagining Work Panel, Women, Justice and
Authority conference, Yale Law School, New Haven, CT, April 30, 2000.

**"Sexual Harassment: What's Sex Got to Do with It?**," presented as Invited
Speaker to Special Session organized by Committee on Law and
Philosophy and the Committee on the Status of Women, American
Philosophical Association annual meeting, Albuquerque, NM, April 8,
2000.

**"Harassment Law in the 21st Century**," presented on Fighting Gender and
Sexual Orientation Harassment panel, CRCL at 35: Constitutional
Lawyering in the 21st Century conference, Harvard Civil Rights-Civil
Liberties Law Review, Harvard Law School, Cambridge, MA, March 4,
2000.

**"Feminism, Work and the Law**," presented on roundtable, Women's Studies
Program, Vanderbilt University, Nashville, TN, January 27, 2000.

**"Harassment Law and Free Expression**," Florrie Wilkes Sanders Lecture
presented at Vanderbilt Law School, Nashville, TN, January 26, 2000.

**"How Reconceptualizing Sexual Harassment Also Helps Us Think About
Religious Harassment**," presented on panel on Law and Religion,
Association of American Law Schools annual meeing, Washington, D.C.,
January 6, 2000.

"**Structuralist Approaches to Empowerment**," presented at Amherst College,
Crafting a Society of Free Speakers program, Amherst, MA, December 6,
1999.

**"Life's Work**," Keck Lecture presented to Department of Law, Jurisprudence and
Social Thought, Amherst College, Amherst, MA, April 29, 1999.

**"Reconceptualizing Sexual Harassment**," presented at Whitney Humanities
Center Fellows luncheon, Yale University, New Haven, CT, April 23,
1999.

 **"Valuing Workers: Low-Wage Workers, Workfare, and Legal Strategies for
Change,"** presented on opening panel, 1999 Arthur Liman Colloquium,
Yale Law School, New Haven, CT, March 5, 1999.

**"Sex Harassment as a Public Health Issue**," presented at School of Public
Health, Yale University, New Haven, CT, February 15, 1999.

**"Regulating Sexual Harassment:  The Convergence of Feminism and
Fordism in Organizations**," presented at Center for Culture,
Organizations, and Politics, Institute for Industrial Relations, University of
California-Berkeley, Berkeley, CA, February 5, 1999.

**"Reconceptualizing Sexual Harassment**," presented at Center for the Study of
Law & Society, Boalt Hall Law School, Berkeley, CA, February 4, 1999.

**"Reconceptualizing Sexual Harassment**," presented at Trinity College,
Hartford, CT, January 26, 1999.

**"Sex Harassment and Discrimination in the Workplace**," presented at
workshop on Work, Workers, and the Law, Association of American Law
Schools annual meeting, New Orleans, LA, January 7, 1999.

**"Sex is the Least of It**," presented to New York Society of Women in
Philosophy, Hunter College, New York, NY, November 20, 1998.

**"Reconceptualizing Sexual Harassment**," The Barbara Aronstein Black Lecture
on Women and Law presented at Columbia Law School, New York, NY,
November 19, 1998.

 **"Sex, Women and the Law: A Conversation About Sexual Harassment,"**
participated in panel discussion sponsored by WOWPAC, Long Wharf
Theater, New Haven, CT, November 9, 1998.

**"Women in Law Teaching,"** participated in meeting sponsored by the Women of
Color Collective, Yale Law School, New Haven, CT, November, 1998.

**"Sexual Harassment,"** presented at Global Constitutionalism Seminar, Yale Law
School, New Haven, CT, September 26, 1998.

**"Sex Harassment in the Workplace**," presented at Grand Rounds, Yale Medical
School, New Haven, CT, June 19, 1998.

**"Sexual Harassment in the Workplace**," presented on panel on The Substantive
Law of Sexual Harassment at the Cutting Edge, New York University's
51st Annual Conference on Labor, New York University Law School,
New York, NY, May 28, 1998.

**"The Media and Sexual Harassment**," presented on panel on Sexual Harassment in the Wake of Jones v. Clinton, Yale Law School, New Haven, CT, April 28, 1998.

**"Reconceptualizing Sexual Harassment**," presented to Working Group on Law, Culture and the Humanities, panel on Sex and Sexual Violation in Law and Literature, Washington, D.C., March 28, 1998.

**"Trends in Sexual Harassment Law**," presented on panel on Sexual Harassment/Glass Ceiling Law, Federal Judicial Center Institute for Judges, New York University Law School, New York, NY, March 19, 1998.

**"Reconceptualizing Sexual Harassment**," presented to American Studies program, Princeton University, Princeton, NJ, February 27, 1998.

**"Sex in the Workplace**," presented at Rethinking the Workplace in the 21st Century, sponsored by the University of Pennsylvania Journal of Labor and Employment Law, University of Pennsylvania Law School, Philadelphia, PA, January 30, 1998.

**"Reconceptualizing Sexual Harassment**," presented at legal theory workshop, University of Pennsylvania Law School, Philadelphia, PA, December 1, 1997.

**"Re-envisioning Discrimination,"** moderated panel at Critical Race Theory conference, Yale Law School, New Haven, CT, November 14, 1997.

**"Reconceptualizing Sexual Harassment**," presented at faculty workshop, Yale Law School, New Haven, CT, October 13, 1997.

**"Reconceptualizing Harassment Law**," presented to Connecticut Employment Lawyers' Association, New Haven, CT, April 23, 1997.

**"Reconceptualizing Harassment Law**," presented at Clason Speaker Series, Western New England College of Law, Springfield, MA, April 7, 1997.

**"The Place of Work in Feminist Theory**," presented to visitors from East Germany as part of a program on feminist theory, Yale Law School, New Haven, CT, February 21, 1997.

**"Empirical Work, Interpretation, and Employment Discrimination Law**," presented on Conference, Law and Social Sciences section panel, Association of American Law Schools Annual, Washington, D.C., January 7, 1997.

**"Reconceptualizing Harassment Law**," presented on panel on labor, Challenging Boundaries Conference, Yale Law School, New Haven, CT, November 9, 1996.

**"The Role of History in Affirmative Action Law**," presented at symposium on Affirmative Action Talk, Whitney Humanities Center, Yale University, New Haven, CT, October 15, 1996.

**"The Dynamics of Sexual Harassment**," presented at symposium on Women, Sexuality and Violence: Re-Visioning Public Policy, Annenberg Public Policy Center, University of Pennslvania, Philadelphia, PA, March 1995.

**"Voluntarist Explanations for Job Segregation in Employment Discrimination Law**," presented at Haverford College, Philadelphia, PA, March 1994.

**"Reinventing Gender**," presented on panel on Legal Perspectives on the Body: Sex Discrimination and Body Image, Body Awareness Week, Yale University, New Haven, CT, February 1994.

Participant, Conference on New Theoretical Perspectives on Dispute Resolution, Stanford Center of Conflict and Negotiation, Stanford University, Palo Alto, CA, February 19-20, 1993.

**"Race, Gender, Work, and Choice: An Empirical Study of the Lack of Interest Defense in Title VII Cases Challenging Job Segregation**," presented at the Yale Law School, New Haven, CT, November 30, 1992.

**"Recent Legal Developments Affecting Women in the Trades**," presented at the Midwest Regional conference of Women in the Trades, Madison, WI, June, 1991.

**"Affirmative Action: A Legal, Philosophical and Pragmatic Perspective**," the Center for Public Representation, Madison, WI, May 1991.

**"Sex Segregation at Work**," presented to the Women's Law Students Association, University of Wisconsin Law School, Madison, WI, March 1991.

**"Telling Stories About Women and Work**," presented at Indiana University School of Law, Bloomington, IN, November 1990.

**"Telling Stories About Women and Work**," presented at the American Bar Foundation and Northwestern Law School, Chicago, Illinois, August 1990.

**"Telling Stories About Women and Work**," presented at the 26th Annual
Meeting of the Law & Society Association, Berkeley, CA, June 1990.

**"The Construction of Gender in the Workplace**," presented at the 25th Annual
Meeting of the Law & Society Association, Madison, WI, June 1989.

**"The Role of The Department of Justice in Title VII Enforcement**," presented
to graduate seminar in Industrial Relations, Madison, WI, February 1989.

**"Practice Theory and Feminist Practice**," presented at the Institute for Legal
Studies Colloquium on Critical Social Theory and the Future of Law and
Society Research, University of Wisconsin Law School, Madison, WI,
October 1988.

**"Legal Constructions of Women's Agency at Work**," presented at the 25th
National Conference on Critical Legal Studies, Washington, D.C., October
1988.

**"The Many Faces of Patriarchy**," presented on panel on Feminist Theory, 24th
Annual Meeting of the Law & Society Association, Washington, D.C.,
June 1987.

## SELECTED MEDIA APPEARANCES

Quoted in Alan Greenblatt, *The Damning Details of Andrew Cuomo's Behavior,* Governing: The Future of States and Localities, August 4, 2021.

Interviewed for the Eddie Mair program, LBC Studio, London, England. August. 4, 2021.

Quoted in Leah Fessler, *Workplace Harassment in the Age of Remote Work,* NEW YORK TIMES, June 8, 2021. < https://www.nytimes.com/2021/06/08/us/workplace-harassment-remote-work.html >.

Interviewed in Reuters Video, *Amid Cuomo allegations, a surge in state laws to fight harassment,* THOMSON REUTERS, March 12, 2021. <https://www.reuters.com/video/watch/amid-cuomo-allegations-a-surge-in-state-idRCV009HK4>.

Quoted in Erin Mulvaney, *Minorities on Pandemic Frontlines Take Race Bias Claims to Court*, BLOOMBERG LAW, November 24, 2020. <https://news.bloomberglaw.com/class-action/minorities-on-pandemic-frontlines-take-race-bias-claims-to-court>.

Quoted in Erin Mulvaney, *Job Discrimination in Pandemic Can Extend Past Asian Workers* , BLOOMBERG LAW, April 15, 2020. <https://news.bloomberglaw.com/daily-labor-report/job-discrimination-in-pandemic-can-extend-past-asian-workers>.

Quoted in Vin Gurrieri, *5 Decisions That May Sway High Court on LGBT Protections Philips v. Martin Marietta Corp.*, LAW360, August 15, 2019. <https://www.law360.com/articles/1189239/print?section=appellate>.

Quoted in Emily Peck, *She Spoke Up About Sexual Harassment At Ernst & Young And Got Caught In A Web Of Retaliation*, HUFFPOST, January 11, 2018. <https://m.huffpost.com/us/entry/us_5c14080ee4b009b8aea73086/amp>.

Quoted in Fiona Drenttel, *Trial by Fire*, THE YALE HERALD, October 26, 2018. <https://yaleherald.com/trial-by-fire-64941feadd1c>.

Quoted in Sam Feldman, *Yale and Title IX: A Complicated History and An Unclear Future*, THE POLITIC, October 8, 2018. <http://thepolitic.org/yale-and-title-ix-a-complicated-history-and-an-unclear-future/>.

Quoted in Jever Mariwala and Carly Wanna, *Professors, Alumni Stand Against Kavanaugh*, YALE DAILY NEWS, October 5, 2018.
< https://yaledailynews.com/blog/2018/10/05/professors-alumni-stand-against-kavanaugh/>.

Vicki Schultz, *Open Statement on Sexual Harassment by U.S. Law Professors*, Reprinted at THECUT.COM, October 4, 2018.
<https://www.thecut.com/2018/10/150-law-professors-share-statement-against-sexual-harassment.html>.

Interviewed by Kamala Kelkar, *#MeToo and Narrow Definitions of Sexual Assault Can Isolate Survivors, Says Yale Law Professor*, PBS.ORG, September 29, 2018.
< https://www.pbs.org/newshour/nation/kavanaugh-metoo-christine-blasey-ford-sexual-assault-survivors>.

Quoted in Olivia B. Waxman, *The Surprising Consequences of the Supreme Court Cases That Changed Sexual Harassment Law 20 Years Ago*, TIME.COM, June 26, 2018.
< http://time.com/5319966/sexual-harassment-scotus-anniversary/>.

Mentioned in Karen Sloan, *In a First, Yale and Stanford Law Journals Team Up for #MeToo Project*, LAW.COM, June 20, 2018.
<https://www.law.com/2018/06/19/in-a-first-yale-and-stanford-law-journals-team-up-for-metoo-project/>.

Quoted in Leah Fessler, *The US Supreme Court Just Dealt a Devastating Blow to the #MeToo Moverment*, QUARTZ, May 21, 2018.
<https://work.qz.com/1283730/the-us-supreme-court-ruling-on-worker-arbitration-dealt-a-huge-blow-to-the-metoo-movement/>.

Quoted in Jennifer Williams-Alvarez, *Mandatory Arbitration Is Top of Mind, but Is Change Afoot?*, AGENDA, May 14, 2018.
<http://www.agendaweek.com/c/1964784/230794/mandatory_arbitration_mind_change_afoot?referrer_module=issueHeadline&module_order=2>.

Quoted in Madeline Buxton, *The Option To Request Female Drivers Isn't The Sollution to Uber's Sexual Assault Issues*, REFINERY 29, May 2, 2018.
<https://www.refinery29.com/2018/05/197980/uber-request-female-driver>.

Interviewed in Leah Fessler, *You've Probably Signed Away Your Sexual Harassment Civil Rights at Work*, QUARTZ AT WORK, April 5, 2018.
<https://work.qz.com/1244779/congresswoman-pramila-jayapal-on-how-mandatory-arbitration-hurts-sexual-harassment-victims/>.

Quoted in Terry DeMio and Kate Murphy, *When Does Bad Behavior Turn Into Sexual Harassment*, CINCINNATI ENQUIRER, February 28, 2018. <https://www.cincinnati.com/story/news/2018/02/28/when-does-bad-behavior-turn-into-sexual-harassment/382939002/>.

Quoted in Brett Anderson, *After John Besh Fallout, Many Hoping For Civilized Change in Restaurant Industry*, NEW ORLEANS TIMES-PICAYUNE, December 30, 2017. <http://www.nola.com/dining/index.ssf/2017/12/will_john_besh_sexual_harassme.html>.

Quoted in Anna Dorn, *Workplace Sexual Harassment Law: A Primer*, MEDIUM, December 22, 2017. <https://medium.com/s/all-rise/workplace-sexual-harassment-law-a-primer-4119b44d992b>.

Quoted in Susan Seager, *Why Did Bill O'Reilly Pay $32 Million? One Accusation May Be Key*, THE WRAP, October 23, 2017. <https://www.thewrap.com/bill-oreilly-fox-news-lis-wiehl-sexual-harassment-nonconsensual-sex/>.

Discussed in Elizabeth C. Tippett, *What Post-Weinstein Hollywood Can Learn from '90s Sexual Harassment Training*, THE CONVERSATION, October 17, 2017. <http://theconversation.com/what-post-weinstein-hollywood-can-learn-from-90s-sexual-harassment-training-85874>.

Quoted in Tyler Kingkade, *Shielded: Want To Fire A Professor For Sexual Harassment? It's Going To Take A While*, BUZZFEED, August 17, 2017. <https://www.buzzfeed.com/tylerkingkade/want-to-fire-a-professor-for-sexual-harassment-its-going-to?utm_term=.rwOMMQVArm#.slPmmEOGb8>.

Quoted in Nitasha Tiku, *VC Firms Promise to Stamp Out Sexual Harassment. Sounds Familiar*, WIRED, July 17, 2017. <https://www.wired.com/story/venture-capital-sexual-harassment-diversity/>.

Quoted in Pavithra Mohan, *It's Time To Regulate the VC-Founder Relationship To Curb Sexual Harassment in Silicon Valley*, FAST COMPANY, July 7, 2017. <https://www.fastcompany.com/40438666/its-time-to-regulate-the-vc-founder-relationship-to-curb-sexual-harassment-in-silicon-valley>.

Quoted in John Hecht, *The Surprising Sexism of Maternity Leave*, BUSTLE, June 15, 2017. <https://www.bustle.com/p/the-surprising-sexism-of-maternity-leave-64766>.

Discussed in Julie Beck, *Online Dating Tries to Flirt With the Workplace*, THE
ATLANTIC, May 3, 2017.
<https://www.theatlantic.com/technology/archive/2017/05/always-be-
crushing/525177/>.

Quoted in Olivia B. Waxman, *Michelle Obama Was Right About the History of
Workplace Sexual Harassment*, TIME, October 14, 2016.
<http://time.com/4531585/michelle-obama-sexual-harassment-workplace-
speech/>.

Cited in Will McGrew, *Gender Segregation at Work: "Separate but Equal" or
"Inefficient and Unfair"?*, WASHINGTON CENTER FOR EQUITABLE
GROWTH, AUGUST 18, 2016.
<http://equitablegrowth.org/human-capital/gender-segregation-at-work-
separate-but-equal-or-inequitable-and-inefficient/>.

Republished as Will McGrew, *Why Male Dominated Workplaces Hold Women
Back*, GENEVA: WORLD ECONOMIC FORUM, August 24, 2016.
<https://www.weforum.org/agenda/2016/08/why-male-dominated-
workplaces-hold-women-back?>.

Quoted in Chris Cumming, *CVC Lawsuit Brings PE's Gender Imbalance Back in
the Spotlight*, DOW JONES PRIVATE EQUITY ANALYST, February 1, 2016.
<https://law.yale.edu/system/files/documents/faculty/schultz-cvcsuit.pdf>.

Quoted in Eve Tahmincioglu, *Lewd Navy Videos Raise Touchy Workplace Issue*,
MSNBC.COM, January 10, 2011.
<http://www.nbcnews.com/id/40965393/ns/business-careers/t/lewd-navy-
videos-raise-touchy-workplace-issue/#.WbaTd8iGOUl>.

Quoted in Ben Smith and Jeffrey Ressner, *Obama Kept Law Review Balanced*,
POLITICO, June 23, 2008.
<http://www.wistv.com/Global/story.asp?S=8539785>.

Quoted in Maureen Holohan, *Game On*, ELLE MAGAZINE, April 2008, at 312.
Discussed in EconTalk podcast episode hosted by Russ Roberts on Money and
Intimacy, February 26, 2007.
<http://www.econtalk.org/archives/2007/02/viviana_zelizer.html>.

Quoted in Emily Bazelon, *No Smoke, No Fire*, SLATE.COM, November 10, 2005.
<http://www.slate.com/articles/news_and_politics/jurisprudence/2005/11/
no_smoke_no_fire.html>.

Discussed in Simon London, *The Real Scandal at Boeing is Not Sex*, FINANCIAL
TIMES, March 12, 2005, at 11.

Guest, Wisconsin Public Radio, discussing *The Sanitized Workplace*, October 13, 2003.

Discussed in Gabrielle S. Friedman, *The Real Harm: Sexual Harassment Law Should Fight Discrimination, Not Regulate Desire*, LEGAL AFFAIRS, September/October 2003, at 30.

Discussed in Cathy Young, *Man Trouble: What Does Male-On-Male Sexual Harassment Mean for Discrimination Law?* 34 REASON MAGAZINE, no. 8, January 2003, at 18.

Discussed in Margaret Talbot, *Men Behaving Badly*, THE NEW YORK TIMES MAGAZINE, October 13, 2002, at 52.

Quoted in Donald Wright, *Gender and the Professionalization of History in English Canada before 1960*, 81 CANADIAN HISTORICAL REVIEW, no. 1, March 2000, at 29.

Discussed in Ethan Bronner, *Women's College to Add Engineering*, NEW YORK TIMES, February 21, 1999, at A1.

Quoted in William Glaberson, *Office Politics: Sex on the Witness Stand: Get Used to It*, NEW YORK TIMES, February 14, 1999, Week in Review section, at 1.

Discussed in John Aloysius Farrel, *Rewriting the Rules; For Decades, American Society Has Grappled with Defining Sexual Harassment. Now it's the Supreme Court's Turn to Step Into the Fray*, THE BOSTON GLOBE, February 7, 1999, at 17.

Quoted in James Lardner, *Cupid's Cubicles: Office Romance is Alive and Well Despite a Barrage of Corporate Countermeasures*, U.S. NEWS AND WORLD REPORT, December 14, 1998.

Quoted in Richard Korman, *The Jokes Aren't Very Funny Anymore*, ENGINEERING NEWS-RECORD, September 7, 1998.

Discussed in Jonathan Alger, *Love, Lust, and the Law: Sexual Harassment in the Academy*, ACADEME, September/October 1998.

Discussed in Cathy Young, *Groping Toward Sanity: Why the Clinton Sex Scandals Are Changing How We Talk About Sexual Harassment*, REASON, August 18, 1998.

Correspondence with Jeffrey Rosen, *In Defense of Color Blindness*, Correspondence, THE NEW REPUBLIC (August 10, 1998).

Discussed in Jeffrey Rosen, *In Defense of Gender Blindness*, THE NEW REPUBLIC, June 29, 1998.

Guest, National Public Radio, Weekend Edition with Lianne Hansen, April 26, 1998.

Guest, BBC World News, "New Directions in Sexual Harassment Law," April 25, 1998.

Quoted in Robert Macquand, *Court May Give Nod to Harassment Suit*, CHRISTIAN SCIENCE MONITOR, April 23, 1998, at 3.

Discussed in Franklin Foer, *Feminism, Clinton, and Harassment*, SLATE MAGAZINE, April 17, 1998.

Quoted in Tamar Lewin, *Testing of a President: The Effects; A Cause for Relief and Concern on Sex Harassment*, NEW YORK TIMES, April 3, 1998, atA22.

CBS Morning News, "Supreme Court Prepares to Better Define the Growing Number of Sexual Harassment Cases Filed in America's Courts," March 25, 1998.

CBS Evening News, "Eye on America: Supreme Court Prepares to Better Define the Growing Number of Sexual Harassment Cases Filed in America's Courts," March 24, 1998.

Guest, "On the Line," with Brian Lehrer, WNYC Radio, New York, New York, March 23, 1998.

Quoted in Patty Henetz, *Getting to the Roots of Gender Discrimination: Professor Says, Discrimination Goes Beyond Sex*, THE SALT LAKE TRIBUNE, March 15, 1998, at A1.

Guest, National Public Radio, Weekend Edition with Scott Simon, March 14, 1998.

Guest, Talk show on sexual harassment law, The Larry Mantle Show, KPCC-Radio, San Francisco, CA, March 3, 1998.

ABC World News Tonight with Peter Jennings, "A Closer Look at Sexual Harassment," February 27, 1998.

Quoted in Ellen Goodman, *Taking the Sex Out of Harassment*, THE BOSTON GLOBE, February 26, 1998, at A19 (Goodman's syndicated column appeared in various newspapers around the country).

Quoted in Juliet Brudney, *Hostile Workplaces Fuel Sexual Harassment*, THE BOSTON GLOBE, February 24, 1998, at D5.

Discussed in David Hawpe, *Northup to Women: Be Shrill*, THE COURIER-JOURNAL (Louisville, Kentucky), February 15, 1998, at 3D.

Discussed in Daniel Schorr, *Time to Redefine Sexual Harassment*, THE CHRISTIAN SCIENCE MONITOR, February 13, 1998, at 23.

Discussed in Daniel Schorr, "Title VII," National Public Radio, Weekend Sunday News, Commentary, February 8, 1998.

Quoted and discussed in Jeffrey Toobin, *The Trouble with Sex*, NEW YORKER, February 2, 1998.

Guest, ABC News, Good Morning America, "Sexual Harassment in the Workplace," February 2, 1998.

Guest Speaker, "The News Hour with Jim Lehrer," Sexual Harassment, March 25, 1998.

Quoted in connection with a show on sexual harassment in the workplace, WHA Radio, Madison, WI, June 1993.

Quoted in Georgia Sergeant, TRIAL MAGAZINE, American Trial Lawyers' Association, Washington, D.C., March 1991.

Guest, Talk show on sexual harassment, WORT Radio, Madison, WI, March 1991.

Quoted in Carol Kleiman, *20 Million Industrial Jobs Hinge on 'Fetal Protection' Court Case*, CHICAGO TRIBUNE, August 27, 1990.

Guest, Talk show on "The Mommy Track," WHA Radio, Madison, WI, March 1989.

## FELLOWSHIPS AND AWARDS

Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford University 2007-2008.

Articles Prize for *The Sanitized Workplace*, Honorable Mention, Law and Society Association, 2004.

Evelyn Green Davis Fellow, Radcliffe Institute for Advanced Study, Harvard University, 2000-2001.

Fellow, Whitney Humanities Center, Yale University, 1998-2000.

Distinguished Alumnus, Texarkana Independent School District, 2012.

Teacher of the Year, University of Wisconsin Law School, 1992.

## TEACHING

Constitutional Law; Antidiscrimination Law; Civil Procedure; Employment Discrimination Law; Family Law; Family, State and Market; Feminism, Gender, and Law; Feminist Theory; Law and the Employment Relation; Work and Gender; Work and Citizenship; Workplace Theory and Policy; Proving Discrimination; Social Science and Law.

## REPRESENTATIVE CONSULTING

Expert witness, L Brands, Sharehold Derivative Lawsuit, Summer-Fall 2021

City of Los Angeles, Special Committee Investigation, 2020

## SERVICE AND RELATED ACTIVITIES

*ConFeminist Judgments: Rewritten Employment Discrimination Opinions,* 2019, Cambridge University Press, Ann McGinley & Nicole Buonocore Porter. Advisory Panel Member.

Union of Legal Educators Against Sexual Harassment (UNLEASH), Founding Member, 2017 – present.

Faculty Advisory Committee, Williams Institute, UCLA School of Law, 2011-Present.

American Constitution Society, Yale Law School, New Haven, CT Member, Faculty Board.

Yale Journal of Law and Feminism, Yale Law School, New Haven, CT Member, Board of Advisors.

Journal of Law and Psychology, The University of Alabama School of Law,
     Tuscaloosa, AL
     Member, Board of Advisors.

Social Sciences Research Network, Legal Scholarship Network Labor &
     Employment Law Abstracts
     Member, Board of Advisors.

Jindal Global University and Jindal Global Law School
     Member, International Board of Advisors.

Workplace Theory and Policy Workshop, Yale Law School, New Haven, CT
     Convener, 1999-present.

Discipline Panel, Yale Law School, New Haven, CT
     Panel Faculty Member, 1993-94, 1994-97, 2013-present.

Student Petitions Committee, Yale Law School, New Haven, CT
     Member, 1997-99, 2006-07, 2011-12, 2013-14.

Thomas Lecture, Yale Law School, New Haven, CT
     Organizer, 1998, 2002, 2005, 2012, 2013.

Women's Faculty Forum, Yale University, New Haven, CT
     Council Member, 2009-2013.

Law Teaching Committee, Yale Law School, New Haven, CT
     Member, 2009-10.

Curriculum Committee, Yale Law School, New Haven, CT
     Member, 2009-2010.

Fellowships Selection Committee, Yale Law School, New Haven, CT
     Member, 2005-06, 2009-10.

Yale Work and Welfare Group, Yale Law School, New Haven, CT
     Convener and Member of inter-disciplinary research group,
     2004-09.

Teacher Placement Committee, Yale Law School, New Haven, CT
     Member, 1993-94, 1996-97, 2005-06.

Yale Law School Faculty Workshop, Yale Law School, New Haven, CT
     Co-Convener, Spring 2005.

Labor and Employment Section, Association of American Law Schools
  Chair, 2003.

Clerkships Committee, Yale Law School, Yale Law School, New Haven, CT
  Member, 1994-96, 1998-99, 2001-02.

Board of Trustees, Law & Society Association
  Trustee, 2002.

Law and Society Association, External Relations Committee
  Member, 1998-1999.

Policy Faculty Board, Yale Law School, New Haven, CT
  Member, 1996-97.

Promotions and Tenure Committee, Yale Law School, New Haven, CT
  Member, 1996-97.

Admissions Policy Committee, Yale Law School, New Haven, CT
  Member, 1995-96.

Antidiscrimination/Antiharassment Committee, Yale Law School, New Haven, CT
  Officer, 1994-95.

Special Courses of Study Committee, Yale Law School, New Haven, CT
  Member, 1993-94.

Visiting Lecturers Committee, Yale Law School, New Haven, CT
  Member, 1994-95.

Member of the Massachusetts and Wisconsin bars.

# EXHIBIT B

# JOANNA L. GROSSMAN

SMU Dedman School of Law
3315 Daniel Ave.
Dallas, TX 75205
(214) 768-2568
jlgrossman@smu.edu

## PRINCIPAL ACADEMIC POSITIONS

**SMU Dedman School of Law**

***Ellen K. Solender Endowed Chair in Women and Law and Professor of Law*** (2016 – present)

**Courses:** Gender Law; Sexual Misconduct; Reproductive Justice; Family Law; Advanced Topics in Family Law; Trusts & Estates; Contracts

**Selected Activities:** Chair, University Faculty Benefits Committee (2018-20); Chair, Appointments Committee (2016-17); Chair, Public Service Committee (2017-19); Member, University Course Evaluations Committee (2017-18)

**Awards:** Don Smart Teaching Award (2018-19); OutLaw Professor of the Year (2017-18); Elected Graduation Hooder (2017, 2018, 2019)

**Hofstra University School of Law**

***Sidney & Walter Siben Distinguished Professor of Family Law*** (2012 - 2016); ***Professor*** (2004 - 2012); ***Associate Professor*** (1999 - 2004)

**Honors:** Faculty Research Scholar (2012-15); John DeWitt Gregory Research Scholar (2010-11 & 2016-17); University's Diversity Lecturer (2010); University's Distinguished Lecturer (2004); Hofstra Law Review's Professor of the Year (2001); Elected Graduation Awards Presenter (2002); Hofstra Labor & Employment Law Journal's Professor of the Year (2002); Public Justice Foundation's Professor of the Year (2002).

***Associate Dean for Faculty Development*** (2004 - 2008)

**Activities:** Spearheaded intellectual life events and initiatives; ran fall, spring and summer faculty workshop series; wrote and published quarterly faculty newsletter; edited Hofstra's SSRN research paper series; wrote content for web and print materials designed to highlight faculty scholarship and achievements; facilitated media contacts for faculty through online media guide and other mechanisms; coordinated faculty mentoring program; ran Junior Faculty Forum; served as reader and mentor for untenured faculty; reviewed summer grant applications; prepared and updated new faculty guide.

**Tulane University Law School**

    *Associate Professor* (1998 - 1999)


## OTHER ACADEMIC POSITIONS

**Stanford Law School,** *Visiting Professor* (Winter 2021)

**Vanderbilt Law School**, *Visiting Professor* (Fall 2008)

**University of North Carolina School of Law**, *Visiting Professor* (Spring 2005)

**Cardozo Law School**, *Adjunct Professor* (Fall 2007, Spring 2015)

**Washington College of Law, American University**, *Adjunct Lecturer* (Fall 1996)


## EDUCATION

**Stanford Law School**
    J.D. with distinction, 1994
    *Order of the Coif*
    *Stanford Law Review*, Articles Development Editor

**Amherst College**, Amherst, MA
    B.A. in Economics, May 1990


## OTHER LEGAL EXPERIENCE

**Consulting Practice** (1998-present)
    Provide counseling and advice on sexual harassment and other issues of gender equity to universities, law firms, and other employers; draft antidiscrimination policies and grievance procedures; advise clients on handling of internal discrimination complaints; conduct sexual harassment training; give presentations on gender equity to groups of employees, partners, or executives; advise clients on best practices for inclusion and diversity; advise clients on changes in discrimination law under Title VII, Title IX, and analogous state laws; work with employee resource groups to achieve inclusion goals; serve as testifying and non-testifying expert witness on employer handling of sexual harassment complaints; analyze employer data on gender equity; make evidence-based recommendations to clients for reaching diversity and inclusion goals.

**Williams & Connolly**, Washington, DC (Summer 1993 & 1996-1998)
    *Litigation Associate.* Trial and appellate litigation involving trusts & estates, family law, products liability, and trademark infringement.

**National Women's Law Center**, Washington, DC (1995 - 1996)
*Staff Attorney.* Recipient of Women's Law and Public Policy Fellowship 1995-96. Litigated cases involving sexual harassment in the workplace, schools, and prisons; analyzed legislation and lobbied in areas of welfare reform and child support enforcement; provided direct legal services and education to women in prison.

**The Honorable William A. Norris**, U.S. Court of Appeals for the Ninth Circuit (1994 - 1995)
*Judicial Clerk.*

**Stanford Law School** (1992 - 1994)
*Research Assistant*, Prof. Barbara A. Babcock, Stanford Law School, 1992-94; *Head Teaching Assistant*, Introduction to American Law, Departments of Political Science and American Studies, Stanford University, 1992 & 1993; *Research Assistant*, Prof. Lawrence M. Friedman, Stanford Law School, 1993-94.

# BOOKS

THE WALLED GARDEN: LAW AND PRIVACY IN MODERN SOCIETY (Rowman & Littlefield 2021, forthcoming) (with Lawrence M. Friedman)

FAMILY LAW IN A CHANGING AMERICA (Aspen 2020) (with Doug NeJaime, Suzanne Kim & Rick Banks)

NINE TO FIVE: HOW GENDER, SEX AND SEXUALITY CONTINUE TO DEFINE THE AMERICAN WORKPLACE (Cambridge University Press 2016)

GENDER AND LAW: THEORY, DOCTRINE, COMMENTARY (Aspen 8th ed. 2020) (with Katharine Bartlett, Deborah Rhode & Deborah Brake)

GENDER LAW AND POLICY (Aspen 3d ed. 2020) (with Katharine Bartlett, Deborah Rhode, and Deborah Brake) (undergraduate edition)

WILLS, TRUSTS AND ESTATES (West Interactive Casebook 2019) (with Lloyd Bonfield and William LaPiana)

NEW YORK FAMILY LAW (Carolina Academic Press 2015) (with Barbara Stark)

INSIDE THE CASTLE: LAW AND THE FAMILY IN 20TH CENTURY AMERICA (Princeton University Press 2011; paperback ed. 2014) (with Lawrence M. Friedman) (co-winner of David J. Langum, Sr. Prize in American Legal History)

GENDER EQUALITY: DIMENSIONS OF WOMEN'S EQUAL CITIZENSHIP (Cambridge University Press 2009; paperback ed. 2012) (Linda C. McClain and Joanna L. Grossman, eds.)

# ARTICLES & CHAPTERS

*Thoroughly Modern Motherhood*, 74 SMU L. REV. 277 (2021)

*The 'No-Problem' Problem: Deborah Rhode's Contributions to Gender Law*, U. CHICAGO L. REV. (forthcoming 2021)

*Sexual Harassment in a Post-Weinstein World*, 11 U.C. IRVINE LAW REVIEW 943 (forthcoming 2020)

*Reproducing Inequality Under Title IX*, 43 HARVARD JOURNAL OF LAW AND GENDER 171 (2020)

*Making Sure Pregnancy Works: Accommodation Claims After* Young v. United Parcel Service, Inc., 14 HARVARD LAW & POLICY REVIEW 302 (2020)

*Gender Bias and the Law*, in ELIMINATING GENDER BIAS (Am. Chem. Soc'y 2020)

*Women are (Allegedly) People, Too*, 114 NORTHWESTERN L. REV. ONLINE 149 (2019) (review essay)

*Does Sexual Harassment Training Work* (forthcoming) (with Vicki J. Magley)

*What to Do if You've Been Sexually Harassed*, *in* HBR Guide to Women at Work, Harvard Business Review (2019) (with Deborah Rhode)

*After the Vote: Continuing the Struggle for Women's Social, Legal, and Political Equality*, in The Limits of Suffrage: The New York Story (SUNY Press 2020) (with Meg Devlin O'Sullivan & Julie Gallagher)

*The Seeds of Early Childhood*, 117 FLA. L. REV. FORUM 117 (2019)

*Legal Regulation of Sexual Misconduct at Work*, *in* RESEARCH HANDBOOK OF SEXUAL HARASSMENT IN THE WORKPLACE (forthcoming 2020) (book chapter)

*Rainbow Loving*, 92 New York University Law Review Online 101 (2017)

*Parental Rights Versus Parental Status*, 32 CONSTITUTIONAL COMMENTARY 307 (2017)

*Expanding the Core: Pregnancy Discrimination Law as it Reaches Full Term*, 52 IDAHO LAW REVIEW 825 (2016)

*Parentage Without Gender*, 17 CARDOZO J. CONFLICT RESOLUTION 717 (2016)

*Looking Forward, Moving Back: A Retrospective on Sexual Harassment Law*, BOSTON UNIVERSITY LAW REVIEW (2015)

*Hard Labor: The Pregnant Body at Work*, Law, Culture & the Humanities 1 (2015)

*Family Law's Loose Canon*, 93 Texas Law Review 681 (2015) (review essay)

*Introduction to Amici Curiae Brief in* Young v. United Parcel Service, Inc., 36 Women's Rights Law Reporter 66 (2015) (with Deborah L. Brake)

*Double Take: Embezzled Lives*, 83 University of Cincinnati Law Review 117 (2014) (with Lawrence M. Friedman)

*Feeding Hay to a Dead Horse*, Judicature (forthcoming) (book review)

*Unprotected Sex: The Pregnancy Discrimination Act at 35*, 21 Duke Journal of Law & Gender 67 (2014) (with Deborah L. Brake)

Review of Laura Briggs, *Somebody's Children: The Politics of Transracial and Transnational Adoption*, 100 Journal of American History 255 (2013)

Review of Holly J. McCammon, *The U.S. Women's Jury Movements and Strategic Adoption: A More Just Verdict*, 31 Law and History Review 899 (2013)

*Independent Together*, 48 Tulsa L. Rev. 313 (2013) (book review)

*A Private Underworld: The Naked Body in Law and Society*, 61 Buffalo L. Rev. 149 (2013) (with Lawrence M. Friedman)

*Defense of Marriage Act, Will You Please Go Now!*, Cardozo L. Rev. de * novo 155 (2012)

*The New Illegitimacy: Tying Parentage to Marital Status for Lesbian Co-Parents*, 20 American University Journal of Gender, Social Policy, & the Law 671 (2012)

*Pregnancy and the False Promise of Equal Citizenship*, 98 Georgetown Law Journal 567 (2010)

*Civil Rites: The Gay Marriage Controversy in Historical Perspective*, *in* Law, Society, and History: Themes in the Legal Sociology and Legal History of Lawrence M. Friedman (Cambridge 2011)

*Making Pregnancy Work: Overcoming the PDA's Capacity-Based Model*, 21 Yale Journal of Law & Feminism 15 (2009) (with Gillian Thomas)

*Pregnancy and Social Citizenship*, *in* Gender Equality: Dimensions of Women's Equal Citizenship (Joanna Grossman & Linda McClain, eds., 2009)

*Introduction* to Gender Equality: Dimensions of Women's Equal Citizenship (Joanna Grossman & Linda McClain, eds., 2009) (with Linda McClain)

Book Review: *Wives Without Husbands: Marriage, Desertion, & Welfare in New York, 1900-1935*, LAW AND HISTORY REVIEW (2008)

*The Failure of Title VII as a Rights-Claiming System*, 86 NORTH CAROLINA LAW REVIEW 859 (2008)

*The Legacy of* Loving, 51 HOWARD LAW JOURNAL 15 (2007) (with John Gregory) (symposium) (reprinted in *LOVING V. VIRGINIA* IN A POST-RACIAL WORLD (Kevin Noble Maillard & Rose Cuison Villazor, eds.) (Cambridge 2012)

*Introduction to Symposium on Family Boundaries: Third-Party Rights and Obligations with Respect to Children*, 40 FAMILY LAW QUARTERLY 3 (2006)

*Resurrecting Comity: Revisiting the Problem of Non-Uniform Marriage Laws*, 84 OREGON LAW REVIEW 433 (2005)

*Fear and Loathing in Massachusetts: Same-Sex Marriage and Some Lessons from the History of Marriage and Divorce*, 14 BOSTON UNIVERSITY PUBLIC INTEREST LAW JOURNAL 87 (2004)

*Job Security Without Equality: The Family and Medical Leave Act of 1993,* 15 WASHINGTON UNIVERSITY JOURNAL OF LAW AND POLICY 17 (2004)

*Feminist Law Journals and the Rankings Conundrum*, 12 COLUMBIA JOURNAL OF GENDER & LAW 522 (2003)

*The Culture of Compliance: The Final Triumph of Form over Substance in Sexual Harassment Law*, 26 HARVARD WOMEN'S LAW JOURNAL 1 (2003)

*Making a Federal Case Out of It: Section 1981 and At-Will Employment*, 67 BROOKLYN LAW REVIEW 329 (2001)

*Separated Spouses*, 53 STANFORD LAW REVIEW 1613 (2001) (review essay)

*The First Bite is Free: Employer Liability for Sexual Harassment*, 61 UNIVERSITY OF PITTSBURGH LAW REVIEW 671 (2000)

*Adoption in the Progressive Era: Preserving, Creating, and Re-Creating Families*, 43 AMERICAN JOURNAL OF LEGAL HISTORY 235 (1999) (with Chris Guthrie)

*The Road Less Taken: Annulment at the Turn of the Century*, 40 AMERICAN JOURNAL OF LEGAL HISTORY 307 (1996) (with Chris Guthrie)

*Guardianship: A Research Note*, 40 AMERICAN JOURNAL OF LEGAL HISTORY 146 (1996) (with Lawrence M. Friedman and Chris Guthrie)

*Women's Jury Service: Right of Citizenship or Privilege of Difference?*, 46 STANFORD LAW REVIEW 1115 (1994) (Note)

# COMMENTARY

I am a regular columnist for *Verdict*, a legal commentary site hosted by Justia.com. My columns are available at http://verdict.justia.com/author/grossman/. From October 2000 until December 2010, I was a columnist for FindLaw's *Writ*. A complete archive of my columns is available at http://writ.news.findlaw.com/grossman/. I have published this column biweekly for over twenty years (over 500 total), with an average length of 2500 words and as many as 22,000 readers for a single column.

# SHORTER PIECES

*What to Do if You've Been Sexually Harassed*, in HARV. BUS. REV., GUIDE TO WOMEN AT WORK (2019) (with Deborah Rhode)

*NFL Cheerleaders Have to Follow Bizarre, Sexist Rules. But Are They Illegal?*, Vox, Apr. 11, 2018

*Groping is a Crime*, Vox.com (Jan. 2, 2018)

*Do Sexual Harassment Prevention Trainings Really Work?*, Scientific American, Nov. 10, 2017 (with Vicki J. Magley)

*It's Time for America's Catcallers to be Punished*, Fortune.com (Sept. 6, 2017)

*Understanding Your Legal Options if You've Been Sexually Harassed*, Harvard Business Review, June 22, 2017 (with Deborah Rhode)

*The Potential Legal Train Wreck Ahead for Fox News and Bill O'Reilly*, Vox.com (Apr. 11, 2017)

*Vice President Pence's "never dine alone with a woman" isn't honorable. It's probably illegal,* Vox.com (Mar. 31, 2017)

*Even the E.R.A. Couldn't Bring About Real Equality,* N.Y. TIMES, Sept. 9, 2016 (op-ed)

*Succession Law*, THE OXFORD COMPANION TO AMERICAN LEGAL HISTORY (2008)
*Family and Medical Leave Act*, THE ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (2008)

*Title VII's Protection Against Pay Discrimination: The Impact of* Ledbetter v. Goodyear Tire & Rubber Co., REGIONAL LABOR REVIEW (Fall 2007) (with Deborah L. Brake)

*Seeking Equality in the Legal System*, NEWSDAY, Oct. 10, 2005, at A39 (op-ed)

*NYers Confront Limbo on Same-Sex Marriages*, NEWSDAY, May 19, 2004, at A48 (op-ed)

*The Supreme Court's 2003 Employment Rulings: Surprising Gains for Workers and Women*, 6 REGIONAL LABOR REVIEW 22 (Fall 2003)

*A Partial Legal Victory Against Continuing Discrimination: The New Supreme Court Ruling in* Amtrak v. Morgan, 5 REGIONAL LABOR REVIEW (Fall 2002)

*ERPL: Looking Beyond the Loss Ratio*, ROUGH NOTES 77 (Nov. 2002) (interview)

*Women's Labor Rights Rulings in 2001: A Mixed Bag*, 4 REGIONAL LABOR REVIEW 34 (Spring/Summer 2002)

*Probate and Succession Law*, LEGAL SYSTEMS OF THE WORLD (2002)

*Harassment*, THE OXFORD COMPANION TO AMERICAN LAW (2002)

*Sexual Harassment*, THE OXFORD COMPANION TO AMERICAN LAW (2002)

## CONFERENCES AND PRESENTATIONS

Presenter, American Chemical Society Fall 2021 National Meeting, Sexual Harassment in Science: Continuing the Conversation, *The Impact of the #MeToo Movement on Academia* (Aug. 23, 2021)

Presenter, *Beyond Pregnancy: Title IX and Reproductive Rights*, 12th Feminist Legal Theory Conference, University of Baltimore School of Law (April 23, 2021)

Presenter, *Past, Present, and Potential of the #MeToo Movement*, Stanford Women in Law (April 14, 2021)

Presenter, Pink Collar Recession, SJ Quinney Utah Law School (March 29, 2021)

Commenter, International Junior Faculty Forum, Stanford Law School (October 7-8, 2020)

Keynote Speaker, Measuring #MeToo: The Movement's Impact on Civil Law, Criminal Law, and Alternative Justice, Washington & Lee University School of Law (Sept. 18, 2020)

Faculty Workshop, Washington & Lee University School of Law, Lexington, VA (Nov. 11, 2019)

Invited Speaker, University of Illinois Summit to Prevent Sexual Harassment, Champaign-Urbana, Illinois (Oct. 16, 2019)

Presenter, Rethinking Institutional Response to Sexual Harassment. Law and Society Association Annual Meeting, Washington, D.C. (June 2, 2019)

Faculty Workshop, University of Minnesota School of Law (May 2, 2019)

Co-Convener & Presenter, *Symposium on Reproductive Justice*, SMU, Dallas, TX (April 4-5, 2019)

Presenter, Sexual Harassment in a Post-Weinstein World, Conference on Applied Feminism and #MeToo, University of Baltimore School of Law, Baltimore, MD (April 11-12, 2019)

Presenter, Panel on Sexual Harassment, National Diversity Equity Workshop, OXIDE, Alexandria, VA (April 9, 2019)

Keynote speaker, *Sexual Harassment in the Wake of #MeToo*, American Music Therapy Association Annual Meeting (Nov. 16, 2018)

Presenter, Sexual Harassment Training, Gender Law and Policy Colloquium, Boston University School of Law (Nov. 4, 2018)

Panelist, Conference in Honor of Joel Grossman, Johns Hopkins University (Oct. 26, 2018)

Presenter, Sexual Harassment in the Modern World, Tower Center (Oct. 30, 2018)

Commentator, International Law Junior Faculty Forum, Stanford Law School (Oct. 12-13, 2018)

Invited Participant, Developing Families: Innovations in Science and Law to Protect Early Relationships, Yale Law School (Sept. 22, 2018)

Keynote Speaker, Sexual Harassment in the Judiciary, Annual Conference of the Texas Judiciary (Sept. 6, 2018)

Panelist, How Can We Make the Legal Profession More Mom-Friendly?, Moms-In-Law, Dallas Bar Association, Dallas, TX, May 22, 2018

Keynote Speaker, Sexual Harassment in the Post-Weinstein World, Zeughauser Roundtable, Newport Beach, CA, March 22 & May 21-22, 2018

Panelist, Knowing Your Rights: Sexual Harassment and Assault, Women Galore, Wild Detectives, Dallas, TX, May 16, 2018

Working Group Participant, Early Childhood: Critical Legal Issues, University of Florida College of Law, Gainesville, FL, April 5-6, 2018

Workshop, The Price of Free Sperm, Washington University, St. Louis, MO (Dec. 4, 2017)

Keynote Address, Raising the Bar: Elevating Diversity in Law, Texas Diversity Council, Dallas, TX (Nov. 7, 2017)

Presentation, Sexual Harassment in Universities, National Academy of Sciences, Engineering, and Math, Boston, MA (Oct. 3, 2017)

Keynote Speaker, American Mortgage Diversity Council Fall Meeting, Dallas, TX (Sept. 18, 2017)

Presenter, Workshop on Family Law, Southeastern Association of Law Schools Annual Meeting, Boca Raton, FL (July 31, 2017)

Presenter, Workshop on Family Law, Southeastern Association of Law Schools Annual Meeting, Boca Raton, FL (July 31, 2017)

Chair, Author Meets Reader, Lawrence Friedman's Impact: How Law Affects Behavior, Law and Society Association Annual Meeting, Mexico City (June 23, 2017)

Commentator, Author Meets Reader, Deborah Rhode's Women and Leadership, Law and Society Association Annual Meeting, Mexico City (June 22, 2017)

Teaching Plenary, Family Law Scholars and Teachers Conference, New York, NY (June 6-7, 2017)

Invited Participant, The Way Forward: Title IX Advocacy Conference, Stanford Law School (May 1-2, 2017)

Presenter, 100 Years: New York State Women's Suffrage, 1917-2017, SUNY-New Paltz (March 22-23, 2017)

Faculty Workshop, Florida International University School of Law (April 5, 2017)

Invited Participant, National Summit on Early Childhood, University of Florida (Feb. 8-10, 2017)

Presenter, *Parental Rights versus Parental Status*, The Constitution and the Family, AALS Annual Meeting, San Francisco, CA (Jan. 4, 2017)

Roundtable Participant, Scholarship and Activism: Writing to Protest and for Social Change, AALS Annual Meeting, San Francisco, CA (Jan. 4, 2017)

Featured Author, *Author Meets Readers: Celebrating Recent Books on Employment Discrimination*, AALS Annual Meeting, San Francisco, CA (Jan. 5, 2017)

Faculty Workshop, *Men Who Give it Away: The Perils and Promise of Free and Nonanonymous Sperm Donation*, Workshop on Regulating Family, Sex, and Gender, University of Chicago Law School (Nov. 30, 2016)

Keynote Speaker, Women's Caucus, General Counsel Forum Annual Conference, San Antonio, TX (Nov. 3, 2016)

Presenter, *Preventing Sexual Harassment on Campus: Some Lessons from Title VII*, Sexual Assault on Campus: Conflicts Between Campus and Courts, University of Montana Law School, Missoula, MT (Sept. 30, 2016)

Presenter, *Legal Scholarship in the Modern Law School*, Legal Academy's Scholarly Mission, Northeastern Law School (sponsored by the Journal of Legal Education) (April 29, 2016)

Presenter, *Pregnancy Discrimination*, Equality in Employment Conference, University of Idaho College of Law, Boise, ID (April 1, 2016)

Presenter, *Parentage Without Gender*, All in the Family: Intimate Parties, Intimate Issues and ADR Conference, Cardozo Law School, New York, NY (Oct. 19, 2015)

Presenter, *The Perils of Non-Anonymous Sperm Donation*, AALS Midyear Meeting: Shifting Foundations in Family Law, Orlando, FL (June 22-24, 2015)

Discussant, *Gendering Criminal Law*, Law and Society Junior Scholar Colloquium, Stanford Law School, Stanford, CA (May 15-16, 2015)

Presenter, *Griswold at 50*, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD (May 6, 2016)

Presenter, Men Who Give it Away, Faculty Workshop, Tulane Law School, New Orleans, LA (April 13, 2015)

Presenter, Activist Strategies to Advance the Rights of Women Workers, 8th Annual Feminist Legal Theory Conference: Applied Feminism and Work, University of Baltimore School of Law, Baltimore, MD (March 7, 2015)

Moderator, Sex and Gender, AALS Workshop on Sexual Orientation and Gender Identity Issues, Washington, DC (June 7, 2014)

Presenter, Men Who Give it Away: The Perils of Free or Non-Anonymous Sperm Donation, Law and Society Association Annual Meeting, Minneapolis, MN (May 30, 2014)

Presenter, NELA/NY Spring Conference, Pregnancy Discrimination: Proving a Right to Accommodation, New York, NY (May 9, 2014)

Keynote Speaker, Symposium, The Legacy of Title IX, Grinnell College, Grinnell, IA (September 16-19, 2013)

Presenter, The Mother (and Father) of All Questions: Who is a Parent?, Law and Society Annual Meeting, Boston, MA (May 31, 2013)

Presenter, Making and Teaching "Real" Family Law, University of Wisconsin Law School (April 5-8, 2013)

Keynote Speaker, Colloquium, Choices and Lives: Abortion after *Roe v. Wade*, St. Mary's College of Maryland (March 19-21, 2013)

Roundtable Participant, Breaking the Glass Ceiling: Exploring the Continued Existence of Gender Bias in the Legal Profession and Understanding How It Can Change, New York University School of Law (March 1, 2013)

Presenter, Comparative Family Law Panel, AALS Annual Meeting, New Orleans, LA (January 5, 2013)

Presenter, Social Justice Feminism Conference, University of Cincinnati School of Law (October 25-27, 2012)

Presenter, Pregnancy, Motherhood, and Reproductive Rights, Law and Society Annual Meeting (June 7, 2012)

Participant, Author Meets Reader Panel on Grossman & Friedman, Inside the Castle, Law and Society Annual Meeting (June 5, 2012)

Chair and Discussant, Intimate Relationships and the State: Reconsidering the Trope of Separate Spheres, Law and Society Annual Meeting (June 5, 2012)

Presenter, Title IX and Sexual Violence, CLE, New York City Bar Association (April 17, 2012)

Presenter, "Parents and Non-Parents: The Struggle to Define Parentage in the Age of the New Family," Law and Society Association Annual Meeting, San Francisco, CA (June 4, 2011)

Commentator, Works-in-Progress Session, Emerging Family Law Scholars and Teachers Conference 2011, San Francisco, CA (June 1-2, 2011)

Keynote Speaker, "The State of the Same-Sex Union," Chicago Bar Association Panel on The Illinois Religious Freedom Protection and Civil Union Act, Chicago, IL (April 20, 2011)

Presenter, "Disentangling Legitimacy and Parentage," Conference on The New 'Illegitimacy': Revisiting Why Parentage Should not Depend on Marriage, American University, Washington, DC (March 24-25, 2011)

Panelist, "Relationship Recognition and the New York Courts," Lesbian, Gay, Bisexual and Transgender Issues in the Courts, The New York State Judicial Institute, White Plains, NY (March 22, 2011)

Presenter, "E-Marriage: Emerging Trends Meet the Law," AALS Annual Meeting, San Francisco, CA (January 7, 2011)

Presenter, "Are Transsexuals Paving the Way for Gender Equality," at the Northeast Law & Society Meeting, Amherst, MA (October 2, 2010)

Chair, "Author Meets Readers: Deborah Brake, Getting in the Game: Title IX and the Women's Sports Revolution," Annual Meeting of the Law and Society Association, Chicago, IL (May 27, 2010)

Reader, "Author Meets Readers: Deborah Rhode, The Beauty Bias," Annual Meeting of the Law and Society Association, Chicago, IL (May 28, 2010)

Lecturer, "Beyond Open Doors: Integrating Pregnant Women into the Workplace," Provost's Annual Diversity Lecture, Hofstra University (March 10, 2010)

Keynote Speaker, "The Future of Pregnancy Discrimination Law," Annual Conference of National Employment Lawyers' Association (Florida chapter), St. Petersburg, FL (September 5, 2009)

Presenter, "Legal Protections for Same-Sex Partners and Their Families," Annual Conference of Gay Officers' Action League, New York, NY (June 24, 2009)

Chair and Moderator, "Dimensions of Women's Equal Citizenship," Law and Society Association Annual Meeting, Denver, CO (May 28, 2009)

Participant, "Empirical Research in Family Law," Law and Society Association Annual Meeting, Denver, CO (May 29, 2009)

Presenter, "Pregnant Workers and Disparate Impact Law," Twelfth Annual Conference of the Association for the Study of Law, Culture, and Humanities, Boston, MA (April 3-4, 2009)

Presenter, "Why Transsexuals Are Paving the Way for Sex Equality," at Symposium: Applied Feminism, University of Baltimore School of Law, Baltimore, MD (March 6, 2009)

Presenter, Faculty Workshop, "Pregnancy, Work, and Citizenship," Vanderbilt Law School, Nashville, TN (November 18, 2008)

Presenter, "The Future of Pregnancy Discrimination Claims," Symposium: Respecting Expecting: The Thirtieth Anniversary of the Pregnancy Discrimination Act, Yale Law School, New Haven, CT (November 7-8, 2008)

Presenter, "Defining Discrimination: The Problem of Pregnancy," Northeast Regional Law and Society Conference, Amherst, MA (October 31, 2008)

Presenter, Faculty Workshop, "Pregnancy, Work, and Citizenship," Stanford Law School, Stanford, CA (July 30, 2008)

Moderator, Opening Plenary: "The New Generation of Family Law Scholars," Emerging Family Law Scholars Workshop, Cardozo Law School, New York, NY (June 5, 2008)

Presenter, "Pregnancy and Women's Equal Citizenship," Law and Society Association Annual Meeting, Toronto, Canada (May 30, 2008)

Participant, Roundtable, "Thirty Years of Anti-Discrimination Law," Law and Society Association Annual Meeting, Toronto, Canada (May 30, 2008)

Keynote Speaker, National Pay Equity Day, "The Future of Pay Discrimination Claims," Hofstra University, Hempstead, NY (April 25, 2008)

Presenter, Faculty Workshop, "Rights-Claiming and Reality under Title VII," Villanova Law School, Villanova, PA (February 8, 2008)

Presenter, "Reflections on the Roberts Court," Cardozo Law School, New York, NY (September 26, 2007)

Presenter, "Knowledge and Voice in a Rights-Claiming System: The Failed Promise of Title VII," Law and Society Association Annual Meeting, Berlin, Germany (July 25, 2007)

Organizer and Moderator, "Sticky Cultural Norms: The Transformative Potential of Title IX," Hofstra Law School (April 30, 2007)

Moderator, "Social Citizenship and Gender," Conference on Dimension's of Women's Equal Citizenship, held at Hofstra Law School on November 3-4, 2006 (conference co-director)

Presenter, "Title VII and 'Reasonable' Employees," Northeast Regional Law and Society Conference, Amherst College, Amherst, MA (May 19-20, 2006)

Presenter, Festschrift for Lawrence Friedman, "Same-Sex Marriage: Some Lessons from the History of Marriage and Divorce," Stanford Law School, Stanford, CA (October 1, 2005)

Chair and Moderator, Author-Meets-Reader Panel on Linda McClain's "The Place of Families," International Society for Family Law World Conference, Salt Lake City, UT (July 20, 2005)

Presenter, "Resurrecting Comity: Revising the Problem of Non-Uniform Marriage Laws," Annual Meeting of the Law and Society Association, Las Vegas, NV (June 3, 2005)

Presenter, "Same-Sex Marriage," International Society for Family Law World Conference, Salt Lake City, UT (July 20, 2005)

Presenter, Faculty Workshop, "The Portability of Marriage," University of North Carolina School of Law, Chapel Hill, NC (March 24, 2005)

Participant, Roundtable, "Master Trends in the Role of Law," New York Law School, New York, NY (November 12, 2004)

Presenter, "Same-Sex Marriage," Judicial Training Institute, Pace Law School, Westchester, NY (September 18, 2004)

Participant, Roundtable, "What Makes a Parent?," Cardozo Law School, New York, NY (June 17-18, 2004)

"Same-Sex Marriage and the False Rhetoric of Uniformity," Conference on "Same-Sex Marriage in Massachusetts: The Meaning and Implications of *Goodridge v. Department of Public Health*, Southern New England School of Law, Dartmouth, MA (June 11, 2004)

"Understanding Organizational Efforts to Prevent Harassment and Their Impact on Employees," Annual Meeting of the Law and Society Association, Chicago, IL (May 28, 2004)

Discussant, "The Canon of Family Law," Seventh Annual Conference of the Association for the Study of Law, Culture, and Humanities, Hartford, CT (March 12, 2004)

"Understanding the Sexual Harassment Culture" (with Vicki Magley and Lisa Kath), Seventh Annual Conference of the Association for the Study of Law, Culture, and Humanities, Hartford, CT (March 12, 2004)

"The Limits of Law: Sexual Harassment and Institutional Culture," Distinguished Lecture, Hofstra University, Hempstead, NY (February 25, 2004)

Participant at conference on "Don't Ask, Don't Tell: 10 Years Later," Hofstra University, Hempstead, NY (September 18, 2003)

"Escaping the Confines of Marriage: Divorce and Gender at the Turn of the Twentieth Century," presented at the International Society of Family Law, North American Regional Conference, Eugene, OR (June 27, 2003)

"Escaping the Confines of Marriage: Divorce and Annulment at the Turn of the Twentieth Century," presented at the Annual Meeting of the Law and Society Association, Pittsburgh, PA (June 6, 2003)

"Feminist Law Journals and the Rankings Conundrum," presented at conference on "Why a Feminist Law Journal?", Columbia University School of Law, New York, NY (April 4, 2003)

Moderator, "Current Policy Initiatives to Promote Marriage," at "A Conference on Marriage, Democracy, and Families," Hempstead, NY (March 14, 2003)

"Escaping the Confines of Marriage: Women and Divorce at the Turn of the Twentieth Century," at the Sixth Annual Conference of the Association for the Study of Law, Culture, and the Humanities, Sixth Annual Conference, New York, NY (March 7, 2003)

Chair and Discussant, "A Duty of Care: Being Responsible for the Mentally Incapable in the Eighteenth- Century Atlantic World," American Society for Legal History Annual Meeting, San Diego, CA (November 8, 2002)

"The Clash Between Law and Reality: Employer Liability for Sexual Harassment," presented at the Law and Society Annual Meeting, Vancouver, Canada (May 31, 2002)

"When Law Confronts Reality: The Limitations on Law's Ability to Change Workplace Culture," presented at the Fifth Annual Conference of the Association for the Study of Law, Culture, and Humanities, Philadelphia, PA (March 10, 2002)

Discussant and Chair, "Women and Violence," Law, Culture, and Humanities Conference, Austin, TX (March 2001)

Lecturer, CLE course on sexual harassment sponsored by the Suffolk County Bar Association, Islip, NY (May 26, 2000)

Panelist, "Sexual Harassment and the Workplace," Nov. 10, 1999 (conference for New York employers) Melville, NY (November 10, 1999)

Participant, "Roundtable—Law, Society, and History: The Contributions of Lawrence Friedman (III)," Chicago, IL (May 28, 1999)

## SELECT MEDIA APPEARANCES

Interviewed for *Amend*, a Netflix documentary on the Fourteenth Amendment (released Feb. 2021)
Interviewed for *Criminal* podcast, North Carolina Public Radio, June 20, 2018 (law of streaking)
Taped episode of Legal Talk Network podcast, Dec. 4, 2017 (sexual harassment in the legal profession)
Interviewed on Texas Standard, Dec. 8, 2017 (sexual misconduct in Texas legislature)
Interviewed on KERA, Art and Seek, Dec. 5, 2017 (sexual misconduct in the arts)
Interviewed on KERA, "Friday Conversation," Dec. 5, 2017 (sexual misconduct)
Interviewed on Fox 4, Dec. 12, 2017 (sexual misconduct in media)
Interviewed on WFAA, Channel 8, Nov. 29, 2017 (30-minute live panel discussion on sexual harassment epidemic entitled "What Changes Now?")
Interviewed on Texas Standard, Nov. 14, 2017 (sexual harassment scandals)
Interviewed on Texas Standard, Oct. 27, 2017 (sexual harassment scandals and NDAs)
Interviewed on Public Radio International's *Marketplace*, Oct. 20, 2017 (Harvey Weinstein scandal)
Interviewed on WHYY, *Radio Times with Marty Moss-Coane*, Aug. 5, 2016 (Roger Ailes scandal)
Interviewed on NPR's *All Things Considered*, April 29, 2015 (marriage equality)
Interviewed on NPR, New York, NY, May 9, 2014 (sperm donation practices)
Interviewed on KMOX Radio, St. Louis, October 8, 2009 (David Letterman harassment scandal)
Interviewed on WNYC, October 10, 2008 (same-sex marriage in Connecticut)
Interviewed on *A Current Affair* (Australia), May 22, 2008 (Heath Ledger's Will)
Interviewed on News12, October 15, 2007 (about controversial ethics speaker)
Interviewed on WNYC, July 6, 2006 (same-sex marriage in New York)
Interviewed on WNYC, May 17, 2004 (same-sex marriage in Massachusetts)
Interviewed on NPR's Morning Edition, March 3, 2004 (same-sex marriage in New York)
Interviewed on "Ken and Company," KABC 770, Los Angeles, California, November 19, 2003 (same-sex marriage in Massachusetts)
Onstage commentary for Broadway production of *Oleanna*, a David Mamet play about sexual

harassment in the university setting, October 10, 2009

## HONORS, GRANTS AND FELLOWSHIPS

National Endowment for Humanities Summer Stipend (2016)
Profiled as "Law Star" on Lawcrossing.com (2006)
Inducted into Long Island's "40 Under 40" (2005)
Hofstra Law School Research Grant (2000-16); SMU research grant (2016-19)
Hofstra University Distinguished Lecturer (2004)
Women's Law and Public Policy Fellowship (1995-96)

## PROFESSIONAL AFFILIATIONS

Elected Member, American Law Institute (since 2009)
Member, New York Bar (2002), California Bar (1995), District of Columbia Bar (1996),
     Texas Bar (2017)
Member, Law and Society Association
Member, Society for American Law Teachers
Member, Association for the Study of Law, Culture, and the Humanities

## PROFESSIONAL ACTIVITIES

Pro Bono Work:

Principal or co-author of pro bono amicus briefs in *June Medical v. McGee* (U.S. S. Ct. 2020; abortion); Whole *Woman's Health v. Paxton* (5th Cir. 2020; abortion); *Pidgeon v. Turner* (in Texas Supreme court and in support of U.S. S. Ct. cert petition; implementation of *Obergefell*); Young *v. UPS* (in support of U.S. S. Ct. cert petition and at merits briefing stage; pregnancy discrimination); *Obergefell v. Hodges*, No. 14-556 (U.S. Supreme Court; same-sex marriage); *Parker v. Pidgeon* (Tex. S. Ct. 2017; impact of *Obergefell*); Lopez-*Aviles v. Rius-Armendariz* (1st Cir. 2015; same-sex marriage); *Brenner v. Armstrong*, No. 14-14061 (11th Cir.; same-sex marriage); *Kitchen v. Herbert*, 2014 WL 2868044 (10th Cir. 2014) (same-sex marriage); *Harris v. Rainey*, 2014 WL 1292803 (4th Cir. 2014) (same-sex marriage); *Tanco v. Haslam* (6th Cir.; same-sex marriage); *Henry v. Himes* (6th Cir.; same-sex marriage); *Latta v. Otter* (9th Cir.; same-sex marriage); *DeLeon v. Perry* (5th Cir.; same-sex marriage); *Ledbetter v. Goodyear Tire & Rubber*, 550 U.S. 618 (2007) (pay discrimination).

Anonymous Referee:

Cambridge University Press; Harvard University Press; Oxford University Press; New York University Press; Lexis/Nexis Publications; Aspen Law and Books; *Law and History Review; Journal of American History*; *Hypatia*; *Law and Society Review*; *Law, Culture, and Humanities Journal*;   *Law and Social Inquiry*

President of the Board, Jane's Due Process (Member, 2018-present; President, 2021-present)
Member of the Advisory Board, Bush Institute's Women's Initiative (2019-present)

Member, Blue Ribbon Advisory Committee, Equal Rights Advocates (2012-13)
Member, 2002-05, Editorial Board, PERSPECTIVES (magazine of the ABA's Commission on Women in the Profession)
Contributor, JOTWELL Press Blogs, Trusts & Estates Section (2011-13)
Guest Contributor, SALT Blog (2011)

## PERSONAL

Married with three sons. Ultramarathon runner, ironman triathlete, open water swimmer, and youth soccer coach.