# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MILTON RUDI,

        Plaintiff,

vs.

LESLIE WEXNER, EDWARD RAZEK, and
DAVID T. KOLLAT,

        Defendants,

    and

L BRANDS, INC.,

        Nominal Defendant.

Case No. 2:20-cv-3068

District Judge Michael H. Watson

Magistrate Judge Elizabeth P. Deavers

## DECLARATION OF PROFESSOR CHARLES R. KORSMO,
## CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW,
## IN SUPPORT OF THE SETTLEMENT AGREEMENT

I, CHARLES R. KORSMO, declare as follows:

## I.      INTRODUCTION

1.    Counsel for Settling Shareholders[1] have retained me to provide my opinion regarding the value

of the corporate reform initiatives (the "Reforms") that nominal Defendant L Brands, Inc. and

its successor entities, Bath & Body Works, Inc. ("Bath & Body Works") and Victoria's Secret

& Co. ("Victoria's Secret") (collectively "L Brands" or the "Company") have agreed to

---

[1] Unless otherwise indicated, all capitalized terms, unless otherwise defined herein, have the same meaning given to them in the Stipulation. *See generally* ECF NO. 23-2

implement in the stipulation and agreement of settlement entered into on July 29, 2021 (the "Settlement" or the "Stipulation").[2]

2. As detailed below, it is my opinion that the Settlement provides significant value to the Company and its stockholders, likely in excess of $100 million.

3. L Brands is a leading retailer. At the time the Actions were commenced, L Brands was the parent company of Bath & Body Works and Victoria's Secret. In August 2021, Victoria's Secret was spun off into an independent public company, and L Brands itself was renamed Bath & Body Works, Inc. Together, the successor entities have a market capitalization in excess of $24 billion[3] and revenues in excess of $16 billion per year.[4]

4. The Actions allege a pervasive culture of sexual harassment and discrimination at the Company. This culture was alleged to have been consistently tolerated and even perpetuated by top management, while whistle-blowers and complainants were ignored and subjected to

---

[2] Specifically, the Stipulation was made and entered into by and among the following, each by and through his, her, or its undersigned attorneys: 1) the Oregon Department of Justice, as chief legal advisor to the Oregon State Treasurer, on behalf of the Oregon Public Employee Retirement Fund ("Oregon"); (2) Milton Rudi ("Rudi"); (3) Detroit Police and Fire Retirement System ("Detroit"); (4) Nancy A. Lambrecht, Co-Trustee of the Amanda Greenfield 2012 Irrevocable Trust ("Lambrecht"); (5) John Giarratano ("Giarratano"); and (6) Maryann Kualii ("Kualii") (collectively with Oregon, Rudi, Detroit, Lambrecht, and Giarratano, the "Settling Shareholders"); (7) current and former members of the Board of Directors of L Brands, Inc. (the "Board"): Leslie H. Wexner, Abigail S. Wexner, Allan R. Tessler, Gordon Gee, Raymond Zimmerman, Patricia S. Bellinger, Donna A. James, Michael G. Morris, Sarah E. Nash, Robert H. Schottenstein, Anne Sheehan, Stephen D. Steinour, David T. Kollat, and Dennis S. Hersch (collectively, the "Board Members"); (8) former officers of L Brands, Inc.: Leslie H. Wexner and Edward Razek (the "Officers," and, together with the Board Members, the "Individual Defendants"); (9) nominal defendant L Brands, Inc. ("L Brands" or the "Company," and, together with the Individual Defendants, the "Defendants"); and (10) the Special Committee of the L Brands Board (the "Special Committee"). Settling Shareholders, Defendants, and the Special Committee are collectively referred to herein as the "Parties."
[3] As of December 9, 2021, Bath & Body Works had a market capitalization of $19.75 billion, while Victoria's Secret had a market capitalization of $4.68 billion. *See* Morningstar Financials (*avaialable at* https://www.morningstar.com/stocks/xnys/bbwi/quote and https://www.morningstar.com/stocks/xnys/vsco/quote).
[4] Bath & Body Works had FY 2021 revenues of $11.85 billion, while Victoria's Secret had FY 2021 revenues of $5.41 billion. *See* Morningstar Financials (*available at* Morningstar.com/stocks/xnys/bbwi/financials and Morningstar.com/stocks/xnys/vsco/financials).

retaliation. Specifically, the Actions allege that certain senior officers presided over or were aware of a culture of harassment at the Company and that certain senior officers even personally sexually harassed and assaulted women associated with the Company, including models hired by Victoria' Secret, and retaliated against complainants.  The Actions also allege that the Company and its officers and directors failed to take appropriate preventative or remedial action in response to complaints of sexual harassment and bullying at the Company. It is also alleged that certain senior officers maintained close ties with notorious sex offender Jeffrey Epstein even after Epstein's criminal conviction for sexual exploitation of minors in 2008, and enabled Epstein to prey upon Victoria's Secret models.

5. Because the Company is a consumer-facing business and depends heavily on its brand appeal to a primarily female customer base, allegations that the Company and its top management tolerated and perpetuated a culture of sexual harassment have been a serious threat to the foundation of the Company's business.

6. Settling Shareholders investigated the misconduct at the Company and made presentations to the Special Committee on the results of their investigations.  Settling Shareholders also presented proposals to the Special Committee for reforms to address the misconduct. Following further investigation by the Special Committee, the Parties engaged in settlement negotiations and mediation.  The Parties ultimately reached the global settlement that is memorialized in the Settlement.

7. The Reforms in the Settlement include, among other things:

    a. Clarifying and enhancing the policies and procedures for identifying, reporting and investigating claims of sexual harassment and discrimination;

b.  Updating Board committee charters to specify responsibility and accountability for the Reforms;

c.  Forbidding the use of non-disclosure agreements and mandatory arbitration agreements to resolve sexual harassment and related claims;

d.  Instituting new and improved sexual harassment, discrimination, and hostile work environment training programs within the Company;

e.  Monitoring outside contractors for compliance with Company policies and procedures;

f.  Collecting and regularly evaluating data relating to sexual harassment and retaliation; and

g.  Establishing a Diversity, Equity, & Inclusion ("DEI") Council to promote DEI initiatives and foster a non-discriminatory workplace;

h.  Retaining a DEI consultant to assist in implementing the Reforms and evaluate their effectiveness in preventing sexual harassment and related misconduct; and

i.  Committing $90 million to fund the Reforms.

8.  Settling Shareholders, working with experts in corporate reforms designed to address sexual harassment and discrimination, determined that the Reforms are necessary and appropriate to address and remedy the misconduct alleged. The Special Committee concluded that "the terms of the Settlement are fair and reasonable to L Brands and its stockholders and that it is in the best interests of the Company and its stockholders to enter into [the] Stipulation."

9.  Additionally, the Special Committee and the Company acknowledged "that Plaintiffs' efforts substantially and materially contributed to the improvements and changes in corporate governance since February 2020."

10. As detailed below, in my opinion, multiple independent methodologies confirm that the Settlement provides significant value to the Company and its stockholders. These methodologies include: (1) an event-study analysis to assess value lost by shareholders as a result of harmful public disclosures about the Company; (2) a review of the empirical academic literature on the value of similar reforms; and (3) a consideration of the market evidence of the increased value of Victoria's Secret in the wake of the Reforms. I selected these methodologies because each is a generally accepted valuation methodology and each, in my opinion, is well-suited for estimating the value of the Reforms here. All of these methodologies confirm to a reasonable degree of certainty that the Reforms have a monetary value to the Company and its stockholders in excess of $100 million. The fact that multiple different methodologies all independently converge on a value in excess of $100 million provides a high level of confidence in my opinion.

## II.   QUALIFICATIONS

11. I am a tenured Professor of Law at Case Western Reserve University School of Law in Cleveland, Ohio. I have been employed as a faculty member since 2011. For the last decade, I have taught courses and conducted research in corporate and securities law and corporate finance. My curriculum vitae is attached to this declaration as **Exhibit 1**.

12. I have published approximately two dozen law review articles and book chapters on issues of corporate and securities law, with an emphasis on stockholder litigation and its impact on corporate governance. My work on these topics has been cited frequently by the Delaware Court of Chancery, as well as the United States Circuit Courts.[5] My work has also been

---

[5] *See, e.g.*, Charles R. Korsmo, *Mismatch: The Misuse of Market Efficiency in Market Manipulation Class Actions*, 52 WM & MARY L. REV. 1111 (2011) (cited in *Mielo v. Steak 'n Shake Operations, Inc*., 897 F.3d 467 (3d Cir. 2018); *Fezzani v. Bear, Stearns & Co. Inc*., 716 F.3d 18 (2d Cir. 2013)); Charles R. Korsmo

featured in multiple popular publications, including The New York Times, the Wall Street Journal, Reuters, and Bloomberg. I have also presented and consulted on relevant topics to audiences including jurists, legal practitioners, government regulators, corporate officers, institutional investors, and other academics, including presentations at the National Business Law Scholars Conference, the American Association of Law Schools Annual Conference, the American Law & Economics Association, the Ohio Securities Conference, and the Practicing Law Institute.

13. I received my undergraduate degree in Physics from the Massachusetts Institute of Technology, where I was admitted to Sigma Xi, the Scientific Research Honor Society. I received my law degree from Yale Law School. After graduating law school, I served as a law clerk to Judge Ralph K. Winter, Jr. on the Second Circuit Court of Appeals. Following my clerkship, I joined the corporate and securities litigation practice at Sullivan & Cromwell in New York. I then taught at Brooklyn Law School as a Visiting Assistant Professor before joining the faculty of Case Western Reserve University School of Law where, in addition to

---

& Minor Myers, *The Structure of Stockholder Litigation: When do the Merits Matter?* 75 OHIO ST. L. REV. 829 (2014) (cited in *In re Appraisal of Dell, Inc*., 2015 WL 4313206, Ruling on Motion to Dismiss (Del. Ch., Jul. 13, 2015)); Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U. L. REV. 1551 (2015) (cited in *In re Appraisal of Columbia Pipeline Group, Inc*., 2019 WL 3778370 (Del. Ch. 2019); *Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693 (Del. Ch. 2018); *ACP Master, LTD. v. Sprint Corp*., CA-8507-VCL (July 21, 2017); *Merion Capital LP v. Lender Processing Services*, CA-9320-VCL (Dec. 16, 2016); *In re Appraisal of Dell, Inc*., CA-9322-VCL (May 31, 2016); *In re Appraisal of Dell, Inc*., 2015 WL 4313206, Ruling on Motion to Dismiss (Del. Ch., Jul. 13, 2015); *In re Appraisal of Dole Food Company, Inc*., CA-9079-VCL, Ruling on Motion to Dismiss (Feb. 13, 2015); *In re Ancestry.com, Inc*. 2015 WL 68825 (Del. Ch., Jan. 5, 2015); *Merion Capital LP v. BMC Software, Inc*., 2015 WL 67586 (Del. Ch., Jan. 5, 2015); *In re Orchard Ent. Stockholder Litig*., 2014 WL 4181912 (Del. Ch., Aug. 22, 2014)); Charles R. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. OF CORPORATION LAW 109 (2016) (cited in *In re Appraisal of Panera Bread Co.*, 2020 WL 506684 (Del. Ch. 2020); *Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693 (Del. Ch. 2018); *ACP Master, LTD. v. Sprint Corp*., CA-8507-VCL (July 21, 2017); *In re Appraisal of Dell, Inc*., CA-9322-VCL (May 31, 2016)); Charles R. Korsmo & Minor Myers, *The Flawed Corporate Finance of* Dell *and* DFC Global, 68 Emory L.J. 221 (2018) (cited in *In re Stillwater Mining Co.* 2019 WL 3943851 (Del. Ch. 2019); *In re Appraisal of Columbia Pipeline Group, Inc*., 2019 WL 3778370 (Del. Ch. 2019)).

my writing on corporate governance, I have for many years taught corporate finance, including event study methodology and company valuation.

14. I have written extensively about the important role that stockholder litigation can play in corporate governance, providing a mechanism of redress and—more importantly—deterrence against faithless conduct by corporate managers. *See, e.g.*, *Lead Plaintiff Incentives in Aggregate Litigation*, 72 VAND. L. REV. 1923 (2019) (w/ M. Myers); *The Deterrence Value of Stockholder Appraisal*, Research Handbook on Mergers & Acquisitions (2016) (w/ M. Myers); *Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U. L. REV. 1551 (2015) (w/ M. Myers); *The Structure of Stockholder Litigation: When do the Merits Matter?* OHIO ST. L. REV. 829 (2014) (w/ M. Myers).

15. I am being paid a flat fee of $25,000 for my work in preparing this opinion. This fee is not contingent on my findings.

## III.    SUMMARY OF OPINION

16. I have been asked by Settling Shareholders' Counsel to review the terms of the Settlement and other related materials to render an independent expert assessment of the value of the Reforms in the Settlement. In formulating my opinion, I have not independently investigated the merits of Settling Shareholders' allegations.

17. To inform my opinion I have read the Verified Stockholder Derivative Complaint (the "Complaint"), the Stipulation, together with Exhibit E to the Stipulation, detailing the governance measures to be taken pursuant to the Stipulation, and a number of other documents relevant to the Actions. These materials are listed in **Exhibit 2**. My opinion is based on a review of these materials and the application of my personal and professional knowledge, research, expertise, and experience, as described in further detail below.

18. The Settlement is the result of extensive negotiations and a mediation that occurred over several months, and has been carefully crafted to implement specific structural reforms targeting critical risks to L Brands' business and stockholder value. In my opinion, the Reforms achieved by the Settlement are extremely valuable to the Company and its stockholders.

19. I understand that the Reforms are being instituted, in part, because of the investigations launched by Settling Shareholders, the commencement of the Actions, and Settling Shareholders' insistence on the adoption of the Reforms throughout their respective investigations and litigations, in their various settlement demands to the Special Committee, and in the Prayer for Relief in the Complaint.[6]

20. The scandals arising out of the Company's culture of sexual harassment and discrimination had a devastating impact on the Company's public image and, consequently, on stockholder value. A recurrence of the sexual harassment problems at the Company would likely produce another—perhaps fatal—crisis, particularly for Victoria's Secret, which depends heavily on the ability to attract the services of top models and other talent, and on the goodwill of a customer and investor base—primarily women—who are particularly concerned with sexual harassment and discrimination in the workplace.

21. The Reforms agreed to in the Settlement transform the sexual harassment compliance mechanisms at the Company and can be expected to meaningfully reduce the possibility of future wrongful conduct, both of the types alleged in the Actions and similar types of conduct. Such conduct is likely to proliferate when a board and a company lack (i) appropriate policies

---

[6] In the Complaint, filed on May 16, 2020, the Prayer for Relief sought, among other things, an order "[d]irecting L Brands to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws, and protect the Company and its stockholders from a recurrence of the damaging events described herein."

and procedures to address such conduct; (ii) internal controls to ensure that such policies and procedures are being implemented in practice; and (iii) measures to ensure that perpetrators of such wrongful conduct are held accountable.

22. In light of the prior negative impact on stockholder value arising from widespread allegations of sexual harassment and related misconduct at the Company and the manifest significance of the Reforms in reducing the likelihood of such misconduct in the future, it is my opinion is that the Settlement provides significant value to the Company and its stockholders, likely in excess of $100 million.

23. As detailed below, I arrive at this opinion as to value on three main grounds:

    a. By estimating the magnitude of the negative effect of the Company's sexual harassment and misconduct scandals on stockholder value and the likely reduction in likelihood of recurrence due to the Reforms (*i.e.* an event study analysis);

    b. By considering recent empirical academic research on the value of good corporate governance practices akin to those implemented by the Settlement; and

    c. By examining market evidence of the increase in the market value of Victoria's Secret attributable in part to the Reforms triggered by the Action.

24. I chose these methodologies because they are generally accepted in the academic literature, frequently employed by experts valuing settlements featuring governance reforms and, in my opinion, well-suited to valuing the Reforms at issue here.

25. While none of these methodologies is definitive, all lead to a similar conclusion, converging on an estimate of the value of the Reforms in excess of $100 million. This suggests that the Reforms secured by the Settling Shareholders' efforts are economically valuable for the stockholders and in the best interests of the Company. It also suggests that a precise weighing

of the percentage of the value created that can be attributable to the Actions is not necessary to determine that the Actions have provided at least $100 million in value to the Company and its stockholders.

## IV.    SUMMARY OF THE REFORMS

26. The Reforms in the Settlement were carefully negotiated by the Parties to address the allegations and issues identified in the Actions and by Settling Shareholders.  These Reforms include:

   a. Amendments to the Company's value statements making clear that diversity, equity, and inclusion will be integrated at all levels of the Company, and that harassment, discrimination, and retaliation will not be tolerated;

   b. Creation of standalone sexual harassment and anti-retaliation policies, together with amendments to the Company's Code of Conduct informing employees how to file complaints and ensuring that alleged misconduct by high-level employees is reported in a systematic fashion;

   c. Retention of an independent expert to design and administer customized harassment prevention training, with separate training for directors and senior managers emphasizing their role in fostering a non-discriminatory work environment;

   d. Application of the training, values articulation, and reporting policies to outside contractors, including the modeling agencies and photographers involved in Company photo shoots;

   e. Implementation of procedures for collecting and analyzing data relating to harassment and discrimination within the Company, together with procedures for addressing any issues identified from such analysis;

f.   A commitment to forgo the use of non-disclosure agreements ("NDAs") in dispute resolution going forward, to narrow enforcement of NDAs entered into previously[7] and exempt claims of sexual harassment or related misconduct from mandatory arbitration;

g.   Retention of a separate and independent DEI Consultant, who will be an expert in sexual harassment in the corporate setting and will be approved by the Parties and the Human Capital and Compensation Committee; the DEI Consultant will work directly with the Board, with ongoing authority to review policies and procedures regarding sexual harassment and discrimination and recommend improvements, and tasked with conducting an annual review of the effectiveness of the Company's efforts to prevent sexual harassment and discrimination;

h.   A new system and set of guidelines for investigating allegations of harassment and discrimination, and providing remediation;

i.   Specific structural corporate governance changes that strengthen the Board's oversight over sexual-misconduct related issues and delineate the responsibilities of individual board committees, including the Human Capital and Compensation Committee, the Audit Committee, and the Nominating and Governance Committee, with respect to sexual harassment, discrimination, and diversity; and

j.   Creation of a DEI Council tasked with responsibility for implementing the DEI initiatives, aimed at fostering a diverse and non-discriminatory culture at the Company;

---

[7]   Recent research suggests that NDAs and mandatory arbitration provisions can be misused to "shield predation, harassment, and other misconduct" within companies, allowing a culture of sexual harassment to grow and fester. *See* Maureen A. Weston, *Buying Secrecy: Non-Disclosure Agreements, Arbitration, and Professional Ethics in the #MeToo Era*, 2 U. ILL. L. REV. 507 (2021). In light of the allegations of prior abuse of NDAs, the prohibitions contained in the Reforms are an important safeguard against the re-emergence of a culture of sexual harassment and discrimination.

k.  Retention of a DEI expert to assist the DEI Council in achieving its objective of furthering DEI initiatives, including by developing and implementing policies and practices to eliminate underrepresentation of women in management positions at the Company, including practices to attract and retain more women for such positions; and

l.  A suite of efforts to attract and retain more women for management positions within the Company and increase diversity across the Company.

27. These Reforms, detailed further in Exhibit E to the Settlement, work together to substantially reduce the risk of a recurrence of sexual harassment and related misconduct at the Company.

## V.    THE VALUE OF AVOIDING A RECURRENCE – EVENT STUDY

28. The governance failures that enabled the alleged sexual harassment and misconduct and the culture of harassment and discrimination at the Company had severely negative financial consequences on the Company and its stockholders.  The Reforms have financial value for stockholders because they reduce the likelihood of a recurrence of similar harassment and misconduct going forward.

29. The standard way that legal academics and financial economists value corporate governance changes is in terms of stockholder value, namely, how much stockholder value was lost as a result of poor corporate governance, and how much stockholder value will be gained by improvements to governance. [8]

30. Losses are typically measured using an "event study" designed to determine whether, and how much, a particular event affected the value of a company.  This methodology makes use of one of the most broadly accepted and well-supported propositions in economics: stock prices

---

[8] *See generally* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I. Technique and Corporate Litigation*, 4 AM. L. & ECON. REV. 141 (2002).

rapidly adjust to reflect the impact of new public information on the value of a company.[9]  For companies with widely-traded stocks—like L Brands—the market's reaction to public revelation of the event thus provides an unbiased estimate of the impact of the event on stockholder value.[10]

31. In broad outlines, an event study consists of three steps.  First, the relevant event is identified, along with a "window" of time during which the event was first revealed to the market.  In order to confidently ascribe any market reaction to the event being considered, it must be confirmed that no other material information about the company was revealed during this window.  Second, the change in the relevant company's stock price during the event window is measured.  Third, because stock prices are also affected in predictable ways by overall market changes and industry-wide developments, the change calculated in step two is adjusted to remove these influences. The result of these calculations is an "abnormal return" that can be ascribed to the event in question.  The overall impact on stockholder value can then be determined by multiplying the abnormal return—the percentage change in stock price ascribable to the event—by the market capitalization of the company at issue.[11]

32. Performing the first step of an event study analysis in this case is somewhat complicated by the nature of the misconduct here.  Instead of a single, dramatic event—such as an accounting restatement revealing previous fraud, or a surprise criminal indictment—the extent of the misconduct at the Company was revealed over a period of time, with a stream of public revelations gradually revealing the depth and breadth of the problems.  As a result, focusing

---

[9] This proposition is sometimes referred to as the semi-strong version of the efficient capital markets hypothesis. *See generally* Richard A. Brealey et al., Principles Of Corporate Finance, 373 (2008).

[10]  *See generally* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I. Technique and Corporate Litigation*, 4 AM. L. & ECON. REV. 141 (2002).

[11] *See generally* Sanjai Bhagat & Roberta Romano, *Empirical Studies of Corporate Law* (in Handbook of Law and Economics), A. Mitchell Polinsky and Steven Shavell, eds. (2006).

an event study on any single public announcement risks understating the extent of the harm from the alleged misconduct.

33. Nonetheless, focusing an event study narrowly on the most shocking revelations provides a straightforward way to estimate a lower bound for the harm to the Company. In particular, the revelations of the close connections between the Company and notorious and convicted sex offender Jeffrey Epstein were highly damaging, and are well-suited to measurement by an event study. In particular, two bursts of news articles informed the market of the Company's ties to Epstein.

34. Following Epstein's arrest for sex trafficking, dozens of news articles appeared from July 9, 2019 to July 11, 2019, tying Epstein to the Company. For example, The New York Times reported that the founder and former CEO of L Brands and Epstein had "formed a financial and personal bond that baffled longtime associates of the wealthy retail magnate, who was [Epstein's] only publicly disclosed investor" and also noted that the two had bought a mansion together.[12] I surveyed public reporting about the Company and confirmed that no other material news about the Company was released during this period.

35. Similarly following Epstein's death in prison, another wave of news articles appearing between August 7, 2019 and August 15, 2019, further detailing Epstein's ties to the Company and allegations that Epstein had misappropriated funds. For example, The New York Times reported that Epstein had allegedly "misappropriated vast sums of money" from Wexner, and that "[t]he relationship between the two men has posed a potentially grave problem for L Brands[.]"[13] The New York Times also reported that ties to Epstein persisted even after

---

[12] James B. Stewart, et al., "Jeffrey Epstein's Fortune May Be More Illusion Than Fact," N.Y. TIMES (July 10, 2019).

[13] Steve Eder and Emily Steel, "Epstein Took 'Vast Sums,' Tycoon Says," N.Y. TIMES (August 8, 2019).

Epstein's 2008 conviction.[14]  I surveyed public reporting about the Company and confirmed that the only other piece of material news regarding the Company released during this period was an 8-K filed by the Company announcing amendments to a revolving credit agreement.

36. The event study methodology described above can be applied to these two event windows. The initial burst of articles in July of 2019 was accompanied by a drop in the Company's stock price of 7.7%.  Given the movements of the S&P 500 and the retail industry index during this period, the expected change in the Company's stock price was an increase of approximately one-and-a-quarter percent.  Controlling for these general market changes thus gives a slightly larger abnormal return of nearly 9%.  The second burst of articles, in August 2019, was accompanied by a drop in the Company's stock price of 21.4%.  Again adjusting for general market and industry movements—which were slightly down during the event window—this gives an abnormal return of approximately 18%.[15]  For each event window, the magnitude of the drop in stock price was so far outside of the normal price fluctuations for the Company's stock as to be statistically significant at the levels conventional for economic research.[16]

37. The following chart illustrates the movement of the Company's stock price during the relevant period, as compared to the movement of a retail industry index of comparable companies:

---

[14] Emily Steel, et al., "Jeffrey Epstein's Opaque Finances Could Become Focal Point for Investigators," N.Y. Times (August 11, 2019).

[15] To avoid confounding the analysis, I excluded the trading day where the market was first informed of the changes to the Company's revolving credit agreement.  Including this trading day slightly reduces the magnitude of the overall and abnormal returns (to -18.5% and -16%, respectively), but does not impact the overall conclusions.

[16] By convention, a result is considered statistically significant if the analysis produces a "confidence level" of >95%--that is, the possibility that the result occurred by chance can be rejected with 95% confidence. Here, the confidence level for each event window is >99%.



38. The share price drops illustrated above represent losses in market capitalization of approximately $640 million—the abnormal return of slightly under 9% times L Brands' prior market capitalization of approximately $7.3 billion—for the first event window in July 2019 and more than $1 billion—the abnormal return of 18% times L Brands' prior market capitalization of approximately $6.3 billion—for the second window in August 2019. Added together, these two drops in market capitalization equal a total loss in the value of the Company of approximately $1.7 billion as a result of the negative publicity surrounding the Company's ties to Epstein. Market prices typically represent the best estimate of the present value of the future earnings of a company. *See, e.g.*, Bradford Cornell, Corporate Valuation, 35-38 (1993); Tim Koller, et al., Valuation: Measuring And Managing The Value Of Companies, 326-33

(2010). This dramatic loss in market capitalization thus reflected a sharply negative reassessment of the Company's future earnings due to damage to the Company's brands and the possibility of future legal liability, among other things.

39. This analysis demonstrates that a reasonable, conservative measure of the loss in stockholder value from a possible recurrence of the sexual harassment and misconduct that the Reforms are designed to avert is $1.7 billion.

40. The figure of $1.7 billion is highly conservative in two respects. First, it reflects only the market reaction to a single aspect of the alleged misconduct—the ties to Epstein—and ignores other revelations, such as the allegations of discrimination and harassment by Company executives and the allegations of harassment faced by Victoria's Secret models. Second, the recurrence of a major sexual harassment scandal would likely do permanent—perhaps existential—damage to the Company's brand (particularly Victoria's Secret), undoing all of the brand repair the Company has done since these Actions were commenced.

41. In valuing the Reforms, the appropriate methodology would be to look at the negative impact of a recurrence of the misconduct alleged in the Actions and assess the extent to which the Reforms can be expected to reduce the likelihood of such a recurrence. As noted, a reasonable floor for the damage to stockholder value from a recurrence of similarly serious sexual harassment problems would be at least $1.7 billion. Although it is not possible to determine the risk of recurrence with precision, based on a review of the academic literature I make the conservative assumption that, absent the Reforms, there would be only a 10% recurrence risk.[17]

---

[17] This reflects a cumulative risk of serious sexual harassment issues over a multi-year period—a "hazard ratio." *See* John Armour, Jeffrey N. Gordon & Geeyoung Min, *Taking Compliance Seriously*, 37 YALE J. REGULATION 1, 21-25 (2020). The 10% figure is especially conservative when applied to a business like Victoria's Secret where the potential for sexual harassment problems may be particularly high given the large percentage of women employees.

The "expected loss" due to a recurrence can thus be estimated at $170 million: the 10% risk multiplied by $1.7 billion in expected damage to stockholder value.[18]  No reforms can entirely eliminate the chance of recurrence.  Nonetheless, as detailed above, and based on the accompanying joint declaration of Professors Schultz and Grossman, the Reforms can be expected to substantially reduce the chance of recurrence.  Making the further conservative assumption that the Reforms will reduce the recurrence risk by 75%, the expected value of the Reforms—in terms of the expected amount of loss they will avoid—would be $127.5 million.

42. In conclusion, the event study methodology suggests a conservative floor for the value of the Reforms at $127.5 million.

## VI.    EVIDENCE FROM EMPIRICAL STUDIES

43. In this section, I consider three related lines of empirical research, each of which suggests that the Reforms are likely to create significant value for the Company's stockholders.  The first line of research has found that investors are willing to pay significant premiums for companies with better governance in general, and for companies with better governance with respect to gender discrimination and sexual harassment, in particular.  The second line of research suggests that companies with greater gender diversity in leadership experience better financial results. The third line of research shows that the premium investors are willing to pay for companies with strong social responsibility and good governance metrics has increased in recent years, along with the penalty paid by socially irresponsible and poorly governed companies.

44. As noted above, the Reforms will transform the Company from being a laggard with respect to sexual harassment-related governance to an industry leader employing best practices.  The

---

[18] To make these numbers work in "present value" terms, I have made the historically safe assumption that the Company's stock price will increase, over time, at a rate not less than the time value of money.

Reforms also offer targeted measures to improve gender diversity at both the board and executive levels. Operating in a consumer-facing industry, the performance of the Company—particularly the Victoria's Secret portion of the business—is likely to be especially sensitive to the appearance or reality of sexual harassment.

    a.   <u>The Market Premium for Good Governance</u>

45. While it is still a developing area of academic research, a number of recent studies have looked at the effect of gender diversity and sexual harassment practices on stockholder value. One study found that companies with a negative reputation for sexual harassment experienced sharp declines in operating profitability and increases in labor costs. *See* Shiu-Yik Au, Ming Dong, & Andreanne Tremblay, *Employee Sexual Harassment Reviews and Firm Value* (2021) (*available at* https://ssrn.com/abstract=3437444). As a result, the worst-performing companies on sexual harassment suffer highly negative abnormal stock returns. *See id.* (finding an annual abnormal annual return of -13.8% for firms in the 99th percentile for sexual harassment, and -7.47% for firms in the 95th percentile). For the Company, with a market capitalization of approximately $24 billion, these findings suggest that underperformance on preventing, investigating, and addressing sexual harassment would translate to an annual loss to stockholders in the billions of dollars.

46. A study by some of the same authors also found that firms with greater gender diversity among senior executives and on the board experience lower levels of sexual harassment. *See* Shiu-Yik Au, Andreanne Tremblay, & Leyan You, *Does Board Gender Diversity Reduce Workplace Sexual Harassment* (2021) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3667087) (finding that "[a]n increase of one female director is associated with a 20.71% decrease in [sexual harassment]" and that

"firms with a higher percentage of female executives also experience decreases in [sexual harassment]").

47. Broader literature also exists on the value markets ascribe to good governance in general, and in particular to strong environmental, social, and governance practices—a heading that encompasses firm practices regarding sexual harassment and diversity. Though less directly focused on sexual harassment and gender diversity, this literature is at least suggestive as to the value of the Reforms.

48. An early and widely known study is the McKinsey Investor Opinion Survey published in June 2000 (*available at* https://www.oecd.org/daf/ca/corporategovernanceprinciples/1922101.pdf). McKinsey surveyed 200 large institutional investors (with $3.25 trillion in assets under management) to determine the importance of strong board governance practices. McKinsey's survey found that governance factors "are at least as important to [investors] as financial performance when they are evaluating companies for investment."

49. Seventy-five percent of responding institutional investors indicated that board governance practices were as important to them as financial performance, and the average premium that the investors reported being willing to pay for a well-governed company vs. a poorly-governed company was 18.3% for firms in the United States. The McKinsey survey concluded that "[a]lthough it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through. . . . If companies could capture but a small portion of the governance premium that is apparently available, they would create significant shareholder value." For a more recent study reaching a similar conclusion, see Cunat, Gine, & Guadalupe, *The Vote is Cast: The Effect of Corporate*

*Governance on Shareholder Value*, 67 J. of Fin. 68(5), 1943-77 (2012); *see also* O.D. Zerbib, *A Sustainable Capital Asset Pricing Model (S-CAPM): Evidence from Green Investing and Sin Stock Exclusion* (2019) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455090) (finding that investor preferences led to a penalty of 3% for socially irresponsible firms, such as those investing in "sin stocks" and those with bad reputations for environmental issues, sexual harassment and diversity, between 2000-2018. As noted, these studies do not purport to examine sexual harassment or gender diversity policies, in particular. Nonetheless, they do suggest that investors are willing to pay a premium for good governance, and that they penalize firms that engage in socially irresponsible behavior.

50. Through the Reforms, and specifically through the retention of a DEI expert, the Company agreed to eliminate the underrepresentation of women in management positions at the Company. Such initiatives are buttressed by an amendment to the Company's Nominating & Governance Committee charter committing to 50% diversity on the Board and requiring that the pool of candidates for any Board vacancy include at least one woman. As explained above, academic research suggests that more women in management—particularly at the board level—can substantially reduce likelihood of sexual harassment at a company. The Company's commitment to improve the representation of women in management is thus well-designed to avoid a recurrence of the type of misconduct alleged in the Actions. The interaction between a greater number of women directors and the new reporting channels will almost certainly reduce the risk that sexual misconduct by officers or a general culture of sexual harassment and discrimination would arise in the first place, let alone that it would go unaddressed. Furthermore, having multiple women in the boardroom will almost certainly counter the

pressure to remain silent that a single or small number of female directors might otherwise experience when confronted with issues of sexual harassment in the presence of a supermajority of male directors. *See, e.g.*, Alison M. Konrad, Vicki Kramer & Sumru Erkut, *Critical Mass: The Impact of Three or More Women Directors*, 37:2 ORGANIZATIONAL DYNAMICS 145, 157 (2008); Solomon Asch, *Opinions and Social Influence*, 193 SCIENTIFIC AMERICAN 31 (1955) (effect of 2 vs. 1 dissenters).

b. Gender Diversity and Financial Performance

51. Though the empirical evidence is more mixed on the question, many empirical studies have found that greater gender diversity on boards and among management is associated with stronger financial performance in general. *See, e.g.*, Kevin Campbell & Antonio Mínguez-Vera, Gender Diversity in the Boardroom and Firm Financial Performance, 83 J. BUS. ETHICS 435, 444 (2008); Cristian L. Dezsö & David Gaddis Ross, Does Female Representation in Top Management Improve Firm Performance? A Panel Data Investigation, 33 STRATEGIC MGMT. J. 1072, 1079–82 (2012). Some studies have also found that more women on a board may have positive reputational effects, especially for firms—like the Company—that "interact directly with consumer sectors." *See* Terry Dworkin & Cindy Schipani, *The Role of Gender Diversity in Corporate Governance*, 21 U. PENN. J. OF BUS. L. 105, 115 (2018) (citing S. Brammer, A. Millington, & S. Pavelin, *Corporate Reputation and Women on the Board*, 20 BRIT. J. OF MGMT. 17-29 (2008)).

c. The Increasing Salience of Social Responsibility and Good Governance for Market Value

52. Recent studies have shown that the effect of good governance on stockholder value has, if anything, grown stronger. Based on my research and review of various literature, it is clear

that investors are more attuned than ever to governance and social issues, and recent years have seen explosive growth in so-called "ESG" investing. ESG funds are dedicated to investing in—and often willing to pay a premium for—firms with strong environmental, social, and governance practices. Assets under management at such funds reached $30 trillion in 2019—doubling in only five years--and continue to grow rapidly. *See, e.g.*, Bloomberg Intelligence, "ESG Assets May Hit $53 Trillion by 2025, a Third of Global AUM" (Feb. 23, 2021) (*available at* https://www.bloomberg.com/professional/blog/esg-assets-may-hit-53-trillion-by-2025-a-third-of-global-aum/); Alexander Fish, Dong Hyun Kim, & Shankar Venkatraman, *The ESG Sacrifice* (2019) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3488475).

53. A recent study by a professor at Harvard Business School evaluated companies by their environmental, social, and governance performance, and found that investors were willing to pay a premium of 6.1% for a one-standard-deviation improvement in ESG performance during the period 2009-2018. George Serafeim, *Public Sentiment and the Price of Corporate Sustainability*, 76, FIN. ANALYSTS. J. 26 (2020). To put these findings in concrete terms: if a company were able to make a one-standard-deviation improvement in its ESG governance—for example, from the 50th percentile to the 85th percentile[19]—it could expect to see its market capitalization increase by 6.1%. Similarly, a two-standard-deviation improvement—for example, from the 50th percentile to the 95th percentile—would translate into an expected increase in market capitalization of 12.2%. The study also found that "the valuation premium"

---

[19] For a so-called "normal distribution"—often known as a bell curve—one standard deviation above the average translates to approximately the 85th percentile, while two standard deviations above the average translates to approximately the 95th percentile.

paid for "companies with strong [ESG] performance" has increased over time, reflecting the increasing salience of social issues to investors. *Id.*

54. The Company currently has a market capitalization of approximately $24 billion (including both Bath & Body Works and Victoria's Secret stocks). In the academic literature canvassed above, estimates of the premium investors are willing to pay for the types of governance improvements contained in the Reforms range from 3% to 18.3%. These estimates are with respect to an average company, and not just consumer-facing businesses like the Company, where the premium is likely to be larger. But even if the Reforms resulted in a far more modest 1% increase in the Company's market capitalization, that would represent more than $200 million in stockholder value.

## VII.    OTHER MARKET EVIDENCE OF THE VALUE OF THE REFORMS

55. Where market evidence is available, it typically provides the most direct and reliable evidence of value. The Delaware Supreme Court has defined fair value as "the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances … without any compulsion upon the seller to sell or upon the buyer to buy." *Poole v. N. V. Deli Maatschappij*, 243 A. 2d 67, 70 n.1 (Del. 1968); *see also Applebaum v. Avaya, Inc.*, 812, A.2d 880, 889-90 (Del. 2002); *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369-70 (Del. 2017). The valuations produced by sophisticated, motivated market participants based on publicly available information about a company with real money at stake are likely to be more reliable.

56. Market evidence is particularly strong where, as in stock markets, a liquid trading market exists, with prices reflecting the collective judgment of the multitudes based on the mass of publicly available information about a given company and the value of its shares. *See* Bradford

Cornell, Corporate Valuation, 35-38 (1993). As a leading corporate finance textbook puts it, "[i]n an efficient market you can trust prices, for they impound all [public] information about the value of each security." Richard A. Brealey, et al., Principles Of Corporate Finance, 373 (2008). Of course, market valuation is only reliable with respect to public information—the market cannot value information that it does not know about.[20]

57. The event study methodology employed above uses one kind of market evidence: the fall in stock price attributable to the public revelations of the harassment and misconduct alleged in the Complaint. When combined with reasonable estimates of how likely the Reforms are to prevent such conduct in the future, this evidence yielded an estimate of the value of the Reforms.

58. A second type of market evidence would be an increase in stock price as a result of the public announcement of the Reforms undertaken in response to this action. Such an increase would provide a direct measure of the value of the Reforms, as estimated by the market.

59. Because the Reforms were discussed and introduced at different times following the inception of these Actions, it is not possible to use a similar event study methodology to value them. The protracted discussions prevent the identification of a clear "event" date on which to examine a stock price change. Instead, the Reforms' expected impact were assimilated into the stock price over time.

---

[20] Economists typically categorize market efficiency by reference to the types of information that are alleged to be reflected in prices. A market is said to be "weak form" efficient if prices reflect all of the information contained in past prices. A market is "semi-strong form" efficient if prices reflect all publicly available information. A market is "strong form" efficient if prices reflect *all* available information, public or private. In general, economic research finds that markets for heavily traded stocks are usually both weak form and semi-strong form efficient, but not strong form efficient. *See generally* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 283 (1970).

60. Nonetheless, the market evidence in this case confirms that the Reforms undertaken in response to these Actions have contributed to a dramatic increase in the value of the Company. While the market evidence pertains to the Company as a whole, such that the contribution of the Reforms cannot be isolated with precision, even an extremely conservative estimate of the percentage of the value increase attributable to the Reforms indicates a value in the hundreds of millions.

61. More specifically, in February of 2020—in the immediate wake of the public revelations of the scandals underlying the Actions—L Brands agreed to sell a controlling stake in Victoria's Secret to a private equity firm, Sycamore Partners, at a valuation of approximately $1.1 billion. In light of Victoria Secret's $6.9 billion revenue in 2019, this valuation gave a rock-bottom 0.16x price-to-sales multiple, as compared to a market average of 2.1x.

62. In early May 2020, however, Sycamore Partners pulled out of the deal, citing the difficulties posed to retailers by the coronavirus pandemic. At the time, L Brands was unable to find a willing buyer for Victoria's Secret at even a $1.1 billion valuation.

63. In August 2021—only 15 months later—L Brands successfully spun off Victoria's Secret as a standalone publicly traded company. Since it began trading on August 3, 2021, Victoria's Secret's market capitalization has never fallen below $4 billion, and as of December 8, 2021, it was valued at approximately $4.8 billion—0.72x sales. This represents an increase in value of more than $3.7 billion in market value for Victoria's Secret since these Actions began.

64. While some of this increase in value can be ascribed to general market conditions, improvement in the pandemic outlook, and changes to Victoria's Secret's marketing strategy that were already being implemented—such as the cancellation of the annual Victoria's Secret fashion show—it is worth noting that—just as much of the fall in the Company's stock price

preceded the onset of the pandemic—the recovery in the Company's value has preceded the end of the pandemic.  As the second "Risk Factor" listed in the Company's most recent annual report states, "the novel coronavirus (COVID-19) global pandemic has had and is expected to continue to have an adverse effect on our business and results of operations."  In particular, the effects of the pandemic are still ongoing and Victoria's Secret's sales are still well below pre-pandemic levels (~$6.6 billion in the past twelve months, compared to ~$7.5 billion in 2019).

65. As such, it appears likely that a substantial portion of the increase can be attributed to the Reforms instituted in response to these Actions.  As discussed above, this increase likely stems from a combination of better management as a result of the Reforms, a willingness of investors to pay higher prices for better-governed companies, and an improving brand reputation leading to improved sales.

66. It is very difficult to determine the precise contribution of the Reforms to the increase in market value, including because of the factors listed above such as improved outlook regarding the pandemic and marketing changes already underway at Victoria's Secret.  Even an extremely conservative estimate of 3%, based on the literature discussed in Section VI *supra*, however, yields an estimate at least $100 million in added value at Victoria's Secret alone.  L Brands as a whole has increased in market value by more than $10 billion since these Actions began.  Even if the Reforms are responsible for less than 1% of this increase, a highly conversative valuation, it would represent more than $100 million in stockholder value.

## **CONCLUSION**

For the above reasons, I believe that the Reforms that have resulted from these Actions deliver substantial value to the Company and its stockholders.  As demonstrated by market evidence, the prior misconduct at the Company was enormously costly for the Company and its

stockholders. A recurrence could be expected to have an equal, or even more, devastating impact, and the Reforms will meaningfully reduce the chance of such a recurrence. Multiple approaches to valuing the Reforms—an event study to estimate the expected loss averted; empirical research on the value of similar reforms; and the increase in market value as the Reforms have been announced and implemented—all point to a value for the Reforms in excess of $100 million. As a result, it is my opinion that that ascribing a value of $100 million to the corporate reforms contained in the Proposed Settlement is reasonable, and well within the range of value-creation-in-fact.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

Dated: December 14, 2021
Charles R. Korsmo

# EXHIBIT 1

# CHARLES R. KORSMO

11075 East Boulevard
Cleveland, OH 44106
crk64@case.edu
216-618-2687

## CURRENT POSITION

**Case Western Reserve University School of Law**, 2011 – present
Professor of Law
Courses: Business Associations, Mergers & Acquisitions, Corporate Finance, Torts

## EDUCATION

**YALE LAW SCHOOL**, New Haven, CT
J.D., 2006
William K.S. Wang Prize, best performance in Business Organizations
Moot Court

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, Cambridge, MA
B.S., Physics, 2000
Sigma Xi, Scientific Research Society
Thesis: "Possible Forms and Probable Consequences of a Time-Dependent Cosmological 'Constant'"

## PUBLICATIONS

*The Single-Owner Standard and the Public-Private Choice* (forthcoming 2022 in the Journal of Corporation Law)

*What do Stockholders Own? The Rise of the Trading Price Paradigm in Corporate Law* (forthcoming 2022 in the Journal of Corporation Law)

*Information Bundling, Disclosure, and Judicial Deference to Market Valuations,* 62 B.C. L. Rev. 571 (2021)

*Lead Plaintiff Incentives in Aggregate Litigation*, 72 Vand. L. Rev. 1923 (2019) (with M. Myers)

*Delaware's Retreat from Judicial Scrutiny of Mergers*, 10 U.C. Irvine L. Rev. 55 (2019)

*2018 Leet Symposium: Fiduciary Duty Corporate Goals, and Shareholder Activism— Introduction*, 69 Case W. Res. L. Rev. 843 (2019) (invited symposium introduction)

*The Flawed Corporate Finance of* Dell *and* DFC Global, 68 Emory L.J. 221 (2018) (with M. Myers)

> Cited:
> - In re Stillwater Mining Company, 2019 WL 3943851 (Del. Ch. 2019)
> - In re Appraisal of Columbia Pipeline Group, Inc., 2019 WL 3778370 (Del. Ch. 2019)

*The Audience for Corporate Disclosure* 102 Iowa L. Rev. 1581 (2017)

*Selling Stock and Selling Legal Claims: Alienability as a Constraint on Managerial Opportunism* 70 Ok. L. Rev. 215 (2017) (invited symposium article)

*Illegality and the Business Judgment Rule* (Research Handbook on Shareholder Litigation (Edward Elgar Publishing) (book chapter) (2017))

*Recent Developments in Stockholder Appraisal* (Research Handbook on Shareholder Litigation (Edward Elgar Publishing) (book chapter) (2017)) (with M. Myers)

*Reforming Modern Appraisal Litigation*, 41 Del. J. of Corp. L. 279 (2017) (with M. Myers)

> Cited:
> - In re Appraisal of Columbia Pipeline Group, Inc., 2019 WL 3778370 (Del. Ch. 2019)
> - Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC, 2018 WL 3326693 (Del. Ch. 2018)
> - ACP Master, LTD. v. Sprint Corp. CA-8507-VCL (July 21, 2017)
> - In re Appraisal of Dell, Inc. CA-9322-VCL (May 31, 2016)

*Interest in Appraisal*, 42 J. of Corporation Law 109 (2016) (with M. Myers)

> Cited:
> - In re Appraisal of Panera Bread Company, 2020 WL 506684 (Del. Ch. 2020)
> - Glidepath Limited v. Beumer Corporation, 2019 WL 855660 (Del. Ch. 2019)
> - In re Oxbow Carbon LLC Unitholder Litigation, 2018 WL 3655257 (Del. Ch. 2018)
> - Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., 2018 WL 2315943 (Del. Ch. 2018)

*The Reasonable Person Standard: A New Perspective on the Incentive Effects of a Tailored Negligence Standard*, 41 Eur. J. of L. & Econ. 459 (2016)

*Aggregation by Acquisition: Replacing the Class Action with a Market for Legal Claims*, 101 Iowa L. Rev. 1323 (2016) (with M. Myers)

*The Deterrence Value of Stockholder Appraisal* (with M. Myers), Research Handbook on Mergers & Acquisitions (Edward Elgar Publishing) (book chapter) (2016)

*Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U. L. REV. 1551 (2015) (with M. Myers)

> Named as one of the top 10 corporate and securities articles of 2016 by *Corporate Practice Commentator* at Georgetown Law

> Featured in the N.Y. Times, Wall Street Journal, Reuters, and Bloomberg.

> Cited:
> - In re Appraisal of Columbia Pipeline Group, Inc., 2019 WL 3778370 (Del. Ch. 2019)
> - Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC, 2018 WL 3326693 (Del. Ch. 2018)
> - ACP Master, LTD. v. Sprint Corp. CA-8507-VCL (July 21, 2017)
> - Merion Capital LP v. Lender Processing Services, CA-9320-VCL (Dec. 16, 2016)
> - In re Appraisal of Dell, Inc., CA-9322-VCL (May 31, 2016)
> - In re Appraisal of Dell, Inc., 2015 WL 4313206, Ruling on Motion to Dismiss (Del. Ch., Jul. 13, 2015)
> - In re Appraisal of Dole Food Company, Inc., CA-9079-VCL, Ruling on Motion to Dismiss (Feb. 13, 2015)
> - In re Ancestry.com, Inc. 2015 WL 68825 (Del. Ch., Jan. 5, 2015);
> - Merion Capital LP v. BMC Software, Inc., 2015 WL 67586 (Del. Ch., Jan. 5, 2015);
> - In re Orchard Ent. Stockholder Litig., 2014 WL 4181912 (Del. Ch., Aug. 22, 2014).

> *Selected for reprint in* 58 Corporate Practice Commentator (2016)

*High-Frequency Trading: A Regulatory Strategy*, 48 U. RICH. L. REV. 523 (2014)

> *Reprinted at* 47 Securities Law Review (2015)

*Market Efficiency and Fraud on the Market: The Danger of* Halliburton, 18 LEWIS & CLARK L. REV. 827 (2014)

*The Structure of Stockholder Litigation: When do the Merits Matter?* 75 OHIO ST. L. REV. 829 (2014) (with M. Myers)

> Selected for 2013 Harvard/Yale/Stanford Junior Faculty Forum

> Cited:

- In re Appraisal of Dell, Inc., 2015 WL 4313206, Ruling on Motion to Dismiss (Del. Ch., Jul. 13, 2015)

*Competition and the Future of M&A Litigation*, 100 IOWA L. REV. BULL. 19 (2014) (with M. Myers)

Cited:
- In re Appraisal of Dell, Inc., 2015 WL 4313206, Ruling on Motion to Dismiss (Del. Ch., Jul. 13, 2015)

*Lost in Translation: Law, Economics, and Subjective Standards of Care in Negligence Law*, 118 PENN ST. L. REV. 285 (2013)

*Venture Capital and Preferred Stock*, 78 BROOK. L. REV. 1163 (2013)

*Mismatch: The Misuse of Market Efficiency in Market Manipulation Class Actions*, 52 WM & MARY L. REV. 1111 (2011)

Cited:
- Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467 (3d Cir. 2018)
- Fezzani v. Bear, Stearns & Co. Inc., 716 F.3d 18 (2d Cir. 2013)

*The Financial Crisis and the Business Judgment Rule*, 17 THE CORPORATE GOVERNANCE ADVISOR 1, January/February 2009, at 9 (with Robert Giuffra, Jr.)


## SELECTED PRESENTATIONS

2020 Winter Deals Conference, "Synergies in Appraisal," Brigham Young University Law School, March 2020 (refereed submission)

2019 Corporate & Securities Litigation Workshop, "Synergies in Appraisal," Boston University Law School, September 2019 (refereed submission).

2019 Winter Deals Conference, "Lead Plaintiff Incentives in Aggregate Litigation," Brigham Young University Law School, March 2019 (refereed submission)

Mergers & Acquisitions 2019: Advanced Trends and Developments, "Trends in Appraisal," Practicing Law Institute, New York City, January 2019 (invited presentation)

2018 Winter Deals Conference, "*Corwin v. KKR* and the Retreat of Judicial Scrutiny of Mergers," Brigham Young University Law School, March 2018 (refereed submission)

2018 National Business Law Scholars Conference, "*Delaware's Retreat from Judicial Scrutiny of Mergers*," University of Georgia Law School, June 2018 (refereed submission)

Ohio Division of Securities, 2018 Ohio Securities Conference, "The 2008 Financial Crisis—What's Changed in 10 Years?," October 2018 (invited presentation)

Law & Business Seminar, "*Corwin v. KKR* and the Retreat of Judicial Scrutiny of Mergers," Vanderbilt Law School, October 2017.

Ohio Division of Securities, 2017 Ohio Securities Conference, "Internet Offerings, Crowdfundings, Peer-to-Peer Lending & Other Current Topics in Securities Offerings," October 2017.

Oklahoma Law Review 2016 Symposium, "Alienability of Stockholder Claims," University of Oklahoma Law School, November 2016.

2016 Corporate Securities Litigation Workshop, "Illegality and the Business Judgment Rule," University of Illinois Law School, September 2016.

2016 Corporate Securities Litigation Workshop, "A Snapshot of Contemporary Appraisal Litigation and Related Legal Developments," University of Illinois Law School, September 2016.

2016 National Business Law Scholars Conference, "Interest in Appraisal" University of Chicago Law School, June 2016.

2016 Federalist Society Junior Faculty Colloquium, "The Audience for Corporate Disclosure," Annapolis, Maryland, June 2016

American Association of Law Schools Annual Meeting, Securities Law Panel, "Aggregation by Acquisition: Replacing Class Actions with a Market for Legal Claims," Washington, D.C., January 2016

Case Downtown Series, "Appraisal Arbitrage and the Future of Public Company M&A," City Club of Cleveland, October 2015.

American Association of Law & Economics Annual Meeting, "Aggregation by Acquisition: Replacing Class Actions with a Market for Legal Claims," Columbia Law School, May 2015.

2015 New Voices in Civil Justice Workshop, "Aggregation by Acquisition: Replacing Class Actions with a Market for Legal Claims," Vanderbilt Law School, May 2015.

2015 Federalist Society Annual Conference, Young Legal Scholars' Paper Panel, "Aggregation by Acquisition: Replacing Class Actions with a Market for Legal Claims," Washington, D.C., January 2015.

2014 Corporate & Securities Litigation Workshop, "Aggregation by Acquisition: Replacing the Class Action with a Market for Legal Claims," University of Richmond Law School, October 2014.

American Association of Law & Economics Annual Meeting, "Appraisal Arbitrage and the Future of Public Company M&A," University of Chicago Law School, May 2014.

Faculty Workshop, "Market Efficiency and Fraud on the Market: The Danger of *Halliburton*" Ohio State University School of Law, February 2014

Faculty Workshop, "Do the Merits Matter in Shareholder Appraisal?" University of Western Ontario Faculty of Law, December 2013

2013 Corporate & Securities Litigation Workshop, "Do the Merits Matter in Shareholder Appraisal?" University of Illinois Law School, November 2013

Southeastern Association of Law Schools Annual Conference, "Venture Capital and Preferred Stock," August 2013.

Harvard/Stanford/Yale Junior Faculty Forum, "The Law and Economics of Merger Litigation: Do the Merits Matter in Shareholder Appraisal?" Yale Law School, June 2013

National Business Law Scholars Conference, "The Law and Economics of Merger Litigation: Do the Merits Matter in Shareholder Appraisal?" Ohio State Law School, June 2013.

2013 Federalist Society Junior Scholars Colloquium, "The Law and Economics of Merger Litigation: Do the Merits Matter in Shareholder Appraisal?" Warrenton, Virginia, June 2013.

American Association of Law & Economics Annual Meeting, "The Law and Economics of Merger Litigation: Do the Merits Matter in Shareholder Appraisal?" Vanderbilt Law School, May 2013.

Canadian Association of Law & Economics Annual Meeting, "Safer at Any Speed: A New Model of Skill in Accident Law," University of Toronto, October 2012.

Case Western Reserve University School of Law, Summer Scholarship Workshop, "Venture Capital and Preferred Stock," July 2012.

Case Western Reserve University School of Law, Summer Scholarship Workshop, "Safer at Any Speed: A New Model of Skill in Accident Law," June 2012.

National Business Law Scholars Conference, "Flexibility and Preferred Stock," June 2012.

American Association of Law & Economics Annual Meeting, "Safer at Any Speed: A New Model of Skill in Accident Law," Stanford Law School, May 2012.

Brooklyn Law School, Brown Bag Series, "Mismatch: The Misuse of Market Efficiency in Market Manipulation Class Actions," March 2010.

## PROFESSIONAL EXPERIENCE

**CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW**, Cleveland, OH
*Professor*                                                             2017-present
Courses in Torts, Business Associations, Mergers & Acquisitions, and Corporate Finance.

**CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW**, Cleveland, OH
*Associate Professor*                                                 2015-present
Courses in Torts, Business Associations, and Corporate Finance.  U.S. Director of the Canada-U.S. Law Institute.

**CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW**, Cleveland, OH
*Assistant Professor*                                                    2011-2015
Courses in Torts, Business Associations, and Corporate Finance.  U.S. Director of the Canada-U.S. Law Institute.

**BROOKLYN LAW SCHOOL**, Brooklyn, NY
*Visiting Assistant Professor*                                        2009-2011
Courses in Torts and Land Use Controls.

**SULLIVAN & CROMWELL**, New York, NY
*Associate*                                                                   2007-2009

**HON. RALPH K. WINTER, JR.**, United States Court of Appeals for the Second Circuit
*Judicial Clerk*                                                             2006-2007

**PROF. HENRY HANSMANN**, Yale Law School
*Research Assistant*                                                       2005-2006

**SULLIVAN & CROMWELL**, New York, NY
*Summer Associate*                                                      Summer 2005

**PROF. ROBERTA ROMANO**, Yale Law School
*Research Assistant*                                                       2004-2005

**LeBOEUF, LAMB, GREENE & MACRAE**, Washington, D.C.
*Summer Associate*                                                      Summer 2004

**HOUSE SELECT COMMITTEE ON HOMELAND SECURITY**, Washington, D.C.
*Professional Staff Member*                                            2003

**HOUSE POLICY COMMITTEE**, Washington, D.C.               2002-2003
*Deputy Domestic Policy Director*

**ENVIRONMENTAL PROTECTION AGENCY**, Washington, D.C.
*Special Assistant*                                                          2001-2002

**<u>OTHER</u>**

- Selected for 2013 Harvard/Yale/Stanford Junior Faculty Forum for "Do the Merits Matter in Stockholder Appraisal?"
- Winner of Federalist Society Young Legal Scholars Paper Competition in 2015 and 2013
- Winner of Federalist Society Junior Scholars Colloquium Competition in 2016
- Named as author one of the top 10 corporate and securities articles of 2016 by Georgetown Law's *Corporate Practice Commentator* for "Appraisal Arbitrage and the Future of Public Company M&A"
- Nominated by President Obama and confirmed by the Senate to serve on the Board of Trustees of the Barry Goldwater Scholarship and Excellence in Education Foundation
- Starred in several major motion pictures, including "Dick Tracy," "What About Bob?" "Hook," and "Can't Hardly Wait"
- Appearances on "The Tonight Show," "The Arsenio Hall Show," "Donahue," and "Live! with Regis and Kathie Lee"
- Three Youth in Film Awards nominations; one win
- American Comedy Awards nomination
- Two-time Minnesota State Math League Champion

# EXHIBIT 2

<u>Materials Relied Upon</u>

*Articles, Books, & Other Secondary Sources*

Alexander Fish, Dong Hyun Kim, & Shankar Venkatraman, *The ESG Sacrifice* (2019) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3488475)

Alison M. Konrad, Vicki Kramer & Sumru Erkut, *Critical Mass: The Impact of Three or More Women Directors*, 37:2 Organizational Dynamics 145 (2008)

Bloomberg Intelligence, "ESG Assets May Hit $53 Trillion by 2025, a Third of Global AUM" (Feb. 23, 2021) (*available at* https://www.bloomberg.com/professional/blog/esg-assets-may-hit-53-trillion-by-2025-a-third-of-global-aum/)

Bradford Cornell, Corporate Valuation: Tools for Effective Appraisal and Decision-Making (1st ed. 1993)

Cristian L. Dezsö & David Gaddis Ross, Does Female Representation in Top Management Improve Firm Performance? A Panel Data Investigation, 33 Strategic Mgmt. J. 1072 (2012)

Emily Steel, et al., "Jeffrey Epstein's Opaque Finances Could Become Focal Point for Investigators," N.Y. Times (August 11, 2019)

Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 283 (1970)

George Serafeim, *Public Sentiment and the Price of Corporate Sustainability*, 76 Fin. Analysts. J. 26 (2020)

James B. Stewart, et al., "Jeffrey Epstein's Fortune May Be More Illusion Than Fact," N.Y. Times (July 10, 2019)

John Armour, Jeffrey N. Gordon & Geeyoung Min, *Taking Compliance Seriously*, 37 Yale J. Regulation 1 (2020)

Kevin Campbell & Antonio Mínguez-Vera, Gender Diversity in the Boardroom and Firm Financial Performance, 83 J. Bus. Ethics 435 (2008)

Maureen A. Weston, *Buying Secrecy: Non-Disclosure Agreements, Arbitration, and Professional Ethics in the #MeToo Era*, 2 U. Ill. L. Rev. 507 (2021)

McKinsey & Company, Investor Opinion Survey on Corporate Governance (June 2000) (*available at* https://www.oecd.org/daf/ca/corporategovernanceprinciples/1922101.pdf)

O.D. Zerbib, *A Sustainable Capital Asset Pricing Model (S-CAPM): Evidence from Green Investing and Sin Stock Exclusion* (2019) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455090)

Richard A. Brealey, Stewart Myers & Franklin Allen, Principles of Corporate Finance (2008)

Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I. Technique and Corporate Litigation*, 4 AM. L. & ECON. REV. 141 (2002)

Sanjai Bhagat & Roberta Romano, *Empirical Studies of Corporate Law* (in Handbook of Law and Economics), A. Mitchell Polinsky and Steven Shavell, eds. (2006)

Shiu-Yik Au, Ming Dong, & Andreanne Tremblay, *Employee Sexual Harassment Reviews and Firm Value* (2021) (*available at* https://ssrn.com/abstract=3437444)

Shiu-Yik Au, Andreanne Tremblay, & Leyan You, *Does Board Gender Diversity Reduce Workplace Sexual Harassment* (2021) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3667087)

Solomon Asch, *Opinions and Social Influence*, 193 SCIENTIFIC AMERICAN 31 (1955)

Steve Eder and Emily Steel, "Epstein Took 'Vast Sums,' Tycoon Says," N.Y. TIMES (August 8, 2019)

Terry Dworkin & Cindy Schipani, *The Role of Gender Diversity in Corporate Governance*, 21 U. PENN. J. OF BUS. L. 105 (2018)

Tim Koller, Marc Goedhart & David Wessels, Valuation: Measuring And Managing The Value Of Companies (2010)

Vicente Cunat, Mireia Gine & Maria Guadalupe, *The Vote is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. OF FIN. 68 (2012) (*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1555961)

### *Case Materials*

*Lambrecht v. Wexner, et al.*, Case No. 2021-0029, ECF No. 3, Verified Stockholder Derivative Complaint, originally filed May 16, 2020 (S.D. Ohio)

*Rudi v. Wexner, et al.*, Case No. 2:20-cv-3068, ECF No. 21, Stipulation and Agreement of Settlement and exhibits thereto, July 30, 2021 (S.D. Ohio)

*Rudi v. Wexner, et al.*, Case No. 2:20-cv-3068, Verified Stockholder Derivative Complaint, May 16, 2020 (Del. Ch.)

*Giarratano v. L Brands*, Case No. 2020-0437, Verified Complaint to Compel Inspection of Books and Records, June 4, 2020 (Del. Ch.)

Stockholder demand letters, including (1) the stockholder litigation demands made by Milton Rudi (dated February 6, 2020; supplemented April 3, 2020); Nancy Lambrecht, Co-Trustee of the Amanda Greenfield 2012 Irrevocable Trust (dated July 10, 2020); and Detroit Police and Fire Retirement System (dated February 23, 2021); (2) the books and records demands made by Oregon Department of Justice, as chief legal advisor to the Oregon State Treasurer, on behalf of the Oregon Public Employee Retirement Fund (dated February 7, 2020; supplemented February 25, 2020 and May 7, 2020); John Giarratano (dated February 12, 2020); and Maryann Kualii (dated September 4, 2020).

## *Financial Information*

Morningstar, Bath & Body Works, listing the company's market capitalization and revenue, https://www.morningstar.com/stocks/xnys/bbwi

Morningstar, Victoria's Secret, listing the company's market capitalization and revenue, https://www.morningstar.com/stocks/xnys/vsco

L Brands, Inc., Form 8-K, dated August 14, 2019 (*available at* https://www.bbwinc.com/static-files/9b778065-ac7a-4fa4-8fa4-6943b0ae57fb)

L Brands 2021 Proxy Statement and 2020 Annual Report (*available at* https://materials.proxyvote.com/Approved/501797/20210326/COMBO_464048/INDEX.HTML?page=12)

## *Legal Authority*

*Applebaum v. Avaya, Inc.*, 812, A.2d 880, 889-90 (Del. 2002)

*DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369-70 (Del. 2017)

*Poole v. N. V. Deli Maatschappij*, 243 A. 2d 67, 70 n.1 (Del. 1968)